JUDGE NATHAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 14 CV 5739

| | |
|---|---|
| United States of America and State of New York, *ex rel.* Edward Lacey, | Civil Action No. |
| Plaintiff, | To Be Filed *in camera* and Under Seal |
| v. | **Complaint for Violations of the Federal and New York State False Claims Acts** |
| Visiting Nurse Service of New York, | |
| Defendant. | |

FILED
U.S. DISTRICT COURT
SDNY 2014 MY 28 PM 9: 11

Relator Edward Lacey brings this *qui tam* action on behalf of the United States and New

York State against Visiting Nurse Service of New York ("VNSNY") under the federal False

Claims Act, 31 U.S.C. §§ 3729-3733, and the New York False Claims Act, New York Finance

Law §§ 187-194, and alleges -- upon knowledge with respect to his own acts and those he

personally witnessed, and upon information and belief with respect to all other matters -- as

follows:

## INTRODUCTION

1. This case is about the long-standing efforts of VNSNY -- one of the oldest, largest

and most storied home health care agencies in the country -- to extract from Medicare and

Medicaid hundreds of millions of dollars in illegal proceeds through improper and inflated

billings.

2. VNSNY's scheme involves four basic frauds against the federal government and

the State of New York. First, VNSNY has submitted (and continues to submit) claims to

Medicare and Medicaid for home health care services it does not actually provide. This includes

billing for but not providing the home care visits and services specifically ordered by the treating

physician in the patient's Plan of Care; falsifying the patient time and service records of VNSNY

nurses; and billing for personal care services when they in fact are non-reimbursable custodial care services such as cleaning, cooking and shopping.

3.    Second, VNSNY has submitted (and continues to submit) inflated or non-reimbursable claims to Medicare and Medicaid.  It has done so by overbilling the more lucrative Medicaid program for dually-eligible patients (*i.e.*, those eligible for both Medicare and Medicaid); steering long-term care patients to the Medicaid program that provided the highest reimbursement without regard to which program provided the most appropriate medical care; and billing for services not medically necessary or even ordered by the treating physician.

4.    Third, VNSNY has failed to comply with numerous conditions of payment under the Medicare and Medicaid programs.  This includes not complying with even the threshold requirement of securing the physician's authorization on the Plan of Care before VNSNY begins treatment.  It also includes not complying with a host of other documentation, authorization and medical supervision requirements which are absolute prerequisites to reimbursement, not to mention safe and effective patient care.

5.    And fourth, VNSNY provides numerous kickbacks to hospitals, nursing homes and physicians to induce them to refer their patients to VNSNY for home care services.

6.    As a result of VNSNY's multi-faceted campaign of fraud against the government, VNSNY has, since at least 2004, billed and collected from Medicare and Medicaid hundreds of millions (if not billions) of dollars to which it was never entitled.

7.    But beyond this massive financial fraud on the government, the ultimate victims here are the tens of thousands of elderly, disabled and impoverished New York residents who, because of VNSNY's misconduct, have not been receiving the critical home health care services they require and their physicians have prescribed.

8.      Relator Lacey brings this action to stop VNSNY from continuing to engage in this fraudulent activity and to recover on behalf of the United States and the State of New York the hundreds of millions (if not billions) of dollars it has paid VNSNY in inflated and improper charges.

## PARTIES

9.      Relator Lacey has been employed at VNSNY for fifteen years.  He currently holds the position of Vice President of Operations Improvement and Integration.  His responsibilities include the development and implementation of strategies to ensure operational best practices and the delivery of standardized and cost effective services throughout the company.  He reports to Kevin Rogers, Senior Vice President and Chief Administrative Officer, who in turn reports directly to Mary Ann Christopher, VNSNY's President and Chief Executive Officer.

10.      Relator Lacey previously worked as VNSNY's Vice President of Finance, and before that held several director-level positions in different VNSNY departments, including Patient Accounts and Children and Family Services.  He has a B.A. in Business from the State University of New York at Albany.  He also has a certificate from New York University in health care financial management and a certificate from the NYS Insurance Department in Group Health and Life Insurance.

11.      As part of his general duties, Relator Lacey regularly meets with VNSNY's other senior management.  On numerous occasions over the past two years, Relator Lacey has raised with management -- including Ms. Christopher, Mr. Rogers, Chief of Provider Services Regina (Regie) Hawkey, President and Chief Operating Officer of Home Care Joan Marren, and

numerous other members of VNSNY's top management -- all of the areas of VNSNY's misconduct alleged herein.  But the company has refused to take any corrective action.

12.     Established in 1893, VNSNY is the largest not-for-profit home health care agency in the country.  It provides home health care services through more than twenty-five licensed agencies to approximately 150,000 patients per year in the five boroughs of New York City and Nassau, Suffolk, Westchester and other upstate New York counties.  The core services it provides include skilled nursing, rehabilitation therapy (physical, occupational, and speech), social work, nutrition counseling and personal and custodial care services.  The majority of the company's patients are beneficiaries under Medicare and Medicaid, and under the federally-funded "Medicare Advantage" programs managed by private insurance companies.  The company employs roughly 20,000 employees and has annual revenues of more than $2 billion. It has offices in all the boroughs of New York City, and Nassau and Westchester Counties.  Its corporate headquarters is located at 107 E. 70th Street in New York.  Relator Lacey's office is located at 1250 Broadway in New York.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 1367 and 31 U.S.C. § 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

14.     Under 31 U.S.C. § 3730(e)(4)(A) and N.Y. Fin. Law § 190(9)(b), there has been no statutorily relevant public disclosure of substantially the same "allegations or transactions" alleged in this complaint.  To the extent there has been any such public disclosure, Relator Lacey meets the definition of an original source, as that term is defined under 31 U.S.C. § 3730(e)(4)(B) and N.Y. Fin. Law § 188(7).

15.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §
1391(b) and (c) because VNSNY transacts business in this judicial district, and the acts
proscribed by 31 U.S.C. § 3729 and N.Y. Fin. Law § 187 have been committed by VNSNY in
this District.

## REGULATORY BACKGROUND

16.     Health care providers under Medicare and Medicaid are required to comply with a
strict set of certification and documentation requirements.  The government has established these
requirements to ensure the money it pays out under these federally and state funded programs are
for services that are medically necessary and actually provided.  As part of its scheme to bill the
government for improper and inflated charges, VNSNY has routinely failed to comply with these
obligations.

Home Health Care Services Under Medicare

17.     Congress established the Medicare program in 1965 to provide health insurance
coverage for people age 65 or older and for people with certain disabilities or afflictions.  The
United States Department of Health and Human Services Centers for Medicare and Medicaid
Services ("CMS") administers Medicare and the federal government's other health programs.
The Medicare programs relevant to home health care services are Medicare Parts A, B and C.
Medicare Part A is the program predominately used to cover these services.  Medicare Part B
covers doctors' services and outpatient care, as well as certain home health care services not
covered under Part A.  Medicare Part C, also known as Medicare Advantage, is where private
health insurance companies contract with Medicare to provide Medicare Part A and Part B
benefits.

18.    There are six categories of home health care services Medicare covers -- skilled nursing, home health aide services (such as bathing, dressing, and feeding), physical therapy, speech-language pathology, occupational therapy, and social services.    Medicare coverage for the package of home health services a particular patient needs is broken out into 60-day periods, each referred to as an "episode of care."

19.    For each episode of care, a physician must certify -- or after the initial 60-day episode, recertify -- the patient's eligibility for the prescribed home health care services.    This certification must provide that: (i) home health care services are required because the individual is confined to his or her home and needs care or therapy on an intermittent basis; (ii) a "Plan of Care" for furnishing the services has been established (which is periodically reviewed by the physician); and (iii) the services are being furnished while the patient is under the physician's care. *See* 42 U.S.C. § 1395f (a)(2)(C); 42 C.F.R. § 422.22.

20.    The Plan of Care that is part of the certification must include: (i) the physician's signature; (ii) the medical necessity of the prescribed home health care services; (iii) all pertinent diagnoses; (vi) the types of services and equipment required; (v) the frequency of visits; (vi) the patient's prognosis; (vii) the patient's rehabilitation potential; (viii) functional limitations on the patient's progress; (ix) activities permitted; (x) nutritional requirements; (xi) medications and treatments; (xii) any safety measures to protect against injury; and (xiii) instructions for discharge or referral.  42 C.F.R. § 409.43.  The Plan of Care must be reviewed by a physician, in consultation with home health agency personnel, at least every 60 days.  42 C.F.R. § 409.43(e). Any changes to the Plan of Care must be signed by a physician.  42 C.F.R. § 409.43.

21.    All certifications (made after January 1, 2010) must also document that the physician, or nurse practitioner or clinical nurse specialist working with the physician, has had a

face-to-face encounter ("FFE") with the patient.  42 U.S. Code § 1395f(a)(2)(C); 42 C.F.R. §

422.22.  FFE documentation must be a separate and distinct section of the physician certification,

clearly titled, dated and signed by the certifying physician.  *Id.*  If a non-physician practitioner is

performing the FFE, he or she must document the clinical findings of that FFE and communicate

those findings to the certifying physician.  *Id.*

   22. The amount of Medicare reimbursement for an episode of care is based largely on

a patient assessment form called the Outcome Assessment Information Set ("OASIS") form,

which is generally completed by a registered nurse or physical therapist.  Critical factors of the

reimbursement rate include diagnosis coding, the degree of services required, and the degree of

functional impairment of the patient.  If, after the completion of an episode of care, the patient

needs additional home services, the home health provider must recertify the patient for a new

episode of care.  This incorporates OASIS elements and is used to determine whether the patient

is still eligible for home health services and, if so, the applicable reimbursement rate.

   23. In order to be eligible for Medicare reimbursement, a health care provider must

submit an enrollment application to CMS and obtain a provider number.  As part of the

application, the health care provider must agree to abide by all Medicare laws, regulations, and

applicable program instructions.  Likewise, every time a provider submits a claim for Medicare

payment, it certifies the claims are true, correct and complete and that the underlying health care

services it provided comply with all applicable laws, regulations, and Medicare program

instructions, including all conditions of payment.

   24. Medicare pays home health care providers under a prospective payment system

which is a predetermined base rate that represents payment in full for all costs associated with

furnishing home health services for each 60 day episode of care.  42 C.F.R. §§ 484.200,

484.205.  The predetermined base rate for each episode of care may be adjusted upward when a patient requires excess care (which triggers a higher base payment known as an "outlier" payment) or downward when the patient requires less care.  42 C.F.R. §§ 484.205(b); 484.205(e).

25.     Under this system, Medicare pays the provider upfront 60 percent of the total expected payment for that patient's initial 60-day episode of care (and 50 percent upfront for each additional episode).  42 C.F.R. § 484.205(b).  At the end of each 60-day episode period, the home health care provider submits a request for the remaining 40 or 50 percent due.  Medicare then pays the provider the requested balance.  42 C.F.R. § 484.205(b).

26.     Prior to receiving any payment, the home health care provider must submit to Medicare a Request for Anticipated Payment ("RAP") at the beginning of every 60 day episode of care.  42 C.F.R. § 409.43(c)(2).  The RAP may only be submitted after: (1) the OASIS assessment is complete; (2) a Plan of Care has been established; (3) the Plan has been signed by the treating physician or the physician's verbal orders for home care have been received and properly documented by the provider; and (4) the first service visit under the Plan of Care has been delivered.  42 U.S.C. § 1395f(a)(2)(C); 42 C.F.R. § 422.22.  Prior to receiving the residual payment at the end of each episode of care, the Plan of Care must be signed by the overseeing physician.  42 C.F.R. § 409.43(c)(3).

Home Health Care Services Under Medicaid

27.     Medicaid is a joint federal-state health benefits program generally available to low-income adults and their children, as well as individuals with certain disabilities.  The federal and state governments jointly fund Medicaid.  Each state administers its Medicaid program in

—

accordance with a CMS-approved state plan.  The Department of Health administers Medicaid for New York State.

28.      All claims submitted to Medicaid for reimbursement must comply with all applicable Medicare requirements, including the conditions of payment outlined above such as the physician certification of eligibility, Plan of Care documentation and FFE documentation.

29.      In addition, New York State Medicaid requires a home health care provider receive a signed Plan of Care within 30 days of the start of care, a change in the Plan of Care or a recertification of patient eligibility for care.  Medicaid will not pay the claim or will seek a refund of a paid claim where the physician's signature is received more than 60 days from these triggering events.  10 NYCRR § 763.7(a)(3)(i)-(iii).  New York State Medicaid also requires that home health care providers bill for services within 90 days of providing the service.

## VNSNY HAS DEFRAUDED MEDICARE AND MEDICAID THROUGH IMPROPER AND INFLATED BILLINGS

30.      VNSNY has defrauded the government in four key ways: (i) billing Medicare and Medicaid for services it did not provide; (ii) submitting inflated or non-reimbursable claims to Medicare and Medicaid for services it did provide; (iii) failing to comply with numerous Medicare and Medicaid conditions of payment or other prerequisites for full payment or reimbursement; and (iv) providing financial inducements to hospitals, nursing homes and physicians in exchange for home health care patient referrals.  With each of these areas of misconduct, VNSNY's objective has been exactly the same: secure the highest level of reimbursement from the government with complete disregard for the medical needs or well-being of the elderly, impoverished and disabled patients the government is paying VNSNY to serve.

9

## I.    VNSNY BILLS MEDICARE AND MEDICAID FOR HOME HEALTH CARE SERVICES IT DOES NOT PROVIDE

### A.    VNSNY Bills For But Does Not Provide All the Visits and Services Prescribed in the Plans of Care

31.    Physicians who refer patients to VNSNY order specific home health care services (*i.e.*, rehabilitation services, skilled nursing, personal care, etc.) and the frequency at which those services are to be provided to each patient.  These instructions are outlined in the Plan of Care which triggers each patient's episode of care on which Medicare and Medicaid reimbursement is based.  Despite the explicit directions in the Plan of Care, VNSNY systematically ignores them by (i) failing to provide either the actual number of visits or the services directed to occur during those visits; or (ii) failing to start or provide care on the date or for the frequency the physician has ordered.

32.    A major reason for VNSNY's failure to follow the Plan of Care is the company's mandatory policy of accepting all referrals regardless of whether the company has the ability to actually handle them.  This is a policy that has been strictly imposed and rigidly enforced by the top management at VNSNY, including CEO Christopher.  Indeed, at a May 14, 2014 meeting Relator Lacey attended, Ms. Christopher reminded her direct reports that they are to take *all* referrals in *all* health care areas regardless of whether VNSNY has the capacity to handle them. She did this fully understanding that VNSNY does not actually have the capacity to handle the workload.

33.    On that same day, Relator Lacey was present when Michael Bernstein, VNSNY Senior Vice President and Chief of Sales and Marketing, instructed Donna Lichte, Senior Vice President of Enterprise Sales and Marketing, to "withdraw whatever instructions you have given the hospitals on not being able to take Rehab cases.  Mary Ann [Christopher] just screamed at me

10

for an hour.  She said we take every referral for everyone.  What the fuck!"  This berating by Ms. Christopher was triggered by Mr. Bernstein and Ms. Lichte telling certain referring hospitals a few days earlier that VNSNY was unable to provide timely services and would have to limit the amount of referrals that VNSNY could accept.

34.     This VNSNY "accept all referrals" policy seriously threatens the health and safety of its patients because it results in their not receiving the medical treatment prescribed by their treating physicians.  It also runs directly counter to the Medicare rule prohibiting a home health care provider from retaining patients it does not have the capacity to handle.  When a provider is unable to deliver the services ordered in the Plan of Care, it must immediately provide written notice (through a Home Health Change of Care Notice or a Skilled Nursing Facility Advance Beneficiary Notice) so the patient can find an alternative provider.  *See* 42 U.S. Code § 1395bbb(a)(1)(A)-(E)(i)-(iv).  As VNSNY Manager of Rehabilitation Professional Practice Joe Gallagher admitted to Relator Lacey, VNSNY "never" follows these requirements per the direction of VNSNY's top management.

35.     As estimated by Mr. Gallagher at a meeting he had with Relator Lacey and other VNSNY executives on May 28, 2014, VNSNY's failure to provide its patients the services ordered in their Plan of Care -- and for which the government pays VNSNY in full -- affects roughly half its patients.  This estimate is further borne out in the various reports VNSNY issues that track the delivery of its health care services.

36.     For example, an April 22, 2014 VNSNY report titled "Rehab Delays 4-22-14.xls" shows out of approximately 5,000 patients referred for rehabilitation services, VNSNY failed to provide the prescribed and paid for physical therapy, occupational therapy and/or speech therapy services for 2,574 of them.

11

37.     A similar example comes from a May 26, 2014 report titled "UNDER_OVER

UTILIZATION REPORT [#2024374].pdf," which compares the services ordered in the Plan of

Care of VNSNY patients to the services VNSNY actually provided.  This particular report shows

that of the 22 patients reviewed, none of them received all the services prescribed in the Plan of

Care and for which VNSNY received full reimbursement.  In fact, 17 of the 22 patients had not

received any services at all during the period reported.  This report is a sample from a larger

report showing that roughly 400 patients did not receive all the services prescribed in their Plans

of Care.

38.     And yet another example comes from a report titled "Late Starts of Care as of

May 29, 2014."  It shows that for the period covered, there were more than 1,800 patients who

had yet to receive any home health care visits even though it was well past the date the Plan of

Care directed the first visit take place and for which VNSNY had already received

reimbursement.

39.     These reports represent just a small sampling of the overwhelming evidence

contained in the files of VNSNY demonstrating the company's widespread and longstanding

practice of ignoring what is contained in their patients' Plans of Care, but nevertheless billing

Medicare and Medicaid in full.

40.     In failing to provide these doctor-ordered services, VNSNY has not only falsely

billed Medicare and Medicaid for services it did not provide.  It has also seriously endangered

the welfare of its patients, many of whom are very sick and require health care services

immediately or soon after they are released from the hospital.  A delay in providing this care, or

a failure to provide it at all, can have significant adverse consequences on the patient's ultimate

recovery, including the need for re-hospitalizations.  Relator Lacey estimates VNSNY's

systematic failure to follow their patients' Plans of Care has resulted in the needless re-hospitalization of tens of thousands of its patients.

41.     The scope of VNSNY's failure to provide its patients with the level of care they require is increasing and engendering a growing chorus of complaints.  As Yvonne Eaddy, who oversees VNSNY home health care services in Brooklyn, told Relator Lacey on May 6, 2014: "there has been an explosion of complaints from hospitals, doctors, and patients" about VNSNY's failure to provide necessary rehabilitation services as prescribed in the Plans of Care. She said that "part of the problem is we provide Rehab to patients who don't even need it and then we can't deliver to the ones who really do."

42.     At a meeting Relator Lacey attended on April 11, 2014 with several other VNSNY vice presidents, there was a discussion on how the company regularly accepts patients when it is abundantly clear it will not be able to provide the health care services prescribed for and required by the patients.  Ms. Eaddy indicated that in her region alone, she had 600 patients for which VNSNY was unable to provide the therapy service ordered in the patients' Plan of Care.  She further complained that even if VNSNY were to now provide the prescribed health care services, it would be too late for the patients to derive any benefit.

43.     At this same meeting, Ginny Field, who oversees VNSNY in Manhattan, said she too had around 600 patients in her region for which VNSNY was failing to follow the Plan of Care.  And Eloise Goldberg, who oversees VNSNY in Queens, echoed these same concerns, pointing to a complaint she had received that morning involving VNSNY accepting a referral for a patient who required speech therapy even though it did not have any available speech therapists to provide the required services.

13

44.     As Ms. Goldberg articulated during the May 28 executive meeting, all these failures are damaging VNSNY's reputation and causing some to begin referring to the company as "the 'No' Visiting Nurse Service."

45.     Relator Lacey again met with Ms. Field to discuss this issue on July 9, 2014.  She stated that VNSNY Chief of Provider Services Regie Hawkey "warned me not to put any of this in writing because it will create even bigger troubles" for the company.  Ms. Field then stated she is "not going down for this shit" and "one of us has to speak up."

46.     At a July 11, 2014 meeting with various regional vice presidents, Ms. Hawkey and other top management, VNSNY Regional Vice President for the Bronx and Westchester Jill Goldstein said several times that VNSNY is "out of compliance" and "unable to provide safe care and services" to its patients.  She described the state of the company as a "grave situation" and explained that the VNSNY Customer Service department is receiving "complaints and threats from physicians, patients, family members, and hospitals."  She said "we overload the staff and cases fall through the cracks."  Ms. Field agreed that there are referrals that "we cannot assign at all.  There are staff availability" issues.  Ms. Goldstein said that part of the problem is that VNSNY Intake Coordinators receive bonuses based on the number of referrals they generate.

47.     Despite these numerous failures to provide the care ordered by the patient's physicians -- and even when it knows at the outset it cannot provide the necessary services -- VNSNY has, for tens of thousands of patients every year, accepted the referrals and billed for and received reimbursement for the full amount of services the Plan of Care prescribed.

**B.      VNSNY Nurses Falsify Patient Time and Service Records**

48.      To comply with New York State Medicaid Verification Organization requirements, VNSNY requires its nurses to verify each home health care visit they make by obtaining the patient's electronic signature (on a tablet computer) and calling from the patient's phone into the VNSNY Professional Call-in System to log the end time of their visit.  The Call-in System "time-stamps" these signatures and phone calls. VNSNY institutes these measures to verify for internal auditing purposes that the visit occurred, what services were provided and the length of each visit.

49.      Despite having this system, VNSNY knowingly fails to enforce it.  It does so despite full knowledge that a large portion of its nursing staff has been cheating this verification system for the past decade.  VNSNY nurses routinely forge patient signatures, falsify their time entries, fail to call in from the patient's phone, miscode visits to elicit double payments (by receiving both hourly and per visit payments), or simply ignore the verification requirements altogether.  Yet, VNSNY has taken no action to correct this fraudulent activity.

50.      VNSNY nurses benefit from this fraudulent activity because it inflates the number of visits and total visiting hours on which their compensation is based.  It is particularly lucrative for salaried nurses who are paid based on a seven-and-a-quarter-hour work day and entitled to additional per diem pay when they work outside their regular business hours.  Internal VNSNY reports show that numerous VNSNY nurses earn up to double their base salary without actually exceeding these threshold hourly minimums.

51.      But it is not just the VNSNY nurses who benefit from this fraudulent billing activity.  VNSNY benefits too by billing for and receiving Medicare and Medicaid

15

reimbursement for home care visits and services that did not happen or did not involve the type or length of care reported.

52.     Based on standard industry practice, the average VNSNY nurse should be providing roughly 1,100 thirty-seven-minute (on average) home health care visits per year or an average of five-and-a-half to six visits per day (based on 210 days in field, accounting for holidays, vacation and training).  However, VNSNY "Signed Visit" reports (which record patient signature and nurse call-in information) show thousands of VNSNY nurses routinely log visits well in excess of this amount -- sometimes by thousands of visits.

53.     One VNSNY nurse in Brooklyn, for example, entered time for 4,000 home visits in 2013, amounting to roughly 20 visits per day.  Not only is this four times the industry standard.  It is an amount of home visits that realistically could not be made in a single day, let alone every day for an extended period of time.  Another VNSNY nurse went even further, logging 28 home care visits in a single day.  These examples of such extreme overbilling are not uncommon.  The VNSNY Signed Visit reports show numerous nurses recording these kinds of impossible numbers.

54.     These internal reports -- which VNSNY has been keeping for years -- also show clear patterns of the fraud and abuse in which VNSNY nurses have engaged to falsify or pad their patient visits and hours.  Among their more questionable practices are submitting the patient's supposed signature but not calling in from the patient's phone; calling in but not submitting the patient's signature; submitting the patient's supposed signature but calling in from a different patient's residence; submitting the patient's supposed signature several hours after making the call from the patient's phone; submitting multiple patient signatures within a window too narrow to deliver any services, let alone the home care services on which the patients

supposedly signed off; and miscoding visits with the per diem rate to receive additional pay to which the nurse is not entitled.

55.     Additional examples of specific VNSNY nurses engaging in this dubious activity come from an audit Relator Lacey conducted of random VNSNY Signed Visit reports for the three-month period of January 1 through March 21, 2014:

- A salaried nurse in Brooklyn logged 831 visits for this period.  She did not obtain the required patient signature on 228 of those visits, and did not use the call-in system for 314 of the visits.  She coded 419 of these visits as per diem visits (entitled to additional per visit pay) even though they all occurred during regular business hours.  In addition, the verifications for at least 221 of the visits were likely fraudulent given their questionable timing.  As just one example, on January 22, 2014, she claimed to have completed two different visits within a minute of each other at two different Brooklyn locations.

- A salaried nurse in Queens logged 384 visits for this period.  She did not call in for a single one of these visits, but submitted what were supposedly the patients' signatures for all of them.  However, the timing of the signatures shows that many, if not most, of them were likely forged.  As just one example, on March 1, 2014, she allegedly visited and received signatures from eight different patients between 7:20 AM and 8:25 AM (which amounts to roughly 8 minutes per patient visit).  Even though her visits were occurring between 7:00-10:00 AM, she earned a full-time wage and an additional $5,000 in per-visit pay.

- A salaried nurse in Manhattan logged 859 visits for this period.  She did not use the call-in system for 372 of these visits and did not obtain the patient signature for 717 of them.  She coded 200 of these visits as per diem visits (entitled to additional per visit pay) even though they all occurred during regular business hours.  On one particularly egregious day, she logged 20 visits during her regular work day, used her per diem code to collect an additional $650 in compensation and was unable to secure the signature of even one of the patients she supposedly visited.

- A salaried nurse in Queens logged 437 visits for this period.  She did not use the call-in system for 192 of these visits but submitted what were supposedly the patients' signatures for virtually all of them.  However, the timing of the signatures shows that many, if not most, of them were likely forged.  As just one example, on January 6, 2014, she claimed to have completed two different visits, and obtained a signature from each patient, within a minute of each other at two different Queens locations – she was paid an extra $120 in per-visit pay for having higher productivity for the day.

17

- A non-salaried nurse in the Bronx logged 331 visits for this period. She did not use the call-in system for 155 of these visits and did not receive a patient signature for 94 of them. And the verifications for at least 130 of these visits appear fraudulent given their impossible timing.

- Two salaried nurses in the Bronx together logged more than 1,200 visits during this period. Neither of them used the call-in system for any of these visits. And the timing of the patient signatures they submitted shows that many, if not most, of them were likely forged. As just one example, on January 2, 2014, one of them allegedly made 11 visits between 7:22 AM and 8:41 AM (which amounts to roughly 7 minutes per patient visit).

56.     For this same three-month period, Relator Lacey examined the records of the VNSNY nurses who make up the 50 "top earners" of the company. These are the nurses who received the highest compensation last year based on the number of home care visits and services they provided VNSNY patients. Relator Lacey found that roughly 20,000 of their recorded visits during this period, representing 40 percent of their supposed visits, were highly suspect. They either were "supported" by patient signature or call-in verifications which did not match up in terms of timing, or they lacked the required verification information altogether.

57.     Relator Lacey has had numerous discussions with VNSNY's top management about this fraudulent record-keeping, including CEO Christopher, CAO Rogers, Chief of Provider Services Hawkey, Senior Vice President Paul Roth, Human Resources Vice President Marian Haas, and all the VNSNY regional vice presidents. As part of these discussions, Relator Lacey has repeatedly urged the company to change how nurses are paid and incentivized as a way to eliminate this fraudulent billing activity. He further suggested that these changes be clearly incorporated in the three-year nursing contract VNSNY was negotiating with the Federation of Nurses/UFT nursing union at the end of last year.

18

58.     But the company has refused to take any corrective action despite the clear recognition at the highest levels that something could and should be done.  One reason for the company's failure to take action, as Ms. Haas explained to Relator Lacey, is that VNSNY nursing staff would be upset with the resulting reduction in their inflated compensation: "If we make this change our nurses are going to riot."

59.     Of course, the other reason is it would significantly cut back on the money VNSNY itself receives from Medicare and Medicaid for these fraudulent billings.  So VNSNY has allowed this fraudulent nursing activity to continue unabated.  The Signed Visit reports evidencing the fraud continue to be circulated regularly around the company.  And VNSNY continues to bill and collect reimbursement from Medicare and Medicaid for home health care visits and services it knows did not occur.

### C.     VNSNY Bills Medicare for Personal Care Services It Does Not Provide

60.     VNSNY provides what are referred to as "paraprofessional services" through its wholly-owned subsidiary, Partners in Care, and through numerous third-party providers.  Home health aides provide these services, which principally include "personal care" services (such as bathing, dressing, and grooming) and "custodial care" services (such as cleaning, cooking, and shopping).  Medicare only reimburses for personal care services.  It does not reimburse for custodial care services.

61.     Home health aides log their visits through the VNSNY Santrax phone system and VNSNY requires them to enter specific codes for each task they perform to separate reimbursable personal care tasks from non-reimbursable custodial care tasks.  However, VNSNY routinely recodes custodial care services as personal care services to collect payment from

Medicare for services that are not supposed to be covered.  Even for custodial care services it does not recode, VNSNY often bills and receives reimbursement from Medicare anyway.

62.     There are numerous internal VNSNY reports that substantiate this fraudulent coding and billing activity.  One such report titled "Copy of PIC_SchedsWithoutPersonalTasks.xls," for example, shows that for the six-day period October 27 through November 1, 2013, VNSNY recoded as personal care services 2,176 hours of custodial care services for 592 patients.  VNSNY billed and received Medicare reimbursement for this entire amount knowing that none of it was eligible for payment.

63.     Another example comes from an internal VNSNY report covering the month of February 2014 which shows Partners in Care home health aides coding 2,369 hours of custodial care services.  Even though none of these services were eligible for reimbursement, VNSNY billed and collected from Medicare reimbursement for all of them.  Relator Lacey has seen numerous other company reports demonstrating VNSNY's pervasive fraud in its billing for personal care services it did not actually provide.

64.     Partners in Care President Marki Flannery told Relator Lacey that reports like these, showing this kind of flagrant billing and coding misconduct, are common and have been around for years.  She also said she tried to raise the issue with VNSNY's top management by, for example, sending these reports to VNSNY's Chief of Provider Services Hawkey.  VNSNY has taken no action to correct this fraudulent practice.

65.     To the contrary, VNSNY has actively facilitated its fraud not only with its own Partners in Care subsidiary, but also with the numerous outside agencies it licenses to perform these home health aide services.  It has done so by programming a "hard stop" into the Santrax phone reporting system for these third-party home health aide vendors, which requires them to

enter time for personal care services regardless of whether any were actually provided.  If no such time is entered, the system will reject the entry of any time.

66.     Karen Brooks, Senior Vice President of Information Technology at Sandata Technologies, the company that designed the Santrax system for VNSNY, told Relator Lacey that VNSNY had the system specifically designed that way.  She said that otherwise, VNSNY "can't bill because the services wouldn't be covered" by Medicare.  VNSNY does not impose this hard-stop protocol on its own Partners in Care health aides.  It simply recodes their entries instead, or ignores them altogether and just submits them to Medicare for payment as personal care services.

## II.    VNSNY HAS SUBMITTED INFLATED CLAIMS TO MEDICARE AND MEDICAID

### A.    VNSNY Overbills Medicaid for Dually Eligible Patients

67.     "Dually eligible" patients are those who are enrolled in both Medicare and Medicaid.  For these patients, home health care providers such as VNSNY are required to bill Medicare as the primary payor and Medicaid as the secondary payor so Medicaid only covers the portion of the bill Medicare does not cover.  *See, e.g.,* 42 CFR § 433.139; CMS State Medicaid Manual, Pub. No. 45, ch. 3, § 3900.1 (Medicaid is intended to be the "payor of last resort").  Instead of following this required "split-billing" procedure, however, VNSNY bills Medicaid for a disproportionate number of home health aide hours to maximize the amount of reimbursement it receives under the two government programs.

68.     Prior to May 1, 2012, VNSNY accomplished this scheme by directing its nurses and clinical staff to bill only two hours of home health aide time to Medicare and the rest to Medicaid.  It did this because Medicaid reimbursed on an hourly fee-for-service basis, while

Medicare reimbursed at an episodic rate.  Therefore, the more hours VNSNY billed to Medicaid, the more money it would make in reimbursement.

69.     Since May 1, 2012, Medicaid moved to reimbursing on an episodic basis similar to Medicare.  However, VNSNY has continued to disproportionately bill its home health aide time to Medicaid so it can collect from both Medicare and Medicaid full episodic rates for the same service -- in effect, double billing for the patient.

70.     Since at least 2008, VNSNY has provided home health care services for roughly 15,000 dually eligible patients per year.  As a result of its split-billing scheme, VNSNY has improperly billed to Medicaid the bulk of home health aide hours for these patients.  As shown immediately below, this has amounted to VNSNY billing Medicaid anywhere from four to nearly ten times as many home health hours as it has billed Medicare.

| Percentage of VNSNY Home Health Aide Hours Billed to Medicare v. Medicaid | | | |
|---|---|---|---|
| | Medicare | Medicaid | Total |
| 2008 | 19% | 81% | 100% |
| 2009 | 21% | 79% | 100% |
| 2010 | 20% | 80% | 100% |
| 2011 | 19% | 81% | 100% |
| 2012 | 10% | 90% | 100% |
| 2013 | 9% | 91% | 100% |

| Number of VNSNY Home Health Aide Hours Billed to Medicare v. Medicaid | | | |
|---|---|---|---|
| | **Medicare** | **Medicaid** | **Total** |
| 2008 | 375,642 | 1,596,478 | 1,972,120 |
| 2009 | 328,520 | 1,260,524 | 1,589,044 |
| 2010 | 336,675 | 1,358,576 | 1,695,251 |
| 2011 | 319,770 | 1,404,328 | 1,724,098 |
| 2012 | 126,779 | 1,156,601 | 1,283,380 |
| 2013 | 121,949 | 1,184,454 | 1,306,403 |

71.     If VNSNY had properly billed for these services, a much higher percentage of these hours would have been apportioned to Medicare and VNSNY would have received substantially less reimbursement.  Instead, VNSNY since at least 2008 has improperly coded and overbilled Medicaid for these millions of hours of home health aide services.

72.     On April 25, 2014, Relator Lacey met with VNSNY Senior Vice President of Population Health Rose Madden-Baer to discuss VNSNY's split billing practice.  Also present at the meeting was Mike Dordick, a partner with McBee and Associates, a health care consulting firm.  Ms. Madden-Baer confirmed the company's "two hour rule" and her discomfort with it: "If the case is a dual [eligible] we just put 2 hours to Medicare so we can bill more to Medicaid." She said that "being told to enter a mind-numbing 2 for Medicare is wrong," and that she was "having a hard time, knowing this is wrong" and that "we haven't done anything for all these years" to correct the practice.

73.     Ms. Madden-Baer also discussed an informal audit she conducted in 2013 of a sampling of VNSNY's dually eligible assisted living patients.  She reported that of approximately two hundred cases she and her team reviewed, they found roughly $25 million in improper split-billings with no basis whatsoever for the hours billed to Medicare and Medicaid.

23

Ms. Madden-Baer raised these findings with VNSNY senior management, but VNSNY took no action.  After hearing all this, Mike Dordick cautioned "you may want to make sure you don't have a whistleblower on this stuff.  Definitely talk more with your compliance officer."

    **B.**    **VNSNY Has Overbilled Medicaid for Long Term Care Patients**

    74.    Up until 2013, VNSNY enrolled its long term care patients in one of two Medicaid programs, either the "VNSNY CHOICE Managed Long Term Care" program ("CHOICE MLTC") or the "Long Term Home Health Care" program ("LTHHC").[1]  For home care services under the CHOICE MLTC program, Medicaid provides reimbursement based on a per-member/per-month flat-fee rate.  Under the LTHHC program, however, Medicaid reimbursed on an hourly, fee-for-service basis.

    75.    Rather than direct its long term care patients to the program that provided the best medical fit and most appropriate treatment, VNSNY has since at least 2010 directed them to the program that would provide the highest reimbursement amounts.  For its long term care patients who were eligible for both programs, VNSNY decided in which program to place them using its so-called "Right Program Right Time" algorithm.

    76.    The "Right Program Right Time" algorithm determined the most lucrative long term care program based on the number of hours of treatment the patient required.  So, for patients requiring a relatively high number of hours of long term care service, VNSNY would direct them to the LTHHC program, which paid on an hourly basis.  For patients requiring a relatively low number of hours of service, VNSNY would direct them to the flat-fee based CHOICE MLTC program.  VNSNY did not make the program selection optional for these

------

[1]  Medicaid announced the discontinuation of the LTHHC program in 2012 and almost all LTHHC patients were enrolled in CHOICE MLTC programs by year-end 2013.

extremely vulnerable patients even though it was ultimately their decision to make.  Rather, VNSNY made the decision for them.

77.     The below chart reflects just how successful VNSNY had been in steering its long term care patients towards the highest reimbursement rates.  It identifies for the 2010 through 2012 three-year period the number of hours of service VNSNY provided to its patients in each of the long term care programs.

| 2010 | | | | | |
|---|---|---|---|---|---|
| **Weekly HHA Hours** | **LTHHC** | **CHOICE** | **Total** | **LTCCH %** | **CHOICE %** |
| 1-9 | 92 | 437 | 529 | 17% | 83% |
| 10-25 | 241 | 861 | 1,102 | 22% | 78% |
| 26-40 | 199 | 328 | 527 | 38% | 62% |
| 41-60 | 184 | 171 | 355 | 52% | 48% |

| 2011 | | | | | |
|---|---|---|---|---|---|
| **Weekly HHA Hours** | **LTHHC** | **CHOICE** | **Total** | **LTCCH %** | **CHOICE %** |
| 1-9 | 75 | 340 | 415 | 18% | 82% |
| 10-25 | 242 | 687 | 929 | 26% | 74% |
| 26-40 | 263 | 249 | 512 | 52% | 49% |
| 41-60 | 201 | 131 | 332 | 61% | 39% |

| 2012 | | | | | |
|---|---|---|---|---|---|
| **Weekly HHA Hours** | **LTHHC** | **CHOICE** | **Total** | **LTCCH %** | **CHOICE %** |
| 1-9 | 60 | 249 | 309 | 19% | 81% |
| 10-25 | 153 | 515 | 668 | 23% | 77% |
| 26-40 | 128 | 229 | 357 | 36% | 64% |
| 41-60 | 105 | 149 | 254 | 41% | 59% |

78.     Unsurprisingly, there was a direct correlation between the number of hours of long term care services VNSNY provided its patients and the particular program in which it placed them.  As the number of hours increased, so did the percentage of patients VNSNY

25

placed in the LTHHC program.  This direct correlation is particularly striking given how many more VNSNY long term care patients were enrolled in the CHOICE MLTC program compared to the LTHHC program.

79.    So in 2011, for example, VNSNY placed in the CHOICE MLTC program 82 percent of its long term care patients who required fewer than 10 hours of care per week, but only 39 percent of those who required between 41 and 60 hours of care per week (the most amount of hours permitted).  Conversely, VNSNY placed in the LTHHC program only 18 percent of the patients requiring fewer than 10 hours of care per week, but 61 percent of those who between 41 and 60 hours of care per week.

80.    This same correlation -- fewer hours, higher CHOICE MLTC percentage; greater hours, higher LTHHC percentage -- occurred in 2010, 2012 and 2013.  There is no explanation for this clear pattern other than VNSNY's use of the Right Program Right Time algorithm to maximize the company's reimbursement under the two Medicaid long term care programs.

81.    Now that Medicaid has discontinued its LTHHC program, VNSNY has devised a different mechanism to maximize its long term care revenue, again in complete disregard of patient well-being.  It replaces the Right Program Right Time algorithm with a new algorithm called the "Premier Solution," which is designed to drastically reduce the services VNSNY provides its roughly 20,000 long term care patients while maintaining the same Medicaid reimbursement amounts for each.

82.    VNSNY CAO Rogers introduced the new strategy at a May 13, 2014 meeting with Relator Lacey and VNSNY's other senior management.  He referred to the plan as a way for the company to continue maximizing its long term care revenue.

83.     To assist in its implementation of the Premier Solution, VNSNY hired the creator

of the program, Premier Home Health Services, to develop a "reassessment questionnaire" (the

"Premier Tool") to make the appropriate "adjustments" in the services VNSNY will provides its

long term care patients.  VNSNY has paid Premier $3.4 million for its work in implementing the

new program.  In addition, it will pay Premier one-third of whatever VNSNY "saves" from its

reduction in long term care services on an endless, ongoing basis, an amount Premier has

projected will reach $90 million annually.

84.     VNSNY rolled out the Premier Solution in the second quarter of 2014.  Nurses

employed by Premier (not by VNSNY) are currently making house calls to VNSNY long term

care patients to "rescore" their needs and advise them of the drastic cut in services they will soon

be receiving.  VNSNY is not having its own nurses deliver the news out of concern they will

speak out against the program and spur patient concern and complaints to the Department of

Health.  VNSNY is also concerned its nurses will not be strict enough with the Premier Tool and

score patients too generously with the services they require.

85.     Relator Lacey recently met with VNSNY long term care finance manager David

Soberman who confirmed the company's projection that the Premier Solution will increase

VNSNY's long term care revenue by $50 million in 2014 and $90 million in 2015.

86.     The Premier Solution not only will drastically cut the much-needed services

VNSNY had been providing to its roughly 20,000 patients under the CHOICE MLTC program.

It also will be a radical departure from how VNSNY intended to manage the program going

forward.  At two VNSNY budget meetings Relator Lacey attended on October 30 and November

5, 2013, VNSNY President of CHOICE MLTC Chris Palmieri repeatedly refused to consider

any reduction in services to compensate for Medicaid's cancellation of its LTHHC program.  He

warned that any such action if discovered by government regulators would lead to CHOICE MLTC being "shut down." VNSNY failed to heed Mr. Palmieri's warning. And in fact, Mr. Palmieri has since changed his mind and now supports the Premier Solution because of the substantial additional revenue it is projected to bring in (notwithstanding the substantial risk it poses to VNSNY's long term care patients).

87.     VNSNY Chief Information Officer William Hugh Hale told Relator Lacey on June 15, 2014 that he thinks Ms. Christopher and Mr. Palmieri will be "fired over whatever is going on with Premier."

### C.     VNSNY Overbills Medicare and Medicaid By Providing Services Outside the Physician-Approved Plans of Care and For Which There is No Medical Need

88.     Medicare and Medicaid do not reimburse for any services provided outside the Plan of Care. Nevertheless, VNSNY routinely provides, and submits reimbursement claims for, services the physician has not ordered and for which there is no medical need. VNSNY's failure to follow the Plan of Care typically stems from changes the treating physician has made in the ongoing course of treatment -- typically reductions in the amount or frequency of care required -- but which VNSNY chooses not to follow so it can maintain the higher reimbursement.

89.     There are numerous internal VNSNY reports which show how prevalent this practice is. For example, an April 18, 2014 VNSNY report titled "MD Portal - VNS Plan of Care – Home Health Cert and Plan of Treatment," shows at least 1,100 cases involving changes to the Plan of Care that VNSNY disregarded. VNSNY continued to provide home care services the treating physician no longer prescribed or deemed medically necessary, in some cases for as long as 18 months and counting.

90.     VNSNY's misconduct in this area is especially prevalent with its long term care patients.  For years, VNSNY has been prolonging care for these patients even after they are no longer eligible for long term care or no longer require the services VNSNY is providing.  In an April 11, 2014 meeting with Relator Lacey and other VNSNY management, VNSNY Manhattan manager Ginny Field acknowledged, "we are keeping CHOICE MLTC cases open way too long . . . .  My God we are recertifying Medicare cases with no skilled need."  Relator Lacey has also discussed this issue with other VNSNY senior management, but the company has refused to address this issue.

91.     In addition to billing for services outside the Plan of Care, VNSNY for many of its hospital patients bypasses the physician altogether by deciding the patient's treatment plan on the home care admission form without any kind of physician input.  In the same meeting on April 11, 2014, with Relator Lacey, Ms. Field and others, VNSNY Vice President of Sales Susan Northover admitted that for certain physical therapy services "we decide what treatments a [physical therapist] will do.  We don't talk to any surgeon or any doctor.  We decide on weight bearing, range of motion, date staples are removed, assistive devices.  We never go to the physician for the frequency of services and treatments."  As Ms. Field recognized at the meeting, aside from the clear violation of Medicare and Medicaid this represents, without a physician order, "we shouldn't even be providing treatment then."  This topic came up again during a July 17, 2014 vice presidents meeting at which Ms. Field objected to VNSNY failing to ensure that physicians direct what care a patient needs on the home care admission form.  Ms. Northover reiterated that her staff never gets such direction from the physicians at referring hospitals.

**D.      VNSNY Overbills Medicare for Unnecessary Services that Trigger More Lucrative "Outlier" Payments**

92.      "Outlier" payments are upward adjustments Medicare makes to the predetermined base rate for those patients who require excess care (*i.e.*, longer or more frequent home care visits).  It is rarely applied and done so only for exceptional cases.  In order to secure the more lucrative reimbursement rates that accompany outlier payments, VNSNY regularly submits to Medicare claims for these payments for patients who do not qualify for outlier status.  VNSNY's misconduct in this area is particularly prevalent with VNSNY's Congregate Care program, which covers the elderly, disabled and chronically ill living in adult homes or assisted-living facilities.

93.      On May 1, 2014, VNSNY Director of Episodic Management Joan Cassano met with Relator Lacey to discuss her concerns with this issue.  She explained that she recently completed an audit of 215 Congregate Care program cases for which VNSNY billed and collected from Medicare outlier payments.  She found at least a quarter of them -- comprising roughly $3 million of services -- were ineligible for outlier status.  Ever worse, she said most of them should not have been billed to Medicare at all because the patients were not eligible even for the regular Medicare episodic base rate.

94.      Ms. Cassano's audit is consistent with numerous internal VNSNY reports showing the company's abuse of the outlier payment system.  One example of this comes from a report titled "Copy of Medicare Care PPS RN Visits and HHA Visits Per Episode - CCL Sites 2013v5.xls" which shows that in 2013, *more than half* of VNSNY visits under its Congregate Care program resulted in improper outlier payments.

**E.     VNSNY Overbills Medicare and Medicaid for Its Visiting MD Program**

95.     In addition to providing visiting nurse and home health aide care, VNSNY also runs a "Visiting MD" program where VNSNY nurses accompany the treating physicians or their nurse practitioners on patient home visits.  The team of VNSNY nurses that participates in this program, referred to internally at VNSNY as "Team 85," regularly serves approximately 200 patients under this program and provides services to several hundred more during the course of a year.  Since the workload on these visits is primarily handled by the physician or nurse practitioner, the amount VNSNY bills Medicare and Medicaid for these nursing services should be lower than what it charges for its regular visiting nurse services.  Just the opposite is true. The charges for these Team 85 services are substantially higher than what VNSNY bills for its standard nursing services.

96.     For example, a recently distributed internal VNSNY document titled "Visiting MD Program Census Report," showed that for the 18 cases covered in the report, there was an average length of stay of 1,423 days (or 3.9 years) -- well over the average length of stay for typical VNSNY patients.  The total charges to Medicare and Medicaid for the 18 patients were $6.6 million, which comes to an average of roughly $367,000 per patient over the course of their home care stay.  Two of the patients had total charges of more than $1 million.  These home health care charges are among the highest for any VNSNY patients and exceed even those charges for VNSNY patients living in nursing homes or skilled-nursing facilities.

97.     On May 9, 2014, VNSNY Regional Vice President in Manhattan Ginny Field told Relator Lacey that the care VNSNY provides under the Visiting MD program is a "nightmare." She explained that the patients are poorly managed and that VNSNY bills for "many" unnecessary cases and for cases in which Medicare and Medicaid criteria are not met, rendering

them ineligible for payment.   She added that the quality of the services is "terrible."  Ms. Field

said that her former boss, former VNSNY Senior Vice President Ilaina Edison often chastised

her because her other Manhattan teams generated so much less revenue than the Visiting MD

Team.  Ms. Field further explained that part of the reason why Visiting MD patients have such

long lengths of stay is "because they are duals" for which VNSNY can bill both Medicare and

Medicaid for the services and "we tell them it is okay not to pay their Medicaid surplus [out of

pocket costs].  So they never want to leave this program."  So in other words, VNSNY's policy to

write off patients' Medicaid surplus removes this cost containment pressure and encourages

patients to continue to receive care they would otherwise be required to pay for so that VNSNY

can bill for unnecessary services.

## III.    VNSNY  DOES NOT COMPLY WITH NUMEROUS MEDICARE AND MEDICAID CONDITIONS OF PAYMENT

98.    There are numerous conditions of payment a health care provider must satisfy

before it is entitled to reimbursement under the Medicare and Medicaid programs.  VNSNY has

failed to comply with many of these prerequisites for payment, including requirements related to

Plan of Care documents, FFE (face-to-face encounter) documentation, Medicaid signature

deadlines, OASIS ("Outcome Assessment Information Set") coding, and nurse supervision of

home health aides.  VNSNY has failed to comply with these conditions of payment even though

(i) in enrolling in the Medicare and Medicaid programs, it agreed to abide by all laws,

regulations and applicable program instructions; and (ii) with every claim it submits for

Medicare and Medicaid reimbursement, it certifies the claims as true and correct and in

compliance with all applicable rules and regulations, including all conditions of payment.

### A.     VNSNY Does Not Comply With Plan of Care Requirements

99.     One condition of payment under Medicare and Medicaid is that the treating physician sign the Plan of Care before the health care provider begins treatment of a patient. Home health care providers may begin treatment prior to receiving the signed Plan of Care.  But they can do so only if a registered nurse or therapist obtains authorization and instructions for care from the treating physician and documents those instructions and authorizations on the "verbal order" line of the Plan of Care.  In those cases, the registered nurse or therapist must sign, date and enter their license number on the Plan of Care.  The health care provider is then required to send the form to the physician for signature prior to submitting the claim for reimbursement.

100.     VNSNY obtains verbal orders from the treating physician for roughly 40 percent of its cases but rarely, if ever, complies with this mandatory certification.  Instead, it routinely submits claims for payment without ever having its registered nurses or therapists sign and complete the necessary verbal order information in the Plan of Care, or falsifying this information after-the-fact in those instances when the treating physician complains about the missing information.

101.     Ms. Field confirmed VNSNY's pervasive failure to comply with this Medicare condition of payment in a conversation with Relator Lacey on June 4, 2014, where she admitted the company virtually never complied with the verbal order documentation requirements.  She further relayed that one physician recently complained that this information was missing from the Plan of Care forms VNSNY had sent him for signature.  To appease him, Ms. Field said that VNSNY Clinical Director "Anny [Wan] is just going to put mine or her name and license number on them and send them back for his signature."  Ms. Wan ultimately put both her and

Ms. Field's signature on the forms even though they were not the VNSNY employees who took

the orders or the ones required to sign the forms.  Expressing her frustration over VNSNY's

continued abuse of Medicare and Medicaid in this and other ways, Ms. Field put two fingers in

her mouth like a whistle and told Relator Lacey, "I hope someone blows the whistle on this

fucking place."

### B.    VNSNY Does Not Comply With Face-to-Face Encounter Requirements

102.    Another Medicare and Medicaid condition of payment is that the physician has a

face-to-face meeting with the patient before treatment begins to ensure only medically necessary

home health care services are provided.  Proper FFE documentation is part of the physician

certification that home health care providers must obtain prior to submitting a claim to Medicare

or Medicaid for payment.  This documentation must include the signature of the certifying

physician, the date of the meeting and a detailed narrative explaining why the patient is

homebound and requires the prescribed home care services.  Simply listing the diagnosis and any

recent injuries or procedures is insufficient.[2]

103.    Despite these strict requirements, VNSNY routinely submits claims for payment

to Medicare without the proper FFE documentation.  Specifically, most of the FFE forms

VNSNY submits with its claims do not adequately substantiate the patients' homebound status

and need for home health care services.  This was confirmed by Relator Lacey in two separate

random audits he recently conducted of roughly 200 VNSNY FFE forms where virtually all of

them were missing this required information.  As just a few examples, the FFE form for patient

S.M. merely states "homebound patient required;" the FFE form for patient Z.L. merely states

---

[2]  42 CFR § 424.22(a)(1)(i).

"needs assistance to leave home;" and for patients D.L. and F.M., their FFE forms say nothing at all about their homebound status or need for home care services.  This kind of sparse detail (or absence of any information at all) does not even come close to satisfying this FFE condition to reimbursement.

        **C.**      **VNSNY Does Not Comply with Medicaid Signature Requirements**

104.    Medicaid also requires as a condition for payment that home health care providers submit claims for reimbursement for home health aide services only where the physician signature was received within 30 days of the date of service, with a 30-day grace period (for a total of 60 days).  VNSNY routinely submits claims to Medicaid without having received the required physician signature within this strictly defined window, and in many cases, without ever having received the required signature at all.

105.    On May 22, 2014, Relator Lacey met with VNSNY Controller Jimmy Singh and Patient Accounts Director John Walz, both of whom confirmed VNSNY's misconduct in this regard.  It is also borne out in the below chart, which shows all the physician orders VNSNY received for home health aide services for the five year period 2009 through 2013 and when and whether VNSNY obtained the required physician's signature authorizing treatment.

| 2013 | | |
|---|---|---|
| **How Long After Service Signature Received** | **Orders Received** | **Percent** |
| 0 - 30 Days | 22,790 | 59% |
| 0 - 60 Days | 8,663 | 23% |
| 61 - 90 Days | 3,477 | 9% |
| 91 + Days | 2,383 | 6% |
| Never Received | 1,002 | 3% |
| **Total** | **38,315** | **100%** |

| 2012 | | |
| --- | --- | --- |
| How Long After Service Signature Received | Orders Received | Percent |
| 0 - 30 Days | 35,140 | 64% |
| 0 - 60 Days | 6,767 | 12% |
| 61 - 90 Days | 2,400 | 4% |
| 91 + Days | 1,319 | 2% |
| Never Received | 9,675 | 18% |
| Total | 55,301 | 100% |

| 2011 | | |
| --- | --- | --- |
| How Long After Service Signature Received | Orders Received | Percent |
| 0 - 30 Days | 60,698 | 72% |
| 0 - 60 Days | 13,924 | 17% |
| 61 - 90 Days | 5,698 | 7% |
| 91 + Days | 2,768 | 3% |
| Never Received | 788 | 1% |
| Total | 83,876 | 100% |

| 2010 | | |
| --- | --- | --- |
| How Long After Service Signature Received | Orders Received | Percent |
| 0-30 Days | 43,619 | 67% |
| 31-60 Days | 8,971 | 14% |
| 61-90 Days | 3,555 | 5% |
| 91+ Days | 1,659 | 3% |
| Never Received | 7,148 | 11.0% |
| Total | 64,952 | 100.0% |

| 2009 | | |
| --- | --- | --- |
| How Long After Service Signature Received | Orders Received | Percent |
| 0 - 30 Days | 64,175 | 72% |
| 0 - 60 Days | 15,871 | 18% |
| 61 - 90 Days | 5,506 | 6% |
| 91 + Days | 2,896 | 3% |
| Never Received | 892 | 1% |
| Total | 89,340 | 100% |

106.    This shows that anywhere from 10 percent (for 2009) to 24 percent (for 2012) of

the more than three hundred thousand physician orders for home health aide services for which

VNSNY submitted claims during this period did not comply with this Medicaid condition of payment. It is not surprising this failure rate is so high given the VNSNY de facto policy -- as CFO Samuel Heller confirmed to Relator Lacey -- to bill for Medicaid reimbursement regardless of whether the 30-day rule is satisfied.[3]

### D.   VNSNY Does Not Comply With Medicare's OASIS Requirements

107.   Since January 1, 2010, Medicare has required home health care providers to have a registered nurse or rehabilitation therapist conduct a comprehensive patient assessment using Medicare's OASIS tool each time a patient begins home health care, at regular intervals thereafter and upon the completion of treatment. OASIS is used to determine whether the patient has a continuing need for home care and, if not, the discharge protocols to ensure a smooth transition from home care. OASIS is also used to determine the payment code for each 60 day episode of care submitted for reimbursement. Medicare requires as a condition of payment all home health care providers to submit OASIS data before presenting their final claim for reimbursement. The Medicare payment codes on the final claim and the OASIS submission must match.

108.   VNSNY routinely submits claims for payment without providing the required OASIS information either at the start of care or at discharge. With respect to the start of care, the VNSNY billing system is set up so that each RAP (Request for Anticipated Payment) is sent to Medicare automatically without regard to whether the mandatory OASIS form has been completed (which in most cases it has not). Likewise at discharge, VNSNY's practice is to send

---

[3] In addition, until 2012 (when Medicaid switched from a fee for service to an episodic rate reimbursement system as described above), VNSNY routinely failed to comply with Medicaid's 90-day billing requirement, which prohibited a health care provider from billing Medicaid more than 90 days after providing the service. VNSNY circumvented this requirement by using a "miscellaneous" code to bill and receive payment from Medicaid for services well past the 90-day deadline, in some cases as much as two years past.

to Medicare its final claims for reimbursement without completing the necessary discharge

OASIS forms.

109.    There are numerous internal VNSNY reports which show how widespread this

problem is.  For example, an internal VNSNY report titled "No discharge OASIS as of April 30,

2014" shows for the four-month period January through April 2014 more than 3,000 cases in

which VNSNY did not provide the required OASIS discharge information.  Relator Lacey

recently reviewed a version of this report updated through May 2014 and it showed an additional

1,500 cases for which no discharge OASIS form had been completed.  Relator Lacey received

yet another report on July 15, 2014, indicating thousands of additional cases for which no

discharge OASIS forms were completed.

110.    Relator Lacey recently spoke with Tim Ash, a nurse practitioner who contracts

with VNSNY and other home care providers and who routinely works with OASIS.  Mr. Ash

told Relator Lacey that, unlike the VNSNY system, the billing systems used by the other home

care providers he works with do not allow claims to be submitted without the necessary OASIS

information.  He stated VNSNY could be "shut down if the Department of Health were to

uncover what is going on with OASIS coding, services delays, no adherence to plans of care, and

you name it."  He further remarked, "if there were ever to be a whistleblower, this place would

be completely shot."

### E.    VNSNY Does Not Comply With Home Health Aide Supervision Requirements

111.    Medicaid requires that home health care providers supervise home health aides by

having nurses accompany them in the field at least once every two weeks.  18 NYCRR §

505.23(a)(2)(iii) and (b)(1); 42 CFR § 484.36(d)(1)-(2).  VNSNY routinely fails to comply with

this basic requirement designed to ensure quality patient care.  A 2013 internal VNSNY report titled "HHA Supervision 2013" demonstrates just how pervasive this lapse is.  It identifies over 100,000 instances where VNSNY failed to provide this required supervision.  The same report covering the first six months of 2014 identifies a similarly sizeable failure to comply with this Medicaid requirement -- 22,667 instances and counting.

## IV.   VNSNY PROVIDES KICKBACKS FOR PATIENT REFERRALS

112.    Under the Anti-Kickback Statute, a health care provider is prohibited from providing any compensation or other form of consideration, including free services, to induce or reward referrals.  But that is exactly what VNSNY does to secure Medicaid and Medicare referrals from its top hospital and nursing home sources.

113.    Roughly 70 percent of VNSNY's patients originate from referrals from hospitals and nursing homes.  Most of those referrals -- about 80 percent, comprising more than $1 billion in revenue -- come from the 60 hospitals and nursing homes at which VNSNY has intake coordinators and home care consultants working onsite.  VNSNY annually spends roughly $30 million in salary for these onsite coordinators and consultants.

114.    VNSNY CEO Christopher has instructed these intake coordinators and consultants to "just say yes" to anything asked of them by hospital employees, specifically as it relates to administrative tasks relating to a patient's discharge.  This blurring of the line between VNSNY employee and hospital/nursing home employee basically provides the facility with "free" employment services, at VNSNY's expense, and provides VNSNY with a fast-track to patient referrals.  The arrangement leaves the patient with little real choice when it comes to their

selection of the company from which they will receive home health care services.  This is precisely the outcome the Anti-Kickback Statute was designed to avoid.[4]

115.    In addition, VNSNY instructs its intake coordinators and consultants to aggressively seek all referrals by, among other things, disregarding insurance verification and authorization, waiving patient co-pays and accepting managed care cases not covered by the patients' plan.  These all serve the purpose of inducing referrals from the hospitals, nursing homes and physicians by offering them -- at great expense to VNSNY -- a guaranteed, hassle-free, speedy placement for their discharges.

116.    In a March 27, 2014 meeting, VNSNY Vice President of Managed Care Frank Segura and VNSNY Director of Managed Care Patricia Jackson told Relator Lacey that Ms. Christopher gave them instructions to take every referral from VNSNY's key hospitals even when the managed care company will not cover the services.  In those instances, VNSNY writes off the uncompensated services as bad debt or charity care.  As Ms. Jackson explained, "the goal is to give these services for free so overall we can get more referrals from these hospitals."

117.    This same rationale is behind VNSNY's directive to "just take" every referral, even if it means not getting an authorization from the managed care company and waiving patient co-pays.  In a May 8, 2014 meeting with Relator Lacey, VNSNY's CAO Kevin Rogers explained that "Mary Ann [Christopher] sees this as the cost of doing business.  We help our hospitals by immediately taking their discharges and they'll give us more Medicare cases."

---

[4] In addition, in its training materials and manuals, VNSNY explicitly requires its onsite staff at hospitals and nursing homes to: (i) interview the patients and begin the admissions process before they have been given a choice by the hospital staff; (ii) alleviate the workload of the discharge planners by helping them to do their jobs; (iii) attend rounds and review hospital medical records to find patients to whom VNSNY can sell home care; (iv) help discharge planners with complex cases; (v) make a point to "stick up for discharge planners" in front of them in order to win referrals; and (vi) "influence" patients, family members, and referrers to provide VNSNY with referrals.

### VNSNY'S FRAUD HAS COST THE UNITED STATES AND NEW YORK
### HUNDREDS OF MILLIONS OF DOLLARS
### IN IMPROPER MEDICARE AND MEDICAID PAYMENTS

118.    VNSNY's misconduct -- in billing Medicare and Medicaid for services it is not
providing; overbilling Medicare and Medicaid for the services it does provide; failing to comply
with numerous Medicare and Medicaid conditions of payment; and providing financial
inducements in exchange for referrals -- has, since at least 2004, caused and continues to cause
the United States and New York to pay VNSNY hundreds of millions -- if not billions -- of
dollars in Medicare and Medicaid payments to which it was not and is not entitled.

119.    For example, VNSNY since 2008 received close to $1 billion annually in
payments from Medicare (including managed care) and Medicaid with these amounts increasing
every year: 2008 -- $885 million; 2009 -- $903 million; 2010 -- $942 million; 2011 -- $1 billion;
2012 -- $1.2 billion; 2013 -- $1.3 billion; 2014 -- $1.4 billion (projected).  Relator Lacey
estimates that roughly half of VNSNY's claims to Medicare and Medicaid involve at least one
form of the misconduct alleged herein.

120.    These numbers understate the full injury suffered by the United States and New
York.  They fail to account for the additional care so many of VNSNY's patients require,
particularly through re-hospitalizations, because of VNSN's failure to provide all the services
prescribed in the Plans of Care or provides them late or at less than the required frequency
(although VNSNY still charges the government in full).  Relator Lacey estimates that tens of
thousands of VNSNY patients every year -- or up to one-third of its patient base -- are subject to
re-hospitalization because of the inadequate or shoddy care VNSNY provides.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

(Federal False Claims Act)

121.    Relator Lacey realleges and incorporates by reference all of the allegations set forth herein.

122.    This is a claim for treble damages and penalties under 31 U.S.C. § 3729(a)(1) or, alternatively, 31 U.S.C. § 3729(a)(1)(A) to the extent this provision applies to conduct that preceded its enactment on May 20, 2009.

123.    As set forth above, in violation of 31 U.S.C. § 3729(a)(l) or, alternatively, 31 U.S.C. § 3729(a)(1)(A), VNSNY has knowingly presented -- or caused to be presented by managed care companies or other third-party carriers -- false or fraudulent claims for payment or approval by submitting, or causing to be submitted, requests to Medicare and Medicaid for payment or reimbursement for home health care services which were based on services not performed, not performed as promised or required, or not medically necessary or otherwise entitled to payment.  These claims include, among other things, requests for payment for (i) services not provided as prescribed in the Plan of Care, including failing to provide the number of visits prescribed or the services directed to occur during those visits and for visits that were not long enough to provide meaningful care; and (ii) personal care services not provided.

124.    Likewise, as set forth above, in violation of 31 U.S.C. § 3729(a)(l), or, alternatively, 31 U.S.C. § 3729(a)(1)(A), VNSNY knowingly presented -- or caused to be presented -- false or fraudulent claims for payment or approval by submitting, or causing to be submitted, inflated claims to Medicare and Medicaid for payment or reimbursement for home health care services not performed, not performed as promised or required, or not medically

42

necessary or otherwise entitled to payment.  These inflated claims include, among other things, requests for payment for services provided (i) to dually-eligible patients; (ii) to LTHHC long term care patients under the "Right Program Right Time" scheme; (iii) to CHOICE MLTC patients under the Premier Solution; (iv) under the Visiting MD program; (v) outside the modified or interim Plans of Care; and (vi) for outlier patients who do not qualify for outlier status.

125.    In addition, as set forth above, in violation of 31 U.S.C. § 3729(a)(2) or, alternatively, 31 U.S.C. § 3729(a)(2)(A) to the extent this provision applies to conduct that preceded its enactment on May 20, 2009, VNSNY knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim by, among other things, (i) falsifying patient time and service records; (ii) incorrectly allocating hours to Medicaid for dually-eligible and long term care patients; and (iii) using the assessment questionnaire developed by Premier to improperly cut member services while receiving the same reimbursement.

126.    Furthermore, in violation of 31 U.S.C. § 3729(a)(2) or, alternatively, 31 U.S.C. § 3729(a)(2)(A), VNSNY falsely certified, or expressly or impliedly represented, that it has complied with all conditions of payment or other requirements for reimbursement, while actually failing to comply with these conditions, including, among other things, compliance with (i) Plan of Care documents; (ii), FFE documentation; (iii) Medicaid signature and Medicaid billing deadlines; (iv) OASIS requirements; and (v) and HHA supervision requirements.  Failure to comply with these conditions and requirements renders the underlying claims non-reimbursable.

127.    These false records or statements were material to the United States' payments to VNSNY for home health care services.  They were material because had the United States been

43

aware that defendants were falsifying records or statements and failing to comply with conditions of payment, it would have had a natural tendency to influence or been capable of influencing the United States' decision to provide payment or reimbursement to VNSNY for home health care services.

128.    VNSNY has also automatically violated 31 U.S.C. § 3729(a)(1) or, alternatively, 31 U.S.C. § 3729(a)(1)(A) and 31 U.S.C. § 3729(a)(2) or, alternatively, 31 U.S.C. § 3729(a)(2)(A), by violating the Anti-Kickback Statute by providing financial inducements to hospitals, nursing homes and their employees in order to encourage or reward patient referrals.

## SECOND CAUSE OF ACTION

(New York False Claims Act)

129.    Relator Lacey realleges and incorporates by reference all of the allegations set forth herein.

130.    This is a claim for treble damages (including consequential damages) and penalties under N.Y. Fin. Law § 189(1)(a) and (1)(b).

131.    As set forth above, in violation of N.Y. Fin. Law § 189(1)(a), VNSNY knowingly presented -- or caused to be presented by managed care companies or other third-party carriers -- false or fraudulent claims for payment or approval by submitting, or causing to be submitted, requests to Medicaid for payment or reimbursement for home health care services which were based on services never performed, not performed as promised or required, or were not medically necessary or otherwise entitled to payment.  These claims include, among other things, requests for payment for services not provided as prescribed in the Plan of Care, including failing to provide the number of visits prescribed or the services directed to occur during those visits and for visits that were not long enough to provide meaningful care.

44

132.    Likewise, as set forth above, in violation N.Y. Fin. Law § 189(1)(a ),VNSNY knowingly presented -- or caused to be presented -- false or fraudulent claims for payment or approval by submitting, or causing to be submitted, inflated claims to Medicaid for payment or reimbursement for home health care services not performed, not performed as promised or required, or not medically necessary or otherwise entitled to payment.  These inflated claims include, among other things, requests for payment for services provided (i) to dually-eligible patients; (ii) to LTHHC long term care patients under the "Right Program Right Time" scheme; (iii) to CHOICE MLTC patients under the Premier Solution; (iv) under the Visiting MD program; and (v) outside the modified or interim Plans of Care.

133.    In addition, as set forth above, in violation of N.Y. Fin. Law § 189(1)(b), VNSNY knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim by, among other things, (i) falsifying patient time and service records; (ii) incorrectly allocating hours to Medicaid for dually-eligible and long term care patients; and (iii) using the assessment questionnaire developed by Premier to improperly cut member services while receiving the same reimbursement.

134.    Furthermore, in violation of N.Y. Fin. Law § 189(1)(b), VNSNY falsely certified, or expressly or impliedly represented, that it has complied with all conditions of payment or other requirements for reimbursement, while actually failing to comply with these conditions, including compliance with (i) Plan of Care documents; (ii) FFE documentation; (iii) Medicaid signature and Medicaid billing deadlines; and (iv) HHA supervision requirements.  Failure to comply with these conditions and requirements renders the underlying claims non-reimbursable.

135.    These false records or statements were material to New York's payments to VNSNY for home health care services.  They were material because had New York been aware

that defendants were falsifying records or statements and failing to comply with conditions of payment, it would have had a natural tendency to influence or been capable of influencing New York's decision to provide payment or reimbursement to VNSNY for home health care services.

136.    To the extent the facts alleged in this complaint have been previously disclosed to the public or the government in any fashion, Relator Lacey is the "original source" of the information as defined by N.Y. Fin. Law § 188(7).

## PRAYER FOR RELIEF

WHEREFORE, Relator Lacey requests the following relief:

A.    Declaring that VNSNY's practices and conduct have violated the federal False Claims Act, 31 U.S.C. §§ 3729-3733 and New York False Claims Act, N.Y. Fin. Law §§ 187-194;

B.    Enjoining and restraining VNSNY from engaging in any conduct, contract or agreement, and from adopting or following any practice, plan, program, scheme, artifice or device similar to, or having a purpose and effect similar to, the conduct complained of above;

C.    Directing that defendants, pursuant to 31 U.S.C. §§ 3729-3733 and N.Y. Fin. Law §§ 187-194, pay an amount equal to three times the amount of damages the United States and New York have sustained, including consequential damages, as a result of defendants' violations of the federal False Claims Act and the New York False Claims Act;

D.    Directing that defendants, pursuant to 31 U.S.C. § 3729 *et seq*. and N.Y. Fin. Law § 187 *et seq*., pay penalties of not less than $5,500 to not more than $11,000 for each violation of 31 U.S.C. § 3729 *et seq*. and $6,000 and not more than $12,000 for each violation of N.Y. Fin. Law § 189.

E.      Directing that Relator Lacey receive the maximum award allotted by 31 U.S.C. § 3730 and N.Y. Fin. Law § 190;

F.      Directing that defendants pay Relator Lacey's costs, including attorneys' fees as provided by law;

G.      Directing that this Court award pre- and post-judgment interest on any damages awarded to the United States, New York, and/or Relator;

H.      Directing such other equitable relief as may be necessary to redress defendants' violations of the United States and New York laws; and

I.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Relator Lacey hereby demands a trial by jury.


Dated:  July 28, 2014

                                        **Constantine Cannon LLP**

                                        Gordon Schnell (Bar I.D. 2502136)
                                        Marlene Koury (Bar I.D. 4423471)
                                        335 Madison Avenue
                                        New York, NY 10017
                                        Tel: (212) 350-2700
                                        Fax: (212) 350-2701