UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| United States of America and State of New York, *ex rel.* Edward Lacey,<br><br>        Plaintiff,<br><br>  v.<br><br>Visiting Nurse Service of New York,<br><br>        Defendant. | Civil Action No.  14 CV 5739 (AJN)<br><br>To Be Filed *In Camera* and Under Seal<br><br>**First Amended Complaint for Violations of the Federal and New York State False Claims Act (Corrected)** |

Edward Lacey ("Relator Lacey") brings this *qui tam* action on behalf of the United States and the State of New York against Visiting Nurse Service of New York ("VNSNY") under the federal False Claims Act, 31 U.S.C. §§ 3729-3733, and the New York False Claims Act, New York Finance Law §§ 187-194, and alleges upon his first-hand knowledge as follows:

## INTRODUCTION

1.    This case is about the long-standing efforts of VNSNY -- one of the oldest, largest and most storied home health care agencies in the country -- to extract from Medicare and Medicaid hundreds of millions of dollars in illegal proceeds through falsified and improper billings.

2.    VNSNY's scheme involves three basic frauds against the federal government and the State of New York.  First, VNSNY has engaged in a systematic failure to provide its patients the home care visits and services specifically ordered by their referring physician in the patient Plans of Care.  These Plans are where the physician prescribes the precise type, length and frequency of treatment VNSNY is supposed to provide its patients and are a precondition for payment under, and participation in, the Medicare and Medicaid programs.  But VNSNY has

intentionally ignored these Plans and provided tens of thousands of its patients only a fraction of the critical care their doctors have ordered while still billing the government.

3.      Second, a significant number of VNSNY nurses and therapists have falsified their patient time and service records, which VNSNY in turn has used to inflate the number and length of visits for which they bill the government.  VNSNY has been aware of this visit falsification for years, as is evident from the visits reports that track nurse and therapist home care visits. These reports show, among other things, hundreds of nurses and therapists with one or more of the following: impossibly high daily visit counts; visits too short to perform any kind of meaningful care; or visits that lack the patient verification VNSNY's own rules are supposed to require.  VNSNY has done nothing to remedy the problem and instead has continued to bill the government for visits and services it knows it did not provide.

4.      Third, VNSNY has billed the government for home health aide services it has not provided, have not been properly supervised or have otherwise not complied with the Medicare and Medicaid rules and regulations.  More specifically, VNSNY has billed Medicare for non-covered paraprofessional care, such as custodial care (*i.e.,* cleaning, cooking, shopping and laundry), knowing that Medicare only covers personal care services (*i.e.,* bathing, dressing, feeding, walking).  It has double-billed Medicare and Medicaid on home health aide services for dually-eligible patients.  And it has failed to provide the required oversight of home health aides to ensure safe and effective patient care.

5.      As a result of VNSNY's multi-faceted campaign of fraud against the government, VNSNY has, since at least 2004, billed and collected from Medicare and Medicaid hundreds of millions of dollars to which it was never entitled.  Relator Lacey witnessed this fraud first-hand, and took great pains to try to stop it, during his tenure with the company.

6.      But beyond this massive financial fraud on the government, the ultimate victims here are the tens of thousands of elderly, disabled and impoverished New York residents who because of VNSNY's misconduct have not been getting the critical home health care services they require and their physicians have prescribed.

7.      Relator Lacey brings this action to stop VNSNY from continuing to engage in this fraudulent activity and to recover on behalf of the United States and the State of New York the hundreds of millions of dollars they have paid VNSNY in falsified and improper charges.

## PARTIES

8.      Relator Lacey was employed at VNSNY for roughly sixteen years.  At the time he left the company, in January 2015, he held the position of Vice President of Operations Improvement and Integration.  His responsibilities in that position included the development and implementation of strategies to ensure operational best practices and the delivery of standardized and cost effective services throughout the company.  He reported to Kevin Rogers, VNSNY's then-Senior Vice President and Chief Administrative Officer, who in turn reported directly to Mary Ann Christopher, then-President and Chief Executive Officer.

9.      Relator Lacey previously worked as VNSNY's Vice President of Finance, and before that held several director-level positions in different VNSNY departments, including Patient Accounts and Children and Family Services.  He has a B.A. in Business from the State University of New York at Albany.   He also has a certificate from New York University in health care financial management and a certificate from NYS Insurance Department in Group Health and Life Insurance.

10.      As part of his general duties at VNSNY, Relator Lacey regularly met with VNSNY's other senior management and presented on a regular basis to the board of directors.

On numerous occasions over the few years leading up to his departure from the company, Relator Lacey raised with management -- including Ms. Christopher, Mr. Rogers, former Chief of Provider Services Regina (Regie) Hawkey, Chief Financial Officer Samuel Heller, former Chief Information Officer(s) Stuart Myer and Hugh Hale, Senior Vice President Ilaina Edison and numerous other members of VNSNY's top management -- all of the areas of VNSNY's misconduct alleged herein.  But the company refused to take any corrective action.

11.     VNSNY was established in 1893 and is the largest not-for-profit home health care agency in the country.  It provides home health care services through more than twenty-five licensed agencies to approximately 150,000 patients per year in the five boroughs of New York City and Nassau, Suffolk, Westchester and several upstate New York counties.  The core services it provides include skilled nursing, rehabilitation therapy (physical, occupational, and speech), social work, nutrition counseling and personal and custodial care services.  The vast majority of the company's patients are beneficiaries of Medicare and Medicaid, and of the federally-funded "Medicare Advantage" programs managed by private insurance companies. The company employs roughly 20,000 employees and has annual revenues of more than $2 billion.  It has offices in all the boroughs of New York City, Nassau, and Westchester.  The corporate office is located at 107 E. 70th Street in New York.

**JURISDICTION AND VENUE**

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367 and 31 U.S.C. § 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3729 and 3730.

4

13.     Under 31 U.S.C. § 3730(e)(4)(A) and N.Y. Fin. Law § 190(9)(b), there has been no statutorily relevant public disclosure of substantially the same "allegations or transactions" alleged in this complaint.  To the extent there has been any such public disclosure, Relator Lacey meets the definition of an original source, as that term is defined under 31 U.S.C. § 3730(e)(4)(B) and N.Y. Fin. Law § 188(7).

14.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) and (c) because VNSNY transacts business in this judicial district, and the acts proscribed by 31 U.S.C. § 3729 and N.Y. Fin. Law § 189 have been committed by VNSNY in this District.

## REGULATORY BACKGROUND

15.     Health care providers under Medicare and Medicaid are required to comply with a strict set of regulatory requirements which must be followed as a precondition to payment under, and participation in, these government health care programs.  The government has established these requirements, along with the general obligation to refrain from fraud, to ensure it only pays for health care services that are medically necessary, actually provided and in the best interests of the patient.  As part of its scheme to bill the government for fraudulent and improper charges, VNSNY has routinely refused to comply with these obligations.

Home Health Care Services Under Medicare

16.     Congress established the Medicare program in 1965 to provide health insurance coverage for people age 65 or older and for people with certain disabilities or afflictions.  The United States Department of Health and Human Services Center for Medicare and Medicaid Services ("CMS") administers Medicare and the federal government's other health programs. The Medicare programs most relevant to home health care services are Medicare Parts A and B.

Medicare Part A, which generally covers hospital stays and related follow-up care, is the program predominately used to cover home health services.  Medicare Part B covers doctors' services and outpatient care, as well as certain home health care services not covered under Part A.

17.     There are four basic categories of home health care services Medicare covers -- skilled nursing, rehabilitation therapy (which includes physical, speech and occupational therapy), certain home health aide services (such as bathing, dressing, feeding), and social services.   Medicare coverage for the package of home health services a particular patient needs is broken out into 60-day periods, each referred to as an "episode of care."

18.     For each episode of care, a physician must certify -- or after the initial 60-day episode, recertify -- the patient's eligibility for the prescribed home health care services.  This certification must provide that: (i) home health care services are required because the individual is confined to his or her home and needs care or therapy on an intermittent basis; (ii) a "Plan of Care" for furnishing the required services has been established and is periodically reviewed by the referring physician; and (iii) the services are being furnished while the patient is under the physician's care.  *See* 42 U.S.C. § 1395f(a)(2)(C); 42 C.F.R. § 424.22.

19.     The Plan of Care is where the referring physician prescribes the specific health care services the home health agency must provide and contains: (i) the physician's signature; (ii) the medical necessity of the prescribed home health care services; (iii) all pertinent diagnoses; (iv) the types of services and equipment required; (v) the frequency of visits; (vi) the patient's prognosis; (vii) the patient's rehabilitation potential; (viii) functional limitations on the patient's progress; (ix) activities permitted; (x) nutritional requirements; (xi) medications and treatments; (xii) any safety measures to protect against injury; and (xiii) instructions for discharge or referral.

6

42 C.F.R. §§ 409.43, 484.18(a).  The Plan of Care must be reviewed by the referring physician,

in consultation with home health agency personnel, at least every 60 days.  42 C.F.R. §

409.43(e).  Any changes to the Plan of Care must be signed and dated by the physician.  42

C.F.R. § 409.43(c)(4).

20.     The amount of Medicare reimbursement for an episode of care is based largely on

the treatment and services prescribed in the Plan of Care, which is incorporated into a patient

assessment form called the Outcome Assessment Information Set ("OASIS") form.  This form is

typically completed by a registered nurse or therapist.  Critical factors that go into the

reimbursement rate include diagnosis coding, the type and frequency of services required, and

the degree of functional impairment of the patient.  If after the completion of an episode of care,

the patient needs continued or additional home services, the home health provider must recertify

the patient for a new episode of care.  At this time, the physician will review and make any

necessary changes to the Plan of Care for the new episode of care period.

21.     In order to be eligible for Medicare reimbursement, a health care provider must

submit an enrollment application to CMS and obtain a provider number.  As part of the

application, the health care provider must agree to abide by all Medicare laws, regulations, and

applicable program instructions.  Likewise, every time a provider submits a claim for Medicare

and Medicaid payment, it certifies the claims are true, accurate and complete, and do not conceal

material facts.  Healthcare providers also agree, as part of their original enrollment in Medicare,

that payment of any claim under the program is conditioned upon the claim and underlying

transaction complying with all material Medicare laws, regulations, and program instructions.

22.     Medicare pays home health care providers under a prospective payment system

which is a predetermined base rate that represents payment for providing the home health care

7

services ordered in the patient Plan of Care for each 60-day episode of care.  42 C.F.R. §§ 484.200, 484.205.  The predetermined base rate for each episode of care may be adjusted upward when a patient requires excess care (which triggers a higher base payment known as an "outlier" payment) or downward where the patient requires less care ("low utilization payment adjustment" or "LUPA") all in accordance with the referring physician's orders as detailed in the patient Plan of Care.  42 C.F.R. § 484.205(b); 42 C.F.R. § 484.205(e).

23.     Under this system, Medicare pays the provider upfront 60 percent of the total expected payment for that patient's initial 60-day episode of care (and 50 percent upfront for each additional episode).  42 C.F.R. § 484.205(b).  At the end of each 60-day episode period, the home health care provider submits a request for the remaining 40 or 50 percent due.  Medicare then pays the provider the requested balance.  42 C.F.R. § 484.205(b).

24.     Prior to receiving any payment, the home health care provider must submit to Medicare a Request for Anticipated Payment ("RAP") at the beginning of every 60 day episode of care.  42 C.F.R. § 409.43(c)(2).  The RAP may only be submitted after: (1) the OASIS assessment is complete; (2) a Plan of Care has been established; (3) the Plan has been signed by the treating physician or the physician's verbal orders for home care have been received and properly documented by the provider; and (4) the first service visit under the Plan of Care has been delivered.  42 U.S.C. § 1395f(a)(2)(C), 42 C.F.R. § 424.22.

Home Health Care Services Under Medicaid

25.     Medicaid is a joint federal-state health benefits program generally available to low-income adults and their children, as well as individuals with certain disabilities.  The federal and state governments jointly fund Medicaid.  Each state administers its Medicaid program in

8

accordance with a CMS-approved State plan. The Department of Health administers Medicaid for New York State.

26. All claims submitted to Medicaid for reimbursement must comply with all applicable Medicare requirements, including the strict rules associated with the patient Plan of Care.

## VNSNY HAS DEFRAUDED MEDICARE AND MEDICAID THROUGH FALSE AND IMPROPER BILLINGS

### I. VNSNY BILLS FOR THE PLAN OF CARE BUT PROVIDES ONLY A FRACTION OF THE VISITS AND SERVICES ORDERED THEREIN

#### A. VNSNY Has Engaged In a Systematic Failure to Follow the Plan of Care

27. Physicians who refer patients to VNSNY order specific home health care services and the frequency at which those services are to be provided to each patient (*e.g.,* 6 rehabilitation therapy visits per week for 6 weeks; 4 skilled nursing visits per week for 4 weeks, etc.). These instructions are prescribed in the Plan of Care which triggers each patient's episode of care on which Medicare and Medicaid reimbursement is based. Despite the referring physicians' explicit directions in the Plan of Care, VNSNY has systematically ignored them for tens of thousands of patients by: (i) failing to provide either the actual number of visits or the services directed to occur during those visits, and (ii) failing to start or provide care on the date or with the frequency the physician has ordered.

28. A major reason for VNSNY's refusal to follow the Plan of Care is the company's mandatory policy of accepting all referrals even when it knows it does not have the capacity to handle them. This allows VNSNY to maximize the number of episodic payments it receives under Medicare and Medicaid, while minimizing the amount of services it provides in complete disregard of the patient Plans of Care.

29.     While Relator Lacey was employed at VNSNY, this "accept all referrals" policy was strictly imposed and rigidly enforced by the top management at VNSNY, including then-CEO Christopher.  Indeed, at a May 14, 2014 meeting Relator Lacey attended, Ms. Christopher reminded her direct reports they are to take *all* referrals in *all* health care areas regardless of whether VNSNY has the capacity to handle them.  She did this fully understanding that VNSNY did not (and does not) actually have the necessary capacity.

30.     On that same day, Relator Lacey was present when Michael Bernstein, VNSNY's then-Senior Vice President and Chief of Sales and Marketing, instructed Donna Lichte, then-Senior Vice President of Enterprise Sales and Marketing, to "withdraw whatever instructions you have given the hospitals on not being able to take Rehab cases.  Mary Ann [Christopher] just screamed at me for an hour.  She said we take every referral for everyone.  What the ##ck!"  This berating by Ms. Christopher was triggered by Mr. Bernstein and Ms. Lichte telling certain referring hospitals a few days earlier that VNSNY was unable to provide timely services and would have to limit the amount of referrals that VNSNY could accept.

31.     VNSNY's "accept all referrals" policy seriously threatens the health and safety of patients because it results in their not receiving the medical treatment prescribed by their treating physicians.  It also runs directly counter to the Medicare rule prohibiting a home health care provider from accepting or retaining patients it does not have the capacity to handle.  When a provider is unable to deliver the services ordered in the Plan of Care, it must immediately provide written notice to the patient (through a Home Health Change of Care Notice) so the patient can find an alternative provider.  *See* 42 U.S.C. § 1395bbb(a)(1)(A)-(E).  As former VNSNY Manager of Rehabilitation Professional Practice Joe Gallagher admitted to Relator Lacey, VNSNY "never" follows these requirements per the direction of VNSNY's top

10

management.  Nor does the company notify and get sign-off from the referring physician that VNSNY is altering the Plan of Care as it is also required to do.

32.     As estimated by Mr. Gallagher at a meeting he had with Relator Lacey and other VNSNY executives on May 28, 2014, VNSNY's refusal to provide its patients the visits and services ordered in their Plan of Care affects roughly half its patients.  This estimate is further borne out in the various reports VNSNY issues that track the delivery of its health care services.

33.     For example, an April 22, 2014 VNSNY report titled "Rehab Delays 4-22-14.xls" shows out of approximately 5,000 patients referred for rehabilitation services during this period, VNSNY failed to provide the prescribed physical therapy, occupational therapy and/or speech therapy services for 2,574 of them.  Another report, a May 9, 2014 report titled "Therapy services not provided as of May 9" shows 2,038 patients for which VNSNY failed to provide any of the ordered therapy services for the period covered.  The report includes Patient Case No.[1] xxx-0714, who had a Plan of Care start date of March 28, 2014 and who at the time of the report, had gone 6 weeks without the therapy services the referring physician had ordered; Patient Case No. xxx-1454, who had a Plan of Care start date of March 10, 2014 and had gone 8 weeks without the ordered therapy; Patient Case No. xxx-4280, who had a Plan of Care start date of March 14, 2014 and had gone 7 weeks without the ordered therapy; Patient Case No. xxx-2446, who had a Plan of Care start date of March 10, 2014 and had gone 8 weeks without the ordered therapy; and Patient Case No. xxx-6863, who had a Plan of Care start date of March 11, 2014, and had gone 8 weeks without the ordered therapy.

---

[1]"Patient Case Number" is the unique identifier VNSNY assigns to each of its patients for each of their 60 day episodes of care.  These numbers have been partially redacted to account for any privacy concerns.

34.     A similar example comes from a May 26, 2014 internal report titled
"UNDER_OVER UTILIZATION REPORT [#2024374].pdf," which compares the visits and
services ordered in VNSNY patient Plans of Care to the visits and services VNSNY actually
provided.  This particular report shows that of the 22 patients reviewed, none of them received
all the visits and services prescribed in their Plans of Care.  In fact, 17 of the 22 patients had not
received any services at all during the relevant period reported.  This report is a sample from a
larger report showing that roughly 400 patients did not receive all the visits and services
prescribed in their Plans of Care.

35.     And yet another example comes from an internal report titled "Late Starts of Care
as of May 29, 2014."  It shows that for the period covered there were more than 1,800 patients
who had yet to receive any home health care visits even though it was well past the date the Plan
of Care directed the first visit take place.

36.     These reports represent just a small sampling of the overwhelming evidence
contained in the files of VNSNY demonstrating the company's widespread and longstanding
practice of ignoring what is contained in the patient Plans of Care, but nevertheless billing and
receiving reimbursement from Medicare and Medicaid anyway without disclosing this critical
failure.

37.     The scope of VNSNY's failure to provide its patients with the level of care they
require has been increasing and engendering a growing chorus of complaints.  As Yvonne
Eaddy, who oversees VNSNY home health care services in Brooklyn, told Relator Lacey on
May 6, 2014: "there has been an explosion of complaints from hospitals, doctors, and patients"
about VNSNY's failure to provide necessary rehabilitation services as prescribed in the Plans of
Care.

38.     At a meeting Relator Lacey attended on April 11, 2014 with several other VNSNY Vice Presidents, there was a discussion on how the company regularly accepts patients when it is abundantly clear it will not be able to provide the health care services prescribed for and required by the patients.  Ms. Eaddy indicated that in her region alone, she had 600 patients for which VNSNY was unable to provide the therapy services ordered in the patient Plans of Care.  She further complained that even if VNSNY were able to provide the prescribed health care services, it would be too late for the patients to derive any benefit.

39.     At this same meeting, Ginny Field, who oversees VNSNY in Manhattan, said she too had around 600 patients in her region for which VNSNY had been failing to follow the Plans of Care.  And Eloise Goldberg, who oversees VNSNY in Queens, echoed these same concerns, pointing to a complaint she had received that morning involving VNSNY accepting a referral for a patient who required speech therapy even though it did not have any available speech therapists to provide the required services.

40.     As Ms. Goldberg articulated it during the May 28 executive meeting, all these failures are damaging VNSNY's reputation and causing some to begin referring to the company as "the 'No' Visiting Nurse Service."

41.     Relator Lacey again met with Ms. Field to discuss this issue on July 9, 2014.  She stated that former VNSNY Chief of Provider Services Regie Hawkey "warned me not to put any of this in writing because it will create even bigger troubles" for the company.  Ms. Field then stated she is "not going down for this ##it" and "one of us has to speak up."

42.     At a July 11, 2014 meeting with various regional vice presidents, Ms. Hawkey and other top management, VNSNY Regional Vice President for the Bronx and Westchester Jill Goldstein said several times that VNSNY is "out of compliance" and "unable to provide safe

care and services" to its patients.  She described the state of the company as a "grave situation" and explained that the VNSNY Customer Service department was receiving "complaints and threats from physicians, patients, family members, and hospitals."  She said "we overload the staff and cases fall through the cracks."

**B.**    **VNSNY's Deliberate Failure to Follow the Plan of Care Seriously Endangers the Welfare of Its Patients**

43.    In failing to provide these doctor-ordered services, VNSNY has not only fraudulently billed Medicare and Medicaid.  The company has also seriously endangered the welfare of its patients, many of whom are very sick and require health care services immediately or soon after they are released from the hospital.

44.    Here are just a few of the countless patient-specific examples of VNSNY's failure to provide its patients the critical care ordered by their referring physicians in their patient Plans of Care:

- For Patient Case No. xxx-2437, the patient had a lower limb amputation, was diagnosed with Lupus, proteinurea and arterial embolism, and was wheelchair bound.  The patient's physician ordered in the Plan of Care 27 rehabilitation visits and 38 nursing visits to occur over the March 18, 2014 to May 16, 2014 60-day episode of care period.  However, VNSNY provided 0 rehabilitation visits and 5 nursing visits during this period, amounting to only 8 percent of the prescribed visits.  Nevertheless, VNSNY billed for and received $3,537 in government reimbursement for this episode of care.

- For Patient Case No. xxx-5533, the patient had a mastectomy and was diagnosed with diabetes, hypertension and obesity.  The patient's physician ordered in the Plan of Care 38 rehabilitation visits and 14 nursing visits to occur over the July 17, 2014 to September 14, 2014 60-day episode of care period.  However, VNSNY provided only 3 rehabilitation visits and 2 nursing visits during this period, amounting to only 10 percent of the prescribed visits.  Nevertheless, VNSNY billed for and received $3,236 in government reimbursement for this episode of care.

- For Patient Case No. xxx-7681, the patient had a kidney transplant and was diagnosed with having difficulty walking and poor endurance.  The patient's

14

physician ordered in the Plan of Care 22 rehabilitation visits and 35 nursing visits to occur over the April 15, 2014 to June 3, 2014 60-day episode of care period. However, VNSNY provided 0 rehabilitation visits and 6 nursing visits during this period, amounting to only 11 percent of the prescribed visits. Nevertheless, VNSNY billed for and received $2,813 in government reimbursement for this episode of care.

- For Patient Case No. xxx-6854, the patient had a knee replacement and was diagnosed with osteoarthritis and gait abnormality. The patient's physician ordered in the Plan of Care 39 rehabilitation visits and 3 nursing visits to occur over the May 27, 2014 to July 25, 2014 60-day episode of care period. However, VNSNY provided only 4 rehabilitation visits and 1 nursing visit during this period, amounting to only 12 percent of the prescribed visits. Nevertheless, VNSNY billed for and received $2,773 in government reimbursement for this episode of care.

- For Patient Case No. xxx-3944, the patient was diagnosed with a hip fracture, unstageable pressure ulcer, diabetes, congestive heart failure and coronary disease. The patient's physician ordered in the Plan of Care 38 rehabilitation visits and 19 nursing visits to occur over the May 22, 2014 to July 20, 2014 60-day episode of care period. However, VNSNY provided only 4 rehabilitation visits and 3 nursing visits during this period, amounting to only 12 percent of the prescribed visits. Nevertheless, VNSNY billed for and received $2,721 in government reimbursement for this episode of care.

- For Patient Case No. xxx-7143, the patient was diagnosed with stage 2 pressure ulcers, chronic obstructive pulmonary disease, hypertension, and congenital postural deformity. The patient's physician ordered in the Plan of Care 30 rehabilitation visits and 22 nursing visits to occur over the May 24, 2014 to July 22, 2014 60-day episode of care period. However, VNSNY provided 0 rehabilitation visits and 9 nursing visits during this period, amounting to only 17 percent of the prescribed visits. Nevertheless, VNSNY billed for and received $2,969 in government reimbursement for this episode of care.

- For Patient Case No. xxx-6462, the patient was diagnosed with hypertension, muscle weakness, syncope and being at risk for falls. The patient's physician ordered in the Plan of Care 35 rehabilitation visits and 17 nursing visits to occur over the April 25, 2014 to June 23, 2014 60-day episode of care period. However, VNSNY provided only 1 rehabilitation visit and 5 nursing visits during this period, amounting to only 12 percent of the prescribed visits. Nevertheless, VNSNY billed for and received $2,680 in government reimbursement for this episode of care.

- For Patient Case No. xxx-8116, the patient was diagnosed with surgical wounds, a fractured coccyx, a lower limb ulcer, Alzheimer's disease and osteoarthritis. The

15

patient's physician ordered in the Plan of Care 34 rehabilitation visits and 38 nursing visits to occur over the May 22, 2014 to July 20, 2016 60-day episode of care period.  However, VNSNY provided only 3 rehabilitation visit and 13 nursing visits during this period, amounting to only 22 percent of the prescribed visits.  Nevertheless, VNSNY billed for and received $3,104 in government reimbursement for this episode of care.

- For Patient Case No. xxx-5668, the patient was diagnosed with coronary disease, peripheral vascular disease and gait abnormality.  The patient's physician ordered in the Plan of Care 27 rehabilitation visits and 13 nursing visits to occur over the May 21, 2014 to July 19, 2014 60-day episode of care period.  However, VNSNY provided only 2 rehabilitation visits and 3 nursing visits during this period, amounting to only 13 percent of the prescribed visits.  Nevertheless, VNSNY billed for and received $2,942 in government reimbursement for this episode of care.

- For Patient Case No. xxx-3383, the patient was diagnosed with diabetes, hypertension and obesity.  The patient's physician ordered in the Plan of Care 11 rehabilitation visits and 22 nursing visits to occur over the April 20, 2014 to June 18, 2014 60-day episode of care period.  However, VNSNY provided 0 rehabilitation visits and 7 nursing visits during this period, amounting to only 21 percent of the prescribed visits.  Nevertheless, VNSNY billed for and received $3,007 in government reimbursement for this episode of care.

45.     Several additional examples of VNSNY's broad-based failure to provide the vital visits and services ordered in its patient Plans of Care include: Patient Case No. xxx-0687, whose doctor prescribed over the May 24, 2014 to July 12, 2014 60-day episode of care period 24 rehabilitation visits to treat the patient's urinary obstruction and dementia but for whom VNSNY provided none of them; Patient Case No. xxx-5607, whose doctor prescribed 35 rehabilitation visits over the April 22, 2014 to June 20, 2014 60-day episode of care period to treat the patient's ovarian cancer but for whom VNSNY provided only one of them; Patient Case No. xxx-6422, whose doctor prescribed 27 rehabilitation visits over the April 25, 2014 to June 23, 2014 60-day episode of care period to treat the patient's congestive heart failure, diabetes, Alzheimer's disease and osteoarthritis but for whom VNSNY provided none of them; and Patient Case No. xxx-5668, whose doctor prescribed 27 rehabilitation visits over the May 21, 2014 to July 19, 2014 60-day

16

episode of care period to treat the patient's coronary disease and peripheral vascular disease but for whom VNSNY provided only 2 of them.

46.     In each of these cases -- and for tens of thousands more involving patients with equally severe medical conditions whose physicians prescribed equally critical rehabilitation and nursing care -- VNSNY billed and received episodic payments from Medicare and Medicaid even though VNSNY failed to provide the vast majority of the critical care visits and services ordered in the patient Plans of Care.

47.     In none of these cases did VNSNY notify the patient of its unilateral decision to so drastically alter the Plan of Care.  Nor did it notify and receive sign-off from the referring physician for these changes.  And in no instance did VNSNY disclose to the government in connection with either its RAP or final claim for payment that it did not provide -- and never had any intention of providing -- a sizeable portion of the visits and services ordered in the Plan of Care (and with many of these VNSNY patients, the vast majority of these prescribed visits and services).

48.     A delay in providing this urgent care, let alone a failure to provide it at all, can have significant adverse consequences on the patient's ultimate recovery, including the need for re-hospitalizations.  VNSNY's Research Department has regularly underscored the importance of providing nursing and rehabilitation care as early as possible and has directed that 2 nursing visits be performed within the first 72 hours of care and that at least 6 rehabilitation visits be performed within the first 2 weeks of care.  VNSNY's pervasive refusal to follow the Plan of Care has resulted in the needless re-hospitalization of many of its patients.

**C.**     **Complying With the Plan of Care Is an Essential Precondition to Government Reimbursement and to Participation in the Medicare/Medicaid Program**

49.     This risk of re-hospitalization and other serious health complications for these homebound patients is precisely the reason why CMS has been so clear in its regulations, interpretations and guidance governing home health care agencies that the Plan of Care must be followed.  It is likewise the reason for CMS's associated regulations and guidance that deviations from the Plan of Care may not occur without sign-off from the referring physician and notice to the patient so that alternative arrangements can be made.

1.     CMS Regulations on Importance of Following the Plan of Care

50.     Providing all the visits and services in the Plan of Care is not only a prerequisite for government payment.  It is an essential requirement for participating in the Medicare and New York Medicaid program altogether.  This comes from the numerous regulations governing the provision of home health care services that specifically relate to the Plan of Care.  *See, e.g.,* 42 C.F.R. § 409.41-43 (requirements for payment); 42 C.F.R. § 424.22 (conditions of payment); 42 C.F.R. § 484.10-55 (conditions of participation).

51.     These regulations include the following requirements surrounding the Plan of Care evincing the government's clear intent that it serve as the core basis around which the home health care patient's treatment is centered: (i) the patient must be under the care of a physician who establishes a Plan of Care for the patient (§ 409.42; § 424.1, 22); (ii) the Plan of Care must provide the exact type and frequency of home health services to be provided (§ 409.43(b); § 484.18(a)); (iii) the referring physician must be notified and sign off on any changes to the Plan of Care (§ 409.43(c); § 484.18(b)); (iv) the patient must be informed of any changes in the Plan of Care before they occur (§ 484.10 (c)); (v) there is an expectation the home health care agency

is capable of meeting all the healthcare needs of the patients it accepts for treatment (§ 484.18);

(vi) the home health agency must provide services and treatment to the patient only as ordered by

the referring physician and in accordance with the Plan of Care (§ 484.18(c); § 484.30; § 484.32;

§ 484.34).  *See also* N.Y. Comp. Codes R. & Regs. tit.10, § 763.11(a)(2) (N.Y.C.R.R.) ("The

governing authority of the agency shall . . . ensure adequate personnel resources to . . . provide

care in the home, based on the needs of the persons served as specified in the plan of care . . .").

>2.   CMS Interpretations on Importance of Following the Plan of Care

52.     The critical importance of following the Plan of Care is also evident from CMS

interpretations and guidance on the subject.  For example, in its Interpretive Guidelines which

are designed to "interpret and clarify" many of the rules governing home health agencies, CMS

highlights the role of the Plan of Care and the need for home health agencies to follow it by

providing all the visits ordered by the referring physician:

> The regulation requires the HHA [home health agency] to alert the physician to
> any changes that suggest a need to alter the plan of care.  If the HHA provides
> fewer visits than the physician orders, it has altered the plan of care and the
> physician must be notified.  The HHA must maintain documentation in the
> clinical record indicating that the physician was notified and is aware of the
> missed visit.

State Operations Manual, Appendix B - Guidance to Surveyors: Home Health Agencies, at

G158.  *See also id.* G108 (HHA must advise patient of frequency of proposed visits and any

changes in Plan of Care before they are made); G157 (reasonable expectation that HHA can meet

all patient's needs); G162 (all clinical services must be implemented "only in accordance" with

Plan of Care); G165 (HHA treatments to be administered "only as ordered by the physician").

53.     CMS also has highlighted the importance of the Plan of Care and of providing all

the services prescribed therein in its Medicare Benefit Policy Manual which provides, among

other things, that: payment can be made only with a Plan of Care established by a physician; the home health agency must be acting upon a Plan of Care that specifically identifies the type and frequency of services to be provided; and any changes to the Plan of Care must be signed and dated by the referring physician; *See* Medicare Benefit Policy Manual, Chapter 7 - Home Health Services, at 10.6B, 20.1.1, 30, 30.2.1, 30.2.4B, 30.5.

54.     As CMS spells out in the Manual, the essential nature of the Plan of Care is grounded in the recognition by Congress in enacting the Medicare program "that the physician would play an important role in determining utilization of services."  *Id.* at 20.1.1.  A home health agency's unilateral decision to disregard the visits and services ordered by the physician in the Plan of Care -- which VNSNY has systematically done across its patient population -- directly undermines this Congressional objective and usurps the role of the referring physicians in deciding the best course of treatment for their patients.

3.     CMS Termination Decisions for Failing to Follow the Plan of Care

55.     It is for this very reason that CMS routinely terminates from the Medicare program home health agencies that fail to follow their patient Plans of Care by providing fewer visits than those ordered by the referring physicians.  In upholding such a termination in a Department of Health and Human Services, Civil Remedies Division, Departmental Appeals Board proceeding, the presiding administrative law judge pointed to the essential role of the home health agency in providing the services and visits ordered by the referring physician:

> A physician must rely on the home health agency to implement the physician's medical judgment, not to exercise its own judgment by providing either more or less care than the physician ordered.  In no instance should a home health agency be unilaterally substituting its judgment for that of the physician as to what the appropriate care of a patient should be.

*A PRO Home Health Care Agency v. Health Care Fin. Admin.*, C-98-095, 1999 HHSDAB

LEXIS 93, at *132 (HHS DAB 1999).  The judge stressed that failing to provide all the

prescribed visits "was a serious and immediate threat to the patient" and clearly warranted the

government's decision to terminate the home health agency from the program.  *Id.* at *84.

56.     The presiding administrative law judge reached a similar conclusion in

*Nightingale Home Healthcare, Inc. v. CMS*, C-16-254, 2016 HHSDAB LEXIS 93 (HHS DAB

2016), in upholding CMS's decision to terminate the home health agency's Medicare

participation for failing to provide the visits ordered in the patient Plans of Care.  The judge

found these "frequent failures" "to conduct patient visits according to the patients' care plans and

physicians' orders… not only were derelictions of the condition requiring [the home health

agency] to meet patients' nursing needs but they harmed or placed patients at great risk for

harm."  *Id.* at *7.  Indeed, the judge found the failures "so egregious as to put Medicare

beneficiaries at immediate jeopardy."  *Id.* at *1.

57.     There are numerous other Departmental Appeals Board decisions reaffirming the

essential requirement that the home health care agency carry out the Plan of Care by providing

all the visits and services ordered by the referring physician.  They likewise attest to the CMS

view that a home health care agency's failure to adhere to this role warrants its termination from

the program.  *See, e.g., Benevolent Home Health Care v. CMS*, C-14-1416, 2015 HHSDAB

LEXIS 222, at *16 (HHS DAB 2015) (upholding CMS decision to terminate the HHA's

Medicare participation for failing to provide ordered visits, noting these "failures 'substantially

limit [Petitioner's] capacity to furnish adequate care' and 'adversely affect the health and safety of

patients'") (quoting 42 C.F.R. § 488.24(b)); *Techota, LLC, d/b/a CV Home Health Servs., v.

CMS*, C-08-445, 2009 HHSDAB LEXIS 11, at *15-16 (HHS DAB 2009) (upholding same,

21

noting that a "[f]ailure to provide the frequency of the visits prescribed for rendering skilled nursing care is indeed a significant deficiency and a failure to meet the required standard"); *Progressive Home Care Servs., Inc. v. CMS*, C-07-724, 2008 HHSDAB LEXIS 97, at *38 (HHS DAB 2008) (upholding same, noting "that these deficiencies limited Progressive's capacity to furnish adequate care"); *Prescribed Care, Inc. v. Health Care Fin. Admin.*, C-96-234, 1997 HHSDAB LEXIS 618, at *20-21 (HHS DAB 1997) (upholding same, noting "[r]epeatedly missing nursing, therapy and other services will adversely affect the health and safety of these vulnerable patients").

       4.      <u>CMS Guidance to Patients on Importance of Receiving All Visits Ordered in Plan of Care</u>

58.      CMS has been equally clear in its messaging to home health care patients how critical it is that they receive all of the visits and services their doctor has ordered in their Plans of Care.  In its "official U.S. government booklet about Medicare home health care benefits," CMS repeatedly emphasizes to patients that the home health care agency "must provide [] all the home care listed in your plan of care."  *Medicare and Home Health Care*, Prod. No. 10969, at 19 (May 2010) (https://www.medicare.gov/Pubs/pdf/10969.pdf) (last visited July 26, 2016); *see also id.* at 9 ("The home health agency is responsible for meeting **all** your medical, nursing, rehabilitative, social, and discharge planning needs, as reflected in your home health plan of care.") (bold emphasis in original).

59.      In fact, in enlisting home health care patients to help CMS prevent fraud in the Medicare program, the very first item on CMS's list of fraudulent conduct that patients should report is "[h]ome health visits that your doctor ordered, but that you didn't get."  *Id.* at 27; *see also* CMS, *What's a home health care plan?* (https://www.medicare.gov/what-medicare-

covers/home-health-care/home-health-plan-of-care.html) (last visited July 26, 2016) ("Your

home health agency must give you or arrange for all the home health care listed in your plan of

care, . . . tell you about any changes in your plan of care and only change it with your doctor's

approval."); *see also* CMS, *What's home health care & what should I expect?*

(https://www.medicare.gov/what-medicare-covers/home-health-care/home-health-care-what-is-

it-what-to-expect.html) (last visited July 26, 2016) ("It's important that home health staff see you

as often as the doctor ordered.").

     60.    With its pervasive failure to follow their patient Plans of Care, VNSNY is not

only acting in direct violation of this clearly articulated government mandate set forth in these

regulations, interpretations, enforcement actions and guidance.  VNSNY is also contravening its

own highly trumpeted promise to patients that it will provide all the visits and services their

referring physician has ordered in the Plan of Care:

> You'll receive from VNSNY all the services your doctor has ordered ….Whether
> you require skilled medical care or assistance with personal care, you can be sure
> that your plan of care will include all the services your doctor prescribes to meet
> your individual needs.

VNSNY, *What to Expect at Your First Home Care Visit*, 2016, (http://www.vnsny.org/

caregivers/caregiving-basics/what-to-expect-at-your-first-home-care-visit/) (last visited

July 26, 2016).

     61.    It is the same promise VNSNY makes to physicians to induce them to send their

patients to VNSNY: "When you send your patients home with a plan of care, we help ensure

they follow it."  VNSNY, *VNSNY Solutions*, 2016 (http://professionals.vnsny.org/) (last visited

July 26, 2016).  Indeed, it is a role VNSNY characterizes as "essential" to the services they

provide patients.  *See* VNSNY, *About Us*, 2016 (http://professionals.vnsny.org/about-us/) (last

visited July 26, 2016) ("helping ensure that patients follow your plan of care is essential to our process").

62.     These representations to patients and physicians evince VNSNY's clear recognition of the critical importance of providing all the visits and services in their patient Plans of Care and how central it is to both doctors and patients in choosing VNSNY for home health care services.  Despite this recognition, VNSNY has intentionally failed to follow through on this vital function for tens of thousands of its patients.  It is doing so to maximize the number of patients it takes so it can in turn maximize the number of episodic payments its receives under Medicare and Medicaid.

63.     If VNSNY patients and their referring physicians were aware of this scheme, they never would have chosen the company for home health care services.  Nor would the government have provided payment (either RAP or final payment) if it had known VNSNY had so blatantly disregarded -- and never had any intention of following -- the doctors' critical care orders in their patient Plans of Care and all the rules on complying with the Plan.

## II.     VNSNY BILLS FOR NURSING AND REHABILITATION VISITS THAT DID NOT OCCUR OR ARE BASED ON FALSIFIED PATIENT TIME AND SERVICE RECORDS

64.     VNSNY requires its nurses and therapists to verify each home health care visit they make by obtaining the patient's electronic signature (on a tablet computer) and calling from the patient's phone into the VNSNY Professional Call-in System.  The visit verification system "time-stamps" these signatures and phone calls.  VNSNY institutes these measures to verify for internal auditing and Medicare/Medicaid reimbursement purposes that the visit occurred, what services were provided and the length of each visit.

65.     Despite having this system, VNSNY knowingly fails to enforce it.  It does so despite full knowledge that a large portion of its nursing and rehabilitation staff has been cheating this verification system for the past decade.  VNSNY nurses and therapists routinely falsify their time and service entries, forge patient signatures, or simply ignore the verification requirements altogether.  Yet, VNSNY has taken no action to correct this fraudulent activity.

66.     VNSNY nurses and therapists obviously benefit from this misconduct because it inflates the number of visits and number of total visiting hours on which their compensation is based.  But VNSNY also benefits by billing for and receiving Medicare and Medicaid reimbursement for home care visits and services that did not happen or did not involve the type or length of care reported.

67.     Based on VNSNY's own internal standards, the average full-time VNSNY nurse should be providing roughly 1,300 home health care visits per year or roughly 6 visits per day. This amount is based on 210 days in the field, accounting for holidays, vacation and training, lunch, breaks and travel between patients and a standard visit length of roughly 37 minutes.  However, VNSNY "Signed Visit" reports (which record patient visit date, time, service, address and visit verification information) show VNSNY staff routinely logging visits well shorter than this 37 minute standard, many just a few minutes long even with travel time. These reports likewise show visit counts well in excess of the standard -- sometimes by thousands of visits per year and by more than triple the standard number of visits for a single day.

68.     One VNSNY nurse in Brooklyn (Employee ID[2] 99700), for example, entered time for roughly 4,000 home visits in 2013, amounting to roughly 20 visits per work day for the entire year.  Not only is this more than three times the standard, it is an amount of home visits that realistically could not be made in a single day, let alone every day for an extended period of time.  VNSNY's reports for 2013 show numerous other examples of such extreme annual visit counts: Employee ID 97535 (3,300 visits); Employee ID 52242 (3,300 visits); Employee ID 72961(3,300 visits); Employee ID 97287 (3,300 visits); Employee ID 62905 (3,300 visits); Employee ID 34425 (3,200 visits); Employee ID 44947 (3,100 visits); Employee ID 97704 (3,000 visits); Employee ID 99013 (3,000 visits); Employee ID 48037 (3,000 visits); Employee ID 48984 (3,000 visits).

69.     The visit reports -- which VNSNY has been keeping for years -- also show clear patterns of the fraud and abuse in which VNSNY nurses and therapists have engaged to falsify their patient visits and hours.  Among their more questionable practices are reporting visits that occurred within a window too narrow to deliver any services, let alone the home care services ordered in the Plan of Care; reporting visits that occurred at different addresses within a window too narrow to even travel between locations; reporting a number of visits too high to be made in a single day; submitting the patient's supposed signature but not calling in from the patient's phone; calling in from the patient's home but not submitting the patient's signature; reporting visits several days after the visit supposedly occurred; failing to provide any verification of the patient visit (patient signature or call-in); and falsely reporting the patient was unable to provide (or refused to provide) a signature verification for the visit.

---

[2] The "Employee ID" is the unique number VNS assigns to its nurses and therapists.

70.     Here are several patient and nurse-specific examples of VNSNY nurses engaging

in this activity.  They come from an audit Relator Lacey conducted of the Signed Visit Reports

for several dozen nurses for the nearly three-month period of January 1 through March 21, 2014.

- On February 19, 2014 a nurse in Manhattan (Employee ID 48037) claimed to have made 20 patient visits at 9 different patient addresses on the Upper East Side of Manhattan (for Patient Case Nos. xx-52734; xx-24649; xx-42927; xx-27765; xx-63924; xx-65728; xx-46730; xx-24303; xx-19624; xx-99422; xx-52949; xx-33773; xx-44250; xx-61814; xx-31442; xx-48110; xx-92154; xx-32449; xx-44980; xx-34829).  According to the nurse, every one of these patients was unable to provide a signature to verify that the visit occurred.  During this three-month period, this nurse had many other days where she purportedly made 20 or more patient visits at multiple different patient addresses.  *See, e.g.,* January 22 (23 visits); January 10 (22 visits); January 29 (22 visits); February 26 (22 visits); March 14 (22 visits); January 2 (21 visits); February 18 (21 visits); March 21 (21 visits); January 21 (20 visits); February 3 (20 visits); February 10 (20 visits); and March 5 (20 visits).  For more than 60 percent of these visits, this nurse reported the patients were unable to provide a signature, and she only provided the required call-in verification for roughly 25 percent of these visits.

- On January 24, 2014 a nurse in Queens (Employee ID 43662) claimed to have made 7 patient visits in 42 minutes, between the hours of 7:25 and 8:07AM, at an 8-story congregate care facility on Woodhaven Boulevard in Rego Park, Queens (for Patient Case Nos. xx-12345; xx-21933; xx-98457; xx-22283; xx-35930; xx-91995; xx-36143).  During this three-month period, this nurse had many other days where she reported making a similarly large number of patient visits at this facility in a similarly short period of time.  *See, e.g.,* March 17 (8 visits between 7:18 and 8:20AM); January 27 (8 visits between 7:23 and 8:27AM); March 1 (6 visits between 7:31 and 8:14AM); March 19 (5 visits between 7:21 and 8:03AM); January 31 (6 visits between 7:25 and 8:13AM); February 22 (5 visits between 7:16 and 7:52AM); and January 10 (6 visits between 7:26 and 8:04AM).

- On January 20, 2014 a nurse in Manhattan (Employee ID 97535) claimed to have completed 20 visits at 19 different patient addresses in Manhattan (for Patient Case Nos. xx-56581; xx-22278; xx-13437; xx-83408; xx-78065; xx-27070; xx-26719; xx-10669; xx-26712; xx-88781; xx-10739; xx-24976; xx-67979; xx-60109; xx-31309; xx-24131; xx-13344; xx-22811; xx-24630; xx-09841).  For 18 of these visits, the nurse reported that the patient was unable to provide a signature to verify that the visit occurred.  For the other 2 visits, the nurse reported that the patient refused to provide a signature.  During this three-month period, this nurse had many other days where she reported making a similarly large number of patient visits without obtaining any patient signature verification because the patients were purportedly all unable to sign.  *See, e.g.,* March 14 (21

patient visits); January 13 (20 patient visits); February 14 (19 patient visits); February 24 (19 patient visits); March 19 (19 patient visits).  In fact, for the entire period, she reported for more than 90 percent of her patient visits that the patient was unable to provide the required patient signature.

- On January 24, 2014, a nurse in Brooklyn (Employee ID 99700) claimed to have made 18 visits to patients at 16 different patient addresses in Brooklyn (for Patient Case Nos. xx-17393; xx-95873; xx-58969; xx-23943; xx-20385; xx-73995; xx-01181; xx-22935; xx-22073; xx-52542; xx-89517; xx-34809; xx-19674; xx-58945; xx-89419; xx-87463; xx-89706; xx-26181).  During one stretch, the nurse claimed to have visited 3 different patients in 3 different buildings in just 35 minutes, between 9:13 AM and 9:48 AM (Patient Case Nos. xx-23943 on Ocean Parkway, xx-20385 at a different address on Ocean Parkway (about 0.5 miles away), and xx-73995 on Argyle Road (about 1.6 miles away)).  During this three-month period, this nurse had many other days where she reported making a similarly large number of patient visits at a similarly large number of disparate patient addresses.  *See, e.g.,* February 4 (20 visits to 18 different patient addresses); February 14 (19 visits to 17 different patient addresses); January 8 (17 visits to 17 different patient addresses); January 15 (17 visits to 16 different patient addresses); February 11 (17 visits to 16 different patient addresses); January 9 (17 visits to 16 different patient addresses).  For roughly 60 percent of the visits she claimed to make during this period, this nurse reported the patients were unable to provide a signature.

- On January 5, 2014 a nurse in the Bronx (Employee ID 52242) claimed to have made 15 patient visits at a congregate care facility on Waring Avenue in the Bronx.  She reported making 9 of those visits in 46 minutes, between 7:39 AM and 8:25 AM (for Patient Case Nos. xx-15610; xx- 44397; xx-86143; xx-86535; xx-99345; xx-88340; xx-27739; xx-69773; and xx-89691).  During this three-month period, this nurse had many other days where she reported making a similarly large number of patient visits at this facility in a similarly short period of time.  She also had numerous visits that reportedly took 3 minutes or less.  *See, e.g.,* February 23 (Patient Case No. xx-88748); January 12 (Patient Case No. xx-85725); February 13 (Patient Case No. xx-88748); February 5 (Patient Case Nos. xx-57927 and xx-26964); February 25 (Patient Case Nos. xx-85737 and xx-37556); February 28 (Patient Case No. xx-69773); March 21 (Patient Case Nos. xx-15610 and xx-85725); January 10 (Patient Case No. xx-93969); February 11 (Patient Case No. xx-37556); February 20 (Patient Case No. xx-77104); January 18 (Patient Case Nos. xx-86535 and xx-88340).

- On February 28, 2014, a nurse in Brooklyn (Employee ID 97704) claimed to have made 13 visits to 13 different patient addresses in Brooklyn (for Patient Case Nos. xx-50650; xx-56126; xx-34894; xx-71741; xx-71390; xx-68596; xx-24250; xx-41235; xx-29761; xx-31958; xx-77662; xx-55030; xx-50316).  During one stretch, she claimed to have visited and treated patient xx-71741 on Ralph Avenue

and to have obtained the patient's signature at 9:36 AM; to have traveled to and treated patient xx-71390 on Thomas S Boyland Street (about 0.9 miles away) just 1 minute later at 9:37 AM when the patient reportedly refused provide a signature; to have traveled to and treated patient xx-68596 on Fulton Street (about 1 mile away) and to have obtained the patient's signature just 8 minutes later at 9:45 AM; and to have traveled to and treated patient xx-24250 at another location on Fulton Street and to have obtained the patient's signature just 9 minutes later at 9:54 AM.  During this three-month period, this nurse had many other days where she reported making a similarly widely dispersed stretch of visits in equally unreasonably short periods of time.  *See, e.g.,* January 31 (5 visits to different addresses between 9:54 and 10:40AM); March 13 (4 visits to different addresses between 5:01 and 5:16PM); March 21 (3 visits to different addresses between 9:21 and 9:28AM); March 14 (3 visits to different addressed between 9:37 and 9:50AM); February 10 (3 visits to different addresses between 9:55 and 10:10AM).

- On March 17, 2014, a nurse in Brooklyn (Employee ID 31877) purportedly made 16 visits to a congregate care facility on East 104th Street in Brooklyn.  Thirteen of the visits were supposedly done in 2 hours between 7:15 and 9:14AM (for Patient Case Nos. xx-05563; xx-04108; xx-04134; xx-03919; xx-45915; xx-38900; xx-30528; xx-59168; xx-74283; xx-05298; xx-80747; xx-65837; xx-62590).  Three of these visits reportedly took place within 7 minutes of each other, between 9:07 and 9:14AM (Patient Case Nos. xx-80747; xx-65837; xx-62590).  During this three-month period, this nurse had many other days where she reported making such short-duration visits.  *See, e.g.,* January 20 (12 visits between 6:17 and 8:28AM); March 8 (13 visits between 6:46 and 8:54AM); January 1 (11 visits between 7:25 and 8:59AM); February 15 (8 visits between 6:43 and 7:48AM).

- On March 10, 2014, a nurse in Manhattan (Employee ID 42285) claimed to have made 16 visits to 13 different locations in Manhattan (for Patient Case Nos. xx-57704; xx-43496; xx-58430; xx-54443; xx-57689; xx-60926; xx-60797; xx-02652; xx-56499; xx-57912; xx-48005; xx-50781; xx-43714; xx-39880; xx-56288; xx-69210.  During one stretch, she claimed to have visited and treated patient xx-43496 on East 121st Street and to have obtained that patient's signature at 12:39 PM; to have traveled to and treated patient xx-58430 on East 105th Street (about 1.3 miles away) and to have obtained that patient's signature just 12 minutes later at 12:51 PM and to have used the call-in system at 1:06 PM; and to have traveled to and treated patient xx-54443 on Lexington Avenue (about 1.3 miles away) and to have obtained that patient's signature just 7 minutes later at 1:13 PM.  Notably, for several of the visits she purportedly made that day, the nurse did not record the visit until 5 days later, reporting for each of them that the patient was unable to provide a signature (Patient Case Nos. xx-56499; xx-57912; xx-48005; xx-50781).  During this three-month period, this nurse had many other days where she recorded a visit several days after the visit supposedly occurred

and for which she reported the patient was unable to provide the required signature verification. *See, e.g.,* February 27 (5 visits reported 5 days later); March 7 (11 visits reported 1 to 5 days later); March 3 (7 visits reported 3 to 5 days later); February 19 (6 visits reported 4 days later); March 14 (7 visits reported 1 to 5 days later).

71.     For each of these visits -- and for tens of thousands of additional visits -- VNSNY has billed and received payment from Medicare and Medicaid even though it has known or should have known that all these visits did not occur or did not last long enough for VNSNY to provide any kind of meaningful care, let alone the critical care ordered in the patient Plans of Care.   VNSNY has billed the government for payment based on the falsified information contained in these nurse visit reports, despite the certification it makes on every final claim for payment that the billing information it is submitting is true, accurate and complete.

72.     This certification is particularly specious given the large number of visits for which VNSNY nurses have failed to provide the required patient signature verification.  This amounted to roughly 10,000 visits for the January 1 through March 21, 2014 nurse sampling Relator Lacey conducted.  In fact, 14 of the nurses from this relatively small sampling failed to obtain the required patient signature for more than 50 percent of the visits they made during this period, with three reaching the 100 percent mark: Employee ID 65229 (100%); Employee ID 97287 (100%); Employee ID 97535 (100%); Employee ID 62271 (92%); Employee ID 97067 (87%); Employee ID 48193 (83%); Employee ID 96189 (78%); Employee ID 48037 (67%); Employee ID 60639 (67%); Employee ID 96257 (65%); Employee ID 99700 (62%); Employee ID 51140 (61%); Employee ID 34425 (53%); Employee ID 8632 (51%).

73.     Relator Lacey had numerous discussions with VNSNY's top management about reining in this fraudulent billing activity, including former CEO Christopher, former CAO Rogers, former Chief of Provider Services Hawkey, Senior Vice President Paul Roth, Human

Resources Vice President Marian Haas, and all the VNSNY regional vice presidents.  But the company refused to take any corrective action despite the clear recognition at the highest levels that something could and should be done.

74.     VNSNY has failed to take any corrective action because it would significantly cut back on the money VNSNY receives from Medicare and Medicaid for these fraudulent billings. So VNSNY has allowed this fraudulent nursing activity to continue unabated.  The "Signed Visit" reports evidencing the fraud continue to be circulated regularly around the company.  And VNSNY continues to bill and collect reimbursement from Medicare and Medicaid based on home health care visits and services it knows have not been provided and have not been properly verified.

## III.   VNSNY BILLS MEDICARE AND MEDICAID FOR HOME HEALTH AIDE SERVICES IT HAS NOT PROVIDED AND FOR WHICH IT IS NOT ENTITLED TO REIMBURSEMENT

### A.     VNSNY Bills Medicare for Home Health Aide Personal Care Services It Does Not Provide

75.     VNSNY provides what are referred to as "paraprofessional services" through its wholly-owned subsidiary, Partners in Care, and through numerous third-party providers.  Home health aides provide these services, which principally include "personal care" services (such as bathing, dressing, grooming) and "custodial care" or housekeeping services (such as cleaning, cooking, shopping, laundry).  Medicare only reimburses for personal care services.  It does not reimburse for custodial care services.  42 C.F.R. § 409.49(d).

76.     Home health aides log their visits through the VNSNY Santrax phone system and VNSNY requires them to enter specific codes for each task they perform to separate reimbursable personal care tasks from non-reimbursable custodial care tasks.  However, VNSNY

routinely re-codes custodial care services as personal care services to collect payment from Medicare for services that are not supposed to be covered.  Even for custodial care services it does not re-code, VNSNY often bills and receives reimbursement from Medicare anyway.

77.     There are numerous internal VNSNY reports that substantiate this fraudulent coding and billing activity.  One such report titled "Copy of PIC_SchedsWithoutPersonalTasks.xls," for example, shows that for the five-day period October 27 through November 1, 2013 VNSNY improperly re-coded as personal care services 2,176 hours of custodial care services for 592 patients.  This included Client MRN Nos.[3] xxxxx-7072 (7 hours); xxxxx-7096 (2 hours); xxxxx-6014 (6 hours); xxxxx-2790 (3 hours); xxxxx-5812 (8 hours); xxxxx-9608 (4 hours); xxxxx-3868 (3 hours); xxxxx-2340 (4 hours); xxxxx-3279 (4 hours); xxxxx-1440 (5 hours).  VNSNY billed and received Medicare reimbursement for this entire amount knowing that none of it was eligible for payment.

78.     Another example comes from an internal VNSNY report covering the month of February 2014 which shows Partners in Care home health aides coding 2,369 hours of custodial care services.  Even though none of these services were eligible for reimbursement, VNSNY billed and collected from Medicare reimbursement for all of them.  This included Client MRN Nos. xxxxx-9285 (2 hours); xxxxx-3736 (4 hours); xxxxx-6450 (6 hours); xxxxx-2672 (6 hours); xxxxx-6635 (6 hours); xxxxx-2221 (24 hours); xxxxx-6688 (6 hours); xxxxx-9164 (3 hours); xxxxx-9797 (4 hours); xxxxx-1985 (4 hours).  Relator Lacey has seen numerous other company reports demonstrating VNSNY's pervasive fraud in its billing Medicare for personal care services it did not actually provide.

---

[3] The "Client MRN Number" is another unique identifier VNSNY assigns to its patients.  These numbers have been partially redacted to account for any privacy concerns.

79.     Former Partners in Care President Marki Flannery told Relator Lacey that reports like these, showing this kind of flagrant billing and coding misconduct, are common and have been around for years.  She also said she tried to raise the issue with VNSNY's top management by, for example, sending these reports to VNSNY's former Chief of Provider Services Hawkey. VNSNY has taken no action to correct this fraudulent practice.

80.     To the contrary, VNSNY has actively facilitated the fraud not only with its own Partners in Care subsidiary, but also with the numerous outside agencies it licenses to perform these home health aide services.  It has done so by programming a "hard stop" into the Santrax phone reporting system for these third-party home health aide vendors, which requires them to enter time for personal care services regardless of whether any were actually provided.  If no such time is entered, the system will reject the entry of any time.

81.     Karen Brooks, Senior Vice President of Information Technology at Sandata Technologies, the company that designed the Santrax system for VNSNY, told Relator Lacey that VNSNY had the system specifically designed that way.  She said that otherwise, VNSNY "can't bill because the services wouldn't be covered" by Medicare.

**B.     VNSNY Has Improperly Billed Medicaid on Home Health Aide Service for Dually Eligible Patients**

82.     "Dually eligible" patients are those who are enrolled in both Medicare and Medicaid.  For these patients, home health care providers such as VNSNY are required to bill Medicare as the primary payor for home health aide services and Medicaid as the secondary payor so Medicaid only covers the portion of the bill Medicare does not cover.  *See, e.g.,* 42 C.F.R. § 433.139; CMS State Medicaid Manual, Pub. No. 45, ch. 3, § 3900.1 (Medicaid is intended to be the "payor of last resort").  Instead of following this required "split-billing"

33

procedure, however, VNSNY often bills Medicaid for a disproportionate number of home health aide hours to maximize the amount of reimbursement it receives under the two government programs.

83.     Prior to May 1, 2012, VNSNY accomplished this scheme by directing its nurses and clinical staff to bill only 2 hours of home health aide time to Medicare and the rest to Medicaid.  It did this because Medicaid reimbursed on an hourly fee-for-service basis, while Medicare reimbursed at an episodic rate.  Therefore, the more hours VNSNY billed to Medicaid, the more money it would make in reimbursement.

84.     Since May 1, 2012, Medicaid moved to reimbursing on an episodic basis similar to Medicare.  However, VNSNY has continued to disproportionately bill its home health aide time to Medicaid so it can collect from both Medicare and Medicaid full episodic rates for the same service -- in effect, double billing for the patient.

85.     Since at least 2008, VNSNY has provided home health care services for roughly 15,000 dually eligible patients per year.  As a result of its split-billing scheme, VNSNY has improperly billed to Medicaid the bulk of home health aide hours for these patients.  As shown immediately below, this has amounted to VNSNY billing Medicaid anywhere from 4 to nearly 10 times as many home health hours as it has billed Medicare.

| Percentage of VNSNY Home Health Aide Hours Billed to Medicare v. Medicaid | | | |
|---|---|---|---|
| | Medicare | Medicaid | Total |
| 2008 | 19% | 81% | 100% |
| 2009 | 21% | 79% | 100% |
| 2010 | 20% | 80% | 100% |
| 2011 | 19% | 82% | 100% |
| 2012 | 10% | 90% | 100% |
| 2013 | 9% | 91% | 100% |

| Number of VNSNY Home Health Aide Hours Billed to Medicare v. Medicaid | | | |
|------|------------|------------|------------|
| | **Medicare** | **Medicaid** | **Total** |
| 2008 | 375,642 | 1,596,478 | 1,972,120 |
| 2009 | 328,520 | 1,260,524 | 1,589,044 |
| 2010 | 336,675 | 1,358,576 | 1,695,251 |
| 2011 | 319,770 | 1,404,328 | 1,724,098 |
| 2012 | 126,779 | 1,156,601 | 1,283,380 |
| 2013 | 121,949 | 1,184,454 | 1,306,403 |

86.     If VNSNY had properly billed for these services, a much higher percentage of these hours would have been apportioned to Medicare and VNSNY would have received substantially less reimbursement.  Instead, VNSNY since at least 2008 has improperly coded and overbilled Medicaid for these millions of hours of home health aide services.

87.     On April 25, 2014, Relator Lacey met with VNSNY Senior Vice President of Population Health Rose Madden-Baer to discuss VNSNY's split billing practice.  Also present at the meeting was Mike Dordick, a partner with McBee and Associates, a health care consulting firm.  Ms. Madden-Baer confirmed the company's "two hour rule" and her discomfort with it: "If the case is a dual [eligible] we just put 2 hours to Medicare so we can bill more to Medicaid."  She said that "being told to enter a mind-numbing 2 for Medicare is wrong," and that she was "having a hard time, knowing this is wrong" and that "we haven't done anything for all these years" to correct the practice.

88.     Ms. Madden-Baer also discussed an informal audit she conducted in 2013 of a sampling of VNSNY's dually eligible assisted living patients.  She reported that of approximately 200 cases she and her team reviewed, they found roughly $25 million in improper split-billings with no basis whatsoever for the hours billed to Medicare and Medicaid.   Ms.

35

Madden-Baer raised these findings with VNSNY senior management, but VNSNY took no action.  After hearing all this, Mike Dordick cautioned "you may want to make sure you don't have a whistleblower on this stuff.  Definitely talk more with your compliance officer."

C.    **VNSNY Has Not Complied With Home Health Aide Supervision Requirements**

89.    Medicare and Medicaid rules specifically require that home health care providers supervise home health aides by having nurses or therapists accompany them in the field on a regular basis -- at least once every two weeks for Medicaid, and once every two weeks for Medicare.  18 N.Y.C.R.R. § 505.23(a)(2)(iii) & (b)(1); 42 C.F.R. § 484.36(d)(1)&(2).  This supervision requirement is to ensure that home health aides are providing the necessary quality care and treatment to appropriately address the serious medical needs of the typical home health care patient.

90.    Despite this important requirement -- which Medicaid treats as a strict condition of payment -- VNSNY has routinely failed to comply with it.  A 2013 internal VNSNY report titled "HHA Supervision 2013" demonstrates just how extensive this lapse is.  It identifies roughly 100,000 instances where VNSNY failed to provide this required supervision.  Among the patients included in this report and the associated number of missed supervision visits are: Patient Case No. xx-1656 (4 missed supervision visits); Patient Case No. xx-14205 (11 missed supervision visits); Patient Case No. xx-44625 (14 missed supervision visits); Patient Case No. xx-78119 (13 missed supervision visits); Patient Case No. xx-85018 (10 missed supervision visits); Patient Case No. xx-26107 (6 missed supervision visits); Patient Case No. xx-41953 (3 missed supervision visits); and Patient Case No. xx-11882 (14 missed supervision visits).  The

same report covering the first six months of 2014 identifies a similarly sizeable failure to comply with this Medicaid requirement -- 22,667 instances.

91.     Notably, New York previously found VNSNY to have violated this requirement in an audit the State Department of Health conducted for the 2003-04 time period.  For this and other failures uncovered in the audit, the State directed VNSNY to return roughly $66 million in Medicaid overpayments.

*        *        *

92.     VNSNY's misconduct -- in billing for visits and services under the Plan of Care but providing only a fraction of those prescribed therein, in billing for falsified nursing and rehabilitation visits, and in billing for falsified, unsupervised, and otherwise ineligible home health aide services -- involves a significant percentage of its patient population, and depending on the particular type of fraud at issue, upwards of one-third of the claims it has submitted to Medicare and Medicaid over the relevant damages period.  This conduct has occurred since at least 2004 caused and continues to cause the United States and New York to pay VNSNY hundreds of millions of dollars in improper Medicare and Medicaid payments.

93.     This damages estimate understates the full injury suffered by the United States and New York.  It fails to account for the significant harm so many of VNSNY's patients have suffered and the additional care so many of them have required because VNSNY has failed to provide them the necessary care their doctors have ordered and that the Medicare and Medicaid rules and regulations require.

## CLAIMS FOR RELIEF

## <u>FIRST CAUSE OF ACTION</u>

### (Federal False Claims Act)

94.     Relator Lacey realleges and incorporates by reference all of the allegations set forth herein.

95.     This is a claim for treble damages and penalties under 31 U.S.C. § 3729(a)(1)(A) and 31 U.S.C. § 3729(a)(1)(B).

96.     As set forth above, in violation of 31 U.S.C. § 3729(a)(l)(A), VNSNY has knowingly presented or caused to be presented false or fraudulent claims for payment or approval by submitting, or causing to be submitted, requests to Medicare and Medicaid for payment or reimbursement for home health care services which were based on services not performed, not performed as promised or required, not in compliance with the governing Medicare and Medicaid rules and regulations, not medically necessary or for which VNSNY was not otherwise entitled to payment.

97.     These claims cover those contained in both the requests for anticipated payment and for final payment VNSNY has made to Medicare and Medicaid over the relevant damages period and include, among other things, requests for payment for (i) visits and services under the patient Plans of Care when VNSNY provided only a fraction of the visits and services the treating physician ordered therein; (ii) visits and services not provided in accordance with patient Plans of Care; (iii) nurse and therapy visits and services not actually provided or where no meaningful care was provided; and (iv) home health aide services not actually provided, not properly supervised or otherwise improperly billed.

38

98.     In addition, as set forth above, in violation of 31 U.S.C. § 3729(a)(1)(B), VNSNY knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims by, among other things (i) not disclosing its failure to provide all the visits and services prescribed in its patient Plans of Care; (ii) not disclosing its failure to provide visits and services in accordance with its patient Plans of Care; (iii) not disclosing its failure to notify and obtain sign-off from the referring physician for changes to the Plans of Care; (iv) not disclosing its inability to provide all the visits and services ordered in, and in accordance with, its patient Plans of Care; (v) not disclosing its intention at the time it submitted its RAP not to provide all the visits and services ordered in, and in accordance with, its patient Plans of Care; (vi) not disclosing its failure to comply with all other material Medicare and Medicaid regulations governing the Plans of Care; (vii) falsifying patient time and service records for nurse and therapy visits; and (viii) falsifying patient service records for home health aide personal care and custodial care visits and otherwise failing to properly bill for home health aide services.

99.     Furthermore, in violation of 31 U.S.C. § 3729(a)(1)(A) & (a)(1)(B), VNSNY has falsely certified on its claims for payment that the information on which the claims are based is true and correct and not based on any misrepresentation or omission of any material fact when it knows it has failed to provide the visits and services ordered in, and in accordance with, its patient Plans of Care, falsified nurse and therapy visit time and service records, falsified home health aide service records, and otherwise failed to abide by important Medicare and Medicaid rules and regulations.

100.    Likewise, in violation of 31 U.S.C. § 3729(a)(1)(A) & (a)(1)(B),VNSNY has falsely certified or represented that it has complied with all governing Medicare and Medicaid rules and regulations.  When enrolling in these government programs it agreed (i) to abide by all

laws, regulations and applicable program instructions; and (ii) that payment of any claim under these programs would be conditioned upon the claim and underlying transaction complying with these laws, regulations, and program instructions.

101.    These false claims, records, statements and certifications were material to the government's payments to VNSNY for home health care services.  Had the government known that VNSNY was failing to provide the visits and services ordered in, and in accordance with, its patient Plans of Care, falsifying nurse and therapy time and service records, falsifying home health aide service records and otherwise failing to comply with such key Medicare and Medicaid rules and regulations, it would have had a natural tendency to influence or been capable of influencing the government's decision to provide payment or reimbursement.  Indeed, the government would not have made payment at all.

## SECOND CAUSE OF ACTION

(New York False Claims Act)

102.    Relator Lacey realleges and incorporates by reference all of the allegations set forth herein.

103.    This is a claim for treble damages (including consequential damages) and penalties under N.Y. Fin. Law § 189(1)(a) and N.Y. Fin. Law § 189(1)(b).  VNSNY has knowingly presented or caused to be presented false or fraudulent claims for payment or approval by submitting, or causing to be submitted, requests to New York Medicaid for payment or reimbursement for home health care services which were based on services not performed, not performed as promised or required, not in compliance with the governing Medicare and New

York Medicaid rules and regulations, not medically necessary or for which VNSNY was not otherwise entitled to payment.

104.    These claims cover those contained in both the requests for anticipated payment and for final payment VNSNY has made to New York Medicaid over the relevant damages period and include, among other things, requests for payment for (i) visits and services under the patient Plans of Care when VNSNY provided only a fraction of the visits and services the treating physician ordered therein; (ii) visits and services not provided in accordance with the patient Plans of Care; (iii) nurse and therapy visits and services not actually provided or where no meaningful care was provided; and (iv) home health aide services not actually provided, not properly supervised or otherwise improperly billed.

105.    In addition, as set forth above, in violation of N.Y. Fin. Law § 189(1)(b), VNSNY knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims by, among other things (i) not disclosing its failure to provide all the visits and services prescribed in its patient Plans of Care; (ii) not disclosing its failure to provide visits and services in accordance with its patient Plans of Care; (iii) not disclosing its failure to notify and obtain sign-off from the referring physician for changes to the Plans of Care; (iv) not disclosing its inability to provide all the visits and services ordered in, and in accordance with, its patient Plans of Care; (v) not disclosing its intention at the time it submitted its RAP not to provide all the visits and services ordered in, and in accordance with, its patient Plans of Care; (vi) not disclosing its failure to comply with all other material Medicare and Medicaid regulations governing the Plans of Care; (vii) falsifying patient time and service records for nurse and therapy visits; and (viii) falsifying patient service records for home health aide personal care and custodial care visits and otherwise failing to properly bill for home health aide services.

41

106.    Furthermore, in violation of N.Y. Fin. Law § 189(1)(a) and N.Y. Fin. Law § 189(1)(b),VNSNY has falsely certified on its claims for payment that the information on which the claims are based is true and correct and not based on any misrepresentation or omission of any material fact when it knows it has failed to provide the visits and services ordered in, and in accordance with, its patient Plans of Care, falsified nurse and therapy visit time and service records, falsified home health aide service records, and otherwise failed to abide by important Medicare and Medicaid rules and regulations.

107.    Likewise, in violation of N.Y. Fin. Law § 189(1)(a) and N.Y. Fin. Law § 189(1)(b),VNSNY falsely certified or represented that it has complied with all governing Medicare and Medicaid rules and regulations.  When enrolling in these government programs it agreed (i) to abide by all laws, regulations and applicable program instructions; and (ii) that payment of any claim under these programs would be conditioned upon the claim and underlying transaction complying with these laws, regulations, and program instructions.

108.    These false claims, records, statements and certifications were material to New York's payments to VNSNY for home health care services.  Had New York known that VNSNY was failing to provide the visits and services ordered in, and in accordance with, the patient Plans of Care, falsifying nurse and therapy time and service records, falsifying home health aide service records and otherwise failing to comply with such key Medicaid and Medicare rules and regulations, it would have had a natural tendency to influence or been capable of influencing New York's decision to provide payment or reimbursement.  Indeed, New York would not have made payment at all.

**PRAYER FOR RELIEF**

WHEREFORE, Relator Lacey requests the following relief:

A.     Declaring that VNSNY's practices and conduct have violated the federal False Claims Act, 31 U.S.C. §§ 3729-3733 and New York False Claims Act, N.Y. Fin. Law §§ 187-194.

B.     Enjoining and restraining VNSNY from engaging in any conduct, contract or agreement, and from adopting or following any practice, plan, program, scheme, artifice or device similar to, or having a purpose and effect similar to, the conduct complained of above;

C.     Directing that VNSNY, pursuant to 31 U.S.C. §§ 3729-3733 and N.Y. Fin. Law § 187-194, pay an amount equal to three times the amount of damages the United States and New York have sustained, including consequential damages, as a result of defendants' violations of the federal False Claims Act and the New York False Claims Act;

D.     Directing that VNSNY, pursuant to 31 U.S.C. §§ 3729 *et seq*. and N.Y. Fin. Law § 187 *et seq*., pay penalties of not less than $5,500 (to increase to $10,781 on August 1, 2016 for violations occurring after November 2, 2015) to not more than $11,000 (to increase to $21,563 on August 1, 2016 for violations occurring after November 2, 2015) for each violation of 31 U.S.C. §§ 3729 *et seq*. and of not less than $6,000 and not more than $12,000 for each violation of N.Y. Fin. Law § 189.

E.     Directing that Relator Lacey receive the maximum award allotted by 31 U.S.C. § 3730 and N.Y. Fin. Law § 190;

F.     Directing that VNSNY pay Relator Lacey's costs, including attorneys' fees as provided by law;

G.      That this Court award pre and post judgment interest on any damages awarded to

the United States, New York, or Relator;

H.      Directing such other equitable relief as may be necessary to redress VNSNY's

violations of the United States and New York law; and

I.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Relator Lacey hereby demands a trial by jury.


Dated:  July 28, 2016

                        **CONSTANTINE CANNON LLP**

                        _____
                        Gordon Schnell (Bar I.D. GS2567)
                        Marlene Koury (Bar I.D. MK0391)
                        Daniel Vitelli (Bar I.D. DV1276)
                        Hamsa Mahendranathan (Bar I.D. HM6119)
                        335 Madison Avenue
                        New York, NY 10017
                        Tel: (212) 350-2700
                        Fax: (212) 350-2701


                        _Counsel for Relator_