UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

United States of America and State of New York
*ex rel.* Edward Lacey,

                    Plaintiff,

            —v—

Visiting Nurse Service of New York,

                    Defendant.

14-cv-5739 (AJN)

MEMORANDUM &
ORDER

---

ALISON J. NATHAN, District Judge:

In this False Claims Act ("FCA") *qui tam* action, Relator Edward Lacey seeks to hold his

former employer, Defendant Visiting Nurse Service of New York ("VNSNY"), liable for its

alleged filing of fraudulent claims for repayment under Medicare and Medicaid to both the

federal government and State of New York.  Defendant has filed a motion to dismiss Relator's

First Amended Complaint in its entirety with prejudice.  Relator has plausibly alleged under

Federal Rule of Civil Procedure 12(b)(6) that VNSNY filed false claims for payment under

several theories of FCA liability and based on several different allegedly fraudulent schemes.

Relator has also alleged most of these fraudulent actions with the particularity required by

Federal Rule of Civil Procedure 9(b).  As a result, the Court largely denies the motion to dismiss.

## I.      Background

The following facts, except the statutes and regulations governing Medicare and

Medicaid, are derived from Relator's First Amended Complaint and are assumed to be true for

purposes of this motion.  *See DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d

145, 147 (2d Cir. 2014).

A.      **Regulatory Background**

1.      **Medicare**

Congress established the Medicare program in 1965 to provide health insurance coverage

for people age 65 and older and for individuals with certain disabilities. *See generally* 42 U.S.C.

§ 1395c. Medicare is administered by the U.S. Department of Health and Human Services

Center for Medicare and Medicaid Services ("CMS"). One of the services covered by Medicare

is "home health services," which entails the provision of certain services for individuals confined

to the home. *See, e.g.*, *id.* §§ 1395d(a)(3); 1395f(a)(2)(C); 1395k(a)(2)(A). Home health

services are generally provided by a "home health agency" ("HHA"), *id.* § 1395x(m), which is

defined as "a public agency or private organization" that "is primarily engaged in providing

skilled nursing services and other therapeutic services," and meets certain other statutorily

prescribed criteria, *id.* § 1395x(o). The four basic categories of home health services Medicare

covers are skilled nursing services, therapy services, medical social services, and home health

aide services. *See id.* § 1395x(m); 42 C.F.R. §§ 484.30-36. Home health aide services include,

among other services, "personal care services," which are covered under Medicare, 42 C.F.R.

§ 409.45(b)(1)(i), and "housekeeping services,"[1] which are not covered, *id.* § 409.49(d).

Medicare only pays for home health services if a physician certifies (and thereafter

recertifies every 60 days) that the patient is eligible for the prescribed home health services. *Id.*

§ 424.22; *see also* 42 U.S.C. § 1395f(a)(2)(C); 42 C.F.R. §§ 409.41-43, 484.10(c). The

certification must provide that (1) the individual requires services because he or she is confined

to the home and needs nursing, therapy, or other care on an intermittent basis; (2) that a plan for

furnishing the services ("Plan of Care") has been established and will be periodically reviewed

---

[1] Both parties refer to these services as "custodial care services," which the Court adopts for purposes of
consistency with the pleadings.

by a physician, (3) that the services outlined in the Plan of Care will be "furnished . . . while the individual [is] under the care of a physician," and (4) the physician or other designated practitioner has recently had a face-to-face encounter with the patient. 42 U.S.C. § 1395f(a)(2)(C); 42 C.F.R. § 424.22(a).

The Plan of Care, in turn, must specify "all pertinent diagnoses, including mental status, types of services and equipment required, frequency of visits, prognosis, rehabilitation potential, functional limitations, activities permitted, nutritional requirements, medications and treatments, any safety measures to protect against injury, instructions for timely discharge or referral, and any other appropriate items." 42 C.F.R. § 484.18(a); *see also id.* § 409.43(a)-(b). The Plan of Care must be reviewed by the referring physician at least every 60 days, *id.* § 409.43(e), and any changes to the Plan of Care must be signed and dated by the physician, *id.* § 409.43(c)(4). Treatment may only be given in accordance with the Plan of Care. *Id.* §§ 484.18(c), 484.30-34. A home health agency is only allowed to accept a new patient if it has "a reasonable expectation that the patient's medical, nursing, and social needs can be met adequately by the agency." *Id.* § 484.18. If an HHA will be unable to provide the services prescribed in the Plan of Care, it is required to immediately provide written notice to the patient so that the patient can find an alternative provider. *See* 42 U.S.C. § 1395bbb(a)(1)(A), (E); CMS Medicare Claims Processing Manual, Pub. No. 100-04, Transmittal 2781 (2013).

In order to be eligible for Medicare reimbursement, an HHA must submit an enrollment application to CMS and obtain a provider number. *See* 42 U.S.C. § 1395bbb(a)(3); 42 C.F.R. § 484.10-55 (conditions of participation). Once the HHA is accepted to the Medicare program, it submits payment requests to CMS under a two-part system. When an HHA begins providing care for a patient, it submits a Request for Anticipated Payment ("RAP"). *See* 42 C.F.R.

3

§ 484.205. CMS will pay the HHA 60% of the anticipated cost at the RAP stage for the initial

episode of care and 50% for all subsequent episodes of care. *Id.* § 484.205(b)(1)-(2). At the end

of the episode of care, the HHA files a final claim for payment. *See id.* This payment is subject

to several adjustments if the amount of services required were significantly higher or lower than

expected or if the episode of care was terminated before 60 days had elapsed. *See id.*

§ 484.205(a)-(e). The amount paid for an episode of care is calculated according to a formula

mandated by federal regulation. *See id.* §§ 484.205(a), 484.215.

### 2. Medicaid

Medicaid is a joint federal-state health benefits program intended to assist low-income

adults and their children, as well as some individuals with disabilities. *See* 42 U.S.C. § 1396-1.

The program is funded by the federal and state governments. *See id.* § 1396a(a)(2). Each state

runs the program in accord with a State Plan approved by the federal government. *Id.* § 1396a.

Claims submitted to Medicaid for reimbursement must comply with all applicable Medicare

requirements. Patients who are dually eligible for both Medicare and Medicaid must use

Medicare as the primary insurer, with Medicaid paying only in excess of Medicare's coverage.

42 C.F.R. § 433.139.

### B. Parties

VNSNY is the largest nonprofit HHA in the country. First Amended Complaint

("FAC"), Dkt. No. 16, ¶ 11. It provides home health care services such as skilled nursing,

rehabilitation therapy, social work, nutrition counseling, and personal and custodial care services

to approximately 150,000 patients each year throughout the five boroughs of New York City, as

well as Nassau, Suffolk, Westchester, and several upstate New York counties. *Id.* The "vast

majority" of VNSNY's patients are beneficiaries of Medicare and Medicaid, as well as the

4

Medicare Advantage program funded by the federal government and managed by private insurance companies. *Id.*

Relator Edward Lacey was employed at VNSNY for approximately sixteen years. *Id.* ¶ 8. When he left the company in January 2015, he was employed as the Vice President of Operations Improvement and Integration. *Id.* Lacey had previously served as VNSNY's Vice President of Finance, as well as serving as director in several of VNSNY's departments. *Id.* ¶ 9. In 2014, while still employed by VNSNY, Lacey filed a Complaint in this case alleging several violations of both the False Claims Act and the New York False Claims Act. *See* Complaint, Dkt. No. 12.

### C.     Alleged Fraud

VNSNY's alleged fraud can be broken into three primary categories: billing for Plans of Care that were not actually satisfied, billing for nursing visits that did not occur, and billing for home health aide services for which reimbursement was not allowed.

#### 1.     Plan of Care Fraud

According to Lacey, VNSNY regularly fails to provide the services set out in the patient's Plan of Care, and does so without notifying the referring physician or having the physician sign off on decreasing the quantity of services provided. FAC ¶¶ 27, 31, 36, 44-47. Approximately half of all VNSNY patients do not receive the number of service visits prescribed by their referring physician and represented in their Plans of Care. *Id.* ¶¶ 27, 32-36. This amounts to tens of thousands of patients each year receiving inadequate services. *See id.* Several internal VNSNY reports from 2014 identified thousands of patients who had not received all of the services prescribed to them, as well as patients who had not received *any* of their prescribed services. *See id.* ¶¶ 33-34, 44-45. For "tens of thousands" of seriously ill

patients, "VNSNY failed to provide the vast majority of the critical care visits and services ordered in the patient Plans of Care." *Id.* ¶¶ 46-47. Such failure can result in patients being rehospitalized. *See id.* ¶ 48. VNSNY's 2014 internal documents also identified thousands of patients who received their care much later than the intended start date of the Plan of Care. *Id.* ¶¶ 33, 35. According to the First Amended Complaint, VNSNY nonetheless billed Medicare and Medicaid for these claims without notifying CMS of the departures from the patients' Plans of Care. *Id.* ¶ 36.

The First Amended Complaint further alleges that several VSNY Vice Presidents stated to Relator Lacey in 2014 that hundreds of the patients in each of their individual geographic regions had not received services or received them "too late for the patients to derive any benefit." *See id.* ¶¶ 38-39. VNSNY's top management acknowledged that these failings put them "out of compliance" with CMS's requirements and made the company "unable to provide safe care and services" to VNSNY's patients. *Id.* ¶ 42. Patients, physicians, and hospitals also began to recognize VNSNY's failings, resulting in "an explosion of complaints" about VNSNY's failure to provide prescribed services, *id.* ¶ 37, and VNSNY earned the nickname "the 'No' Visiting Nurse Service," *id.* ¶ 40.

Plaintiff alleges that a major cause of VNSNY's failure to provide all services required by patients' Plans of Care is VNSNY's policy of accepting all referrals, even when it knows it cannot handle new clients. *Id.* ¶ 28. VNSNY adopted this policy in order to maximize the payment it receives from CMS and the State of New York, which occurs on an episodic basis rather than per service provided. *See id.* VNSNY's CEO expressly reminded the managers reporting to her of this policy "regardless of whether VNSNY ha[d] the capacity to handle" the referrals. *Id.* ¶ 29. She also "berat[ed]" the company's Senior Vice President in 2014 for telling

hospitals that it could not provide timely services and would need to limit the number of new

referrals the hospitals made to VNSNY. *Id.* ¶ 30.

### 2.    Falsified Personnel Visits

Lacey also claims that VNSNY's nursing and rehabilitation staff regularly falsifies

patient service visits. *Id.* ¶ 65. VNSNY knows about this behavior but does not correct its staff

because this practice allows the company to receive Medicare and Medicaid reimbursement for

services "that did not happen or did not involve the type or length of care reported." *Id.* ¶ 66.

Evidence of this pattern of fraud includes personnel:

> reporting visits that occurred within a window too narrow to deliver any services,
> let alone the home care services ordered in the Plan of Care; reporting visits that
> occurred at different addresses within a window too narrow to even travel between
> locations; reporting a number of visits too high to be made in a single day; . . .
> reporting visits several days after the visit supposedly occurred; failing to provide
> any verification of the patient visit (patient signature or call-in); and falsely
> reporting the patient was unable to provide (or refused to provide) a signature
> verification for the visit.

*Id.* ¶ 69. For example, twelve VNSNY nurses and other personnel reported that they conducted

between 3000 and 4000 patient service visits in 2013. *Id.* ¶ 68. This amounts to approximately

20 service visits per day every work day for the entire year.[2] *Id.* In contrast, VNSNY's internal

standards suggest that personnel can conduct approximately 6 visits per day (of approximately

37 minutes each) for a total of 1300 visits per year. *Id.* ¶ 67. Eight additional nurses reported

regularly conducting high numbers of service visits per day, sometimes reporting that several

visits occurred at separate addresses within minutes of each other. *See id.* ¶ 70.

While VNSNY has in place a verification system to ensure visits occurred – which

requires personnel to both obtain a patient's electronic signature and call from the patient's

---

[2] These calculations are based on VNSNY's internal standards, which assume personnel will work 210
days per year after holidays, vacation, and training are accounted for. *See* FAC ¶ 67.

phone to VNSNY's call-in system, *id.* ¶ 64, it "knowingly fails to enforce it," *id.* ¶ 65. For example, between January 1 and March 21, 2014, approximately 10,000 visits were not properly verified. *Id.* ¶ 72. During that period, fourteen nurses failed to verify over half of their patient service visits, including three nurses who did not verify a single visit. *Id.* And many of the nurses who recorded an improbable number of patient visits on various days in 2014 also failed to verify those same visits. *See id.* ¶ 70 (reporting that Employee ID 48037 visited twenty patients at nine different addresses on February 19, 2014 without obtaining a single patient signature and Employee ID 97535 visited 20 different patients at 19 different addresses on January 20, 2014 without obtaining any patient signatures); *see also id.* (reporting that the nurses identified as reporting improbably high numbers of patient visits per day also generally obtained patient signatures at a rate below 40%).

These examples are indicative of personnel behavior "for tens of thousands of additional visits" – all of which VNSNY nevertheless billed to Medicare and Medicaid. *Id.* ¶ 71. Although Relator Lacey persistently discussed this fraudulent billing activity with VNSNY's CEO and other top executives, VNSNY "refused to take any corrective action." *See id.* ¶¶ 73-74. According to the First Amended Complaint, VNSNY instead has continued to knowingly submit records of falsified services to CMS and the State of New York. *Id.*

### 3. Home Health Aide Fraud

The last category of fraud pled in the First Amended Complaint is that VNSNY submits claims for reimbursement to CMS for home health aide services that are fraudulent based on three different practices. First, VNSNY improperly re-codes "custodial care" services, which Medicare does not reimburse, as personal care services, which it then submits for reimbursement. *Id.* ¶¶ 77-78. Despite one of VNSNY's subsidiaries raising this issue with VNSNY's top

management, VNSNY "has taken no action to correct this fraudulent practice." *Id.* ¶ 79. In fact, VNSNY perpetuates fraudulently billing CMS for custodial care services – it programmed a unique phone system that will not allow personnel to enter any custodial care service hours unless they first enter at least one hour of personal care services. *Id.* ¶¶ 76, 80-81.

Second, VNSNY bills both Medicare and Medicaid for dually eligible patients in order to receive full episodic payment from each instead of only billing Medicaid when Medicare will not cover the costs of the entire episode. *Id.* ¶¶ 82-86. VNSNY knew it was acting in violation of the law: one of its Senior Vice Presidents acknowledged VNSNY's practice, that it was intended to let VNSNY "bill more to Medicaid," and that she was "having a hard time, knowing this [practice] is wrong." *Id.* ¶ 87. VNSNY's practice is widespread: in a 2013 audit of 200 cases conducted by the same VNSNY Senior Vice President, she discovered "roughly $25 million in improper split-billings with no basis whatsoever for the hours billed to Medicare and Medicaid." *Id.* ¶ 88. A healthcare consultant who was present when the Senior Vice President described this practice to Relator Lacey advised "you may want to make sure you don't have a whistleblower on this stuff." *Id.*

Third, VNSNY does not comply with Medicare and Medicaid rules, which require home health aides be supervised by nurses or therapists once every two weeks. 18 N.Y.C.R.R. § 505.23(a)(2)(iii), (b)(1); 42 C.F.R. § 484.36(d)(1)-(2). A 2013 VNSNY report listed 100,000 instances in which VNSNY failed to supervise home health aides. FAC ¶¶ 89-90. During the first six months of 2014, VNSNY failed to supervise home health aides in 22,667 required instances. *Id.* ¶ 90. VNSNY was previously forced by the State of New York to return $66 million in Medicaid overpayments for failure to supervise home health aides. *Id.* ¶ 91.

## II.   Relator's Claims Plausibly Allege Violations of the False Claims Act Under Rule 12(b)(6).

### A.   Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), the complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim achieves "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausibility is "not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Assessing the plausibility of a complaint is "a 'context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Pantoja v. Banco Popular*, 545 F. App'x 47, 49 (2d Cir. 2013) (quoting *Harris v. Mills*, 572 F. 3d 66, 72 (2d Cir. 2009)). "Plausibility thus depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

The False Claims Act ("FCA") imposes civil penalties on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the U.S. government. 31 U.S.C. § 3729(a)(1)(A).[3] To prove a claim under the FCA, relators "must show that defendants (1) made a claim, (2) to the United States government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury." *Mikes*

---

[3] The New York False Claims Act "mirrors the FCA in many respects." *United States v. N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d 276, 286 (E.D.N.Y. 2016). As a result, "[w]hen interpreting the NYFCA, New York courts rely on federal FCA precedent." *Kane ex rel. United States v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 381 (S.D.N.Y. 2015).

*v. Straus*, 274 F.3d 687, 695 (2d Cir. 2001), *abrogated in part by Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016). Under the FCA, "claims" include "direct requests to the Government for payment as well as reimbursement requests made to the recipients of federal funds under federal benefits programs." *Escobar*, 136 S. Ct. at 1996. In order to demonstrate that a defendant acted knowingly, the relator must prove that the defendant had actual knowledge, acted in deliberate ignorance, or acted in reckless disregard of the falsity of the claims being submitted. 31 U.S.C. § 3729(b)(1)(A).

Under the FCA, claims can be either "factually" false or "legally" false. *United States ex rel. Wood v. Allergan, Inc.*, No. 10-cv-5645 (JMF), 2017 WL 1233991, at *2 (S.D.N.Y. Mar. 31, 2017). The archetypal FCA claim is a factually false one that "involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *Mikes*, 274 F.3d at 697. A factually false claim may also be based on fraudulent inducement: that is, the defendant made fraudulent representations to the government to induce it to enter a contract, and although no false statements were made at the time of the actual claims for payment, because the claims "derived from the original fraudulent misrepresentation," they too are "actionable false claims." *United States ex rel. Feldman v. van Gorp*, 697 F.3d 78, 91 (2d Cir. 2012) (quoting *United States ex rel. Longhi v. United States*, 575 F.3d 458, 468 (5th Cir. 2009)). To plausibly allege a fraudulent inducement claim, a relator must demonstrate that the defendant made fraudulent statements to the government and that this fraudulent conduct induced the government to enter into some form of contract with the defendant. *See United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 623 (S.D.N.Y. 2013).

A legally false claim, meanwhile, is "predicated upon a false representation of compliance with a federal statute or regulation or a prescribed contractual term." *Mikes*, 274

F.3d at 696.  There are two types of legally false claims: those based on express false

certification and those based on implied false certification.  Express false certification occurs

when "a party certifies compliance with a statute or regulation as a condition to governmental

payment, but is not actually compliant." *Bishop v. Wells Fargo & Co.*, 823 F.3d 35, 43 (2d Cir.

2016) (quoting *Mikes*, 274 F.3d at 697), *vacated on other grounds*, 137 S. Ct. 1067 (2017).

Implied false certification occurs "where the submission of the claim itself is fraudulent because

it impliedly constitutes a certification of compliance." *Id.*  A theory of implied false certification

can be a basis for liability where two conditions are satisfied: "first, the claim does not merely

request payment, but also makes specific representations about the goods or services provided;

and second, the defendant's failure to disclose noncompliance with material statutory, regulatory,

or contractual requirements makes those representations misleading half-truths." *Escobar*, 136

S. Ct. at 2001.

  For a relator to make out a violation of the FCA under a legally false theory, it must be

shown that the misrepresentation about compliance is "material" to the government's decision to

pay.  *Id.* at 2002.  This is because the FCA is not intended to be "'an all-purpose antifraud

statute' or a vehicle for punishing garden-variety breaches of contract or regulatory violations."

*Id.* at 2003 (quoting *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 672

(2008)).  In order to be material, the misrepresentation must "hav[e] a natural tendency to

influence, or be capable of influencing, the payment or receipt of money or property." *Id.* at

1996 (quoting 31 U.S.C. § 3729(b)(4)).  The Supreme Court has explained that materiality is a

"demanding" standard, *id.* at 2003, that requires a holistic assessment.  Provisions are "not

automatically material, even if they are labeled conditions of payment." *Id.* at 2001.  For

example, "if the Government pays a particular claim in full despite its actual knowledge that

certain requirements were violated, that is very strong evidence that those requirements are not material." *Id.* at 2003. Conversely, where "a reasonable person would realize" that the misrepresentation concerned an "imperative" aspect of the good or service, "a defendant's failure to appreciate the materiality of that condition would amount to 'deliberate ignorance' or 'reckless disregard' of the 'truth or falsity of the information' even if the Government did not spell this out." *Id.* at 2001-02.

Defendant argues that the First Amended Complaint fails to allege a prima facie case because it does not demonstrate "that claims for governmental payment that VNSNY submitted (or caused to be submitted) were actually *false*." Memo. in Support of Mot. to Dismiss, Dkt. No. 27, at 7. In addition, it argues that even if the claims were false, they were not *materially* false. *See id.* at 7, 9.

### B.    Relator Has Alleged a Prima Facie Claim Based on VNSNY'S False Plans of Care

Lacey's primary claim – that VNSNY submitted fraudulent claims for repayment to the government based on VNSNY's failure to satisfy patients' Plans of Care – survives the motion to dismiss based on two theories: factual falsity and implied false certification.

#### 1.    Factual Falsity Theory

Lacey has alleged a prima facie claim that VNSNY filed false claims with the government by receiving Medicare and Medicaid payments for Plans of Care that were not actually satisfied. In short, the First Amended Complaint alleges that VNSNY submitted claims to the government for services that were never provided (or not provided the number of times claimed). FAC ¶¶ 27, 31-36, 44-47, 96-97. This is the "archetypal" factually false claim under the FCA. *See Bishop*, 823 F.3d at 43; *see also New York ex rel. Khurana v. Spherion Corp.*, 15-cv-6605 (JFK), 2016 WL 6652735, at *15 (S.D.N.Y. Nov. 10, 2016) ("[Plaintiff's] allegations

raise a plausible theory of factual falsity. The crux of Plaintiff's false billing claims is that Spherion billed for certain services it did not actually provide."). At the very least, the First Amended Complaint plausibly alleges that when VNSNY made claims for repayment and sent CMS the attendant Plans of Care, it provided a false description of the services it had actually provided: VNSNY thus claimed reimbursement for services in which "the description of the . . . services [was] facially incorrect" – the description of factual falsity acknowledged by VNSNY. Memo. in Support of Mot. to Dismiss at 8 n.6.

In response, VNSNY argues that Lacey has not alleged that any of its final submissions were false and that VNSNY would have been entitled "to any final *adjusted* payment." Reply Memo. in Support of Mot. to Dismiss, Dkt. No. 32, at 6 (emphasis added). VNSNY apparently suggests that it disclosed its failure to meet Plan of Care requirements to the relevant government entities. However, the First Amended Complaint alleges at length that VNSNY failed to abide by patients' Plans of Care but nevertheless submitted the unaltered Plans when seeking reimbursement, and the Court must take these allegations as true at the motion to dismiss stage. For example, after listing numerous reports in which approximately 50% of patients had not received care as listed in their Plans, *see* FAC ¶¶ 33-35, Lacey alleges that these reports "represent just a small sampling of the overwhelming evidence . . . demonstrating the company's widespread and longstanding practice of ignoring what is contained in the patient Plans of Care, *but nevertheless billing and receiving reimbursement* from Medicare and Medicaid anyway *without disclosing this critical failure,*" *id.* ¶ 36 (emphasis added). Lacey also details fourteen specific patients who received only small fractions of the visits outlined in their Plans of Care (including two who received no visits at all), *id.* ¶¶ 44-46, and alleges that "[i]n none of these cases . . . . did VNSNY disclose to the government in connection with either its RAP or final

claim for payment that it did not provide – and never had any intention of providing – a sizeable portion of the visits and services ordered in the Plan of Care," *id.* ¶ 47.  These allegations are sufficient to allege that VNSNY submitted fraudulent claims for reimbursement to Medicare (rather than claims for adjusted pay, as VNSNY suggests).

## 2.   Implied False Certification Theory

Lacey's allegations are also sufficient to allege an FCA claim under a theory of implied false certification: First, VNSNY's failure to disclose its noncompliance with patients' Plans of Care made its claims for reimbursement to the government "misleading half-truths." *Escobar*, 136 S. Ct. at 2001.  Second, VNSNY submitted RAPs when it knew it would not – and could not – provide care to patients as specified in the Plan of Care.  The failure to disclose this knowledge misled CMS to believe that VNSNY intended to follow the Plans of Care as required.

### a)   Specific Representations about Services

In support of this claim, Lacey has sufficiently pleaded that VNSNY made specific representations to the government as part of its requests for payment, as required by *Escobar*. *See id.*  When submitting RAPs and final claims for payment, VNSNY was required to provide specific codes designated by CMS, including the "*Type of Bill Code*, which represents the RAP and final claim are being submitted for home health services provided under a Plan of Care" and the "*Revenue Code*, which represents all services . . . provided to the patient in line item detail, including the number of 15 minute increments for each service," and numerous other codes such as the "*Treatment Authorization Code*."  Memo. in Opp. to Mot. to Dismiss, Dkt. No. 30, at 14 n.16; FAC ¶¶ 97-98; *see also* CMS Medicare Claims Processing Manual, *supra*, §§ 10.40.1-2 (outlining various codes to be entered in RAPs and final claims for payment submitted to CMS by HHAs).  VNSNY's use of such codes was a sufficient representation to render its claims

misleading. *Escobar*, 136 S. Ct. at 2000-01 ("By using payment and other codes that conveyed this information without disclosing [the defendant's] many violations of basic staff and licensing requirements for mental health facilities, Universal Health's claims constituted misrepresentations.").[4]

VNSNY argues that Lacey's allegations are insufficient because "[n]owhere does Lacey identify which of those payment codes (if any), appearing on which actual claims forms, were false or misleading, or why they were so." Reply Memo. in Support of Mot. to Dismiss at 6. First, Lacey has sufficiently pled that certain of the pay codes required on CMS payment requests were misleading in context. For example, in order to receive CMS payment for home health services, VNSNY was required to use the billing code 032x – "Home Health Services *under a Plan of Treatment*" on its RAPs. CMS Medicare Claims Processing Manual § 10.40.2 (emphasis added); *see also* Memo. in Opp. to Mot. to Dismiss at 14 n.16 (describing payment codes). This is plausibly misleading in light of VNSNY's alleged knowledge that it would not comply with the Plan of Care in approximately half of the cases it accepted and its alleged knowledge when submitting final payments that it had, in fact, not complied for many patients for whom it received reimbursement. FAC ¶ 47 ("[I]n no instance did VNSNY disclose to the government in connection with either its RAP or final claim for payment that it did not provide – and never had any intention of providing – a sizeable portion of the visits and services ordered in the Plan of Care . . . ."); *see also id.* ¶¶ 44-46 (listing patients for whom VNSNY received payment from CMS without disclosing failure to follow Plan of Care). Similarly, when VNSNY

---

[4] Because the Court finds that the First Amended Complaint sufficiently alleges that VNSNY made specific representations to the government in connection with claims for repayment, it does not address Lacey's alternative argument that the Supreme Court's decision in *Escobar* did not overrule the prior rule in this circuit that mere submission of claims without any representations may in some circumstances be sufficient to support a claim based on an implied false certification. *See* Memo. in Opp. to Mot. to Dismiss at 14 & n.15.

submitted an itemized list of services provided under the CMS Revenue Code, CMS Medicare

Claims Processing Manual § 10.40.2; Memo. in Opp. to Mot. to Dismiss at 14 n.16, this

plausibly implied that the services were provided in accordance with the required Plan of Care.

The Court also disagrees with VNSNY that Lacey did not allege *where* these codes appeared.

Lacey has alleged – and CMS's own requirements confirm – that they were required to be listed

on either (or both) the RAP and final claim for payment, and Lacey has provided examples of

over a dozen specific patients for whom he claims reimbursement was requested and received

despite not complying with those patients' Plans of Care. *See* FAC ¶¶ 44-47.

> b)   Materiality

Lacey has also successfully alleged that VNSNY's misrepresentations that it both

intended to follow and did ultimately follow patients' Plans of Care were material to CMS's

decision to pay its claims.  The First Amended Complain cites dozens of regulations suggesting

that following the Plan of Care is a condition for CMS payment,[5] as well as a central component

of the Medicare program.  *See* FAC ¶¶ 50-51.  Most significant among them, a federal regulation

specifies that "[i]n order for home health services to qualify for payment under the Medicare

program," the services must be provided by a home health agency that "[m]eets the conditions of

participation for HHAs."  42 C.F.R. § 409.41(a)(1); *see also* FAC ¶ 50.  Among the conditions of

participation, the law requires that HHAs only accept patients "on the basis of a reasonable

expectation that the patient's medical, nursing, and social needs can be met adequately by the

agency."  42 C.F.R. § 484.18.  The conditions of participation also include developing Plans of

Care with the referring physician and consulting that referring physician to approve

"modifications to the original plan," *id.* § 484.18(a), HHA staff "promptly alert[ing] the

---

[5] While *Escbar* admonishes that mere designation as a condition of payment is not necessarily sufficient to prove materiality, it is nonetheless an important factor to consider in favor of materiality. *See* 136 S. Ct. at 2001.

physician to any changes that suggest a need to alter the plan of care," *id.* § 484.18(b), and HHA

personnel only administering treatments in conformance with physician orders, *id.* § 484.18(c);

*see also* FAC ¶¶ 50-51. A further condition of participation is that "[t]he HHA furnishes skilled

nursing services . . . in accordance with the plan of care." 42 C.F.R. § 484.30; *see also id.*

§§ 484.32-34 (same for therapy services and medical social services). VNSNY's unilateral

decision, as alleged in the First Amended Complaint, to provide far fewer services than ordered

by the referring physician (and foreknowledge that it regularly failed to provide the prescribed

services in half of its patients' Plans of Care) violates all of these conditions of participation, and

thus the conditions of payment under 42 C.F.R. § 409.41. Similarly, Medicare will pay for home

health services "*only if* a physician certifies and recertifies" the Plan of Care, which involves

attesting that a Plan of Care was established and periodically reviewed by the physician and that

the services specified in the Plan of Care "*were furnished* while the individual was under the care

of a physician." *Id.* § 424.22 (emphasis added); FAC ¶ 50.

VNSNY argues that these regulations (and the others cited in the First Amended

Complaint) do not establish that *all* of the visits listed in a Plan of Care must be provided as a

precondition for payment. *See* Reply Memo. in Support of Mot. to Dismiss at 2. Citing to 42

C.F.R. § 424.22, VNSNY instead asserts that the only conditions of payment are that a Plan of

Care be established and that it be periodically reviewed by a physician. *Id.* First, this argument

ignores the express requirements of several regulatory provisions cited by Lacey and quoted

above. Second, even if VNSNY's argument were correct that these regulatory provisions were

not technically express conditions of payment, they would nonetheless establish that following

the Plan of Care is a central concern for CMS. Under *Escobar*, a requirement need not be

labeled an express condition of payment in order to be material to the government's payment decision. *See* 136 S. Ct. at 2001-02.

Lacey has further pled the materiality of following the Plan of Care through CMS's guidance and manuals. *See* FAC ¶¶ 52-54.  In CMS's Interpretive Guidelines, it states that "[i]f the HHA provides fewer visits than the physician orders, it has altered the plan of care and the physician must be notified. The HHA must maintain documentation in the clinical record indicating that the physician was notified and is aware of the missed visit." State Operations Manual, Appendix B, § 484.18, at G158.  Similarly, the CMS Benefit Policy Manual requires that the Plan of Care be implemented except when changes are made by the referring physician and that, prior to an HHA submitting a final claim for payment, "[a]ny changes in the plan of care must be signed and dated by a physician."  Medicare Benefit Policy Manual, Pub. No. 100-02, § 10.6B.  CMS's Medicare Claims Processing Manual also states that "HHAs may not submit [a final] claim until after *all* services are provided for the episode and the physician has signed the plan of care and any subsequent verbal order."  § 10.1.10.4 (emphasis added); *see also id.* § 20.1.1 (describing the centrality of physicians in decisionmaking).  Thus, a final claim represents that all services have been provided and that if there has been a divergence from the original Plan of Care, it was at the direction of a physician and has been signed by the physician to demonstrate such.  Similarly, CMS advises patients that an HHA "must give you all of the home care listed in your plan of care, including services and medical supplies."  Medicare & Home Health Care, Prod. No. 10969, at 19 (rev. Sept. 2017).  Patients are further instructed to report to CMS any incidents of fraud, including "[h]ome health visits that your doctor ordered, but that you didn't get."  *Id.* at 24.

19

Lacey also cites to numerous cases in which CMS either denied home health agencies'
requests to participate in the Medicare program or terminated agencies for providing services
below the level prescribed in the patients' Plans of Care. *See* FAC ¶¶ 55-57. For example, in
*Techota, LLC v. Centers for Medicare Medicaid Services*, DAB No. CR1886, 2009 WL 1176334
(2009), CMS denied an HHA the ability to participate in Medicare because it had failed to
provide two patients all the services in their Plans of Care. *Id.* at *3. The Department of Health
and Human Service's Departmental Appeals Board upheld this decision, recognizing that a
"failure to follow the plan of care is breach of the regulatory requirement . . . . Failure to provide
the frequency of the visits prescribed for rendering skilled nursing care is indeed a significant
deficiency and a failure to meet the required standard." *Id.* at *5. This case, along with the
others cited by Lacey, provide further evidence that CMS may cancel participation in the
Medicare program – to say nothing of payment for any particular claim – for diverging from the
physician-established Plan of Care. That, as pled, satisfies the materiality requirement.

VNSNY argues that these cases are irrelevant because they concern participation in the
Medicare program rather than payment decisions of CMS. First, because payment is conditioned
on the HHA complying with the requirements of participation, *see* 42 C.F.R. § 409.41(a)(1),
CMS's determination that HHAs are not qualified to participate in the Medicare program thus
reflect that CMS could also consider those HHAs not entitled to payment on particular claims.
Second, CMS's decisions to terminate other HHAs that did not follow patients' Plans of Care
suggest that, had VNSNY not misled CMS (as alleged in the First Amended Complaint), it too
would have been terminated from participating in the program. As such, it may plausibly be
inferred that VNSNY received payment on its claims only through fraud because Lacey has
sufficiently alleged that CMS would have terminated their participation – and therefore their

ability to receive *any* payments related to *any* clients – if it had known about VNSNY's routine practices.

VNSNY also argues that the decisions cited by Lacey do not demonstrate that following Plans of Care is material to CMS's payment decisions because those cases involved HHAs that "failed to comply with numerous Medicare conditions of participation." Memo. in Support of Mot. to Dismiss at 10 n.7. However, as the HHS Departmental Appeals Board reasoned in *Techota*, failing to comply with the Plan of Care is itself a "significant deficiency." 2009 WL 1176334, at *5. While CMS may be even more likely to terminate a provider who violates multiple conditions of participation, these decisions nonetheless demonstrate that failing to follow Plans of Care can affect whether CMS will allow a provider to participate in the Medicare program (and, by extension, to pay its claims for reimbursement). This is sufficient to plead materiality under *Escobar*. *See* 136 S. Ct. at 1996.

### 3.    Fraudulent Inducement Theory

In contrast to the theories above, Lacey has not alleged sufficient facts to support a theory of fraudulent inducement. Lacey's argument in support of this theory is two sentences. The first asserts that "if patients and their treating physicians knew that . . . VNSNY had no intention of following the Plan of Care, they never would have selected VNSNY in the first place." Memo. in Opp. to Mot. to Dismiss at 13. This statement is irrelevant to the FCA, which concerns whether VNSNY fraudulently induced *the government* to pay its claims. *See Wells Fargo Bank, N.A.*, 972 F. Supp. 2d at 623 ("[C]ourts have repeatedly held that the 'use of fraudulent information to induce the Government to provide a loan guarantee' or other contract 'constitutes a false claim under the FCA.'" (quoting *United States v. Eghbal*, 548 F.3d 1281, 1283 (9th Cir. 2008))). The second sentence states that "the government [would not] have provided payment

(either RAP or final) had it known VNSNY intended to . . . so blatantly disregard the Plan of Care." Memo. in Opp. to Mot. to Dismiss at 13. This fails to allege that VNSNY made an affirmative representation to the government that it intended to follow patients' Plans of Care or that this representation induced CMS to contract with VNSNY. To the extent that Lacey alleges that merely by requesting approval to provide home health services under Medicare VNSNY implied that it would adhere to such requirements, this is a claim for implied false certification rather than a claim for fraudulent inducement.

### C.   Relator Has Alleged a Prima Facie Claim Based on VNSNY'S Falsified Personnel Visit Records

Lacey's allegations that VNSNY nurses (and other personnel) regularly falsified records of patient visits and that VNSNY nonetheless reported these visits in its claims for CMS payment sufficiently state a claim under the FCA. Lacey has plausibly alleged his factual falsity claim through records of specific nurses who reported making a number of visits each day that was unrealistic, if not impossible, see FAC ¶¶ 68-70, as well as highlighting that nurses regularly do not provide the required verification of patient visits, see id. ¶ 72. Together, these allegations support the plausible inference that nurses were regularly not making required patient visits and falsifying records with VNSNY's knowledge, deliberate ignorance, or reckless disregard. He has thus sufficiently alleged that VNSNY submitted claims for visits that never occurred and that VNSNY knew or should have known that many of these visits were, in fact, fraudulent.[6]

VNSNY argues that the Court should not draw the inference that nurses did not actually visit patients because there are alternative, innocent explanations for the impossible visit times

---

[6] VNSNY's attempt to characterize this claim as a failure to follow self-imposed regulations regarding patient signatures, Memo. in Support of Mot. to Dismiss at 11-12, is unavailing. Lacey has alleged a claim for "fraudulent billing" that merely uses visit verification data as evidence that such fraud occurred. See FAC ¶ 73; see also id. ¶¶ 68-70.

that "render [the] plaintiff's inferences unreasonable." Memo. in Support of Mot. to Dismiss at

13 (alteration in original) (quoting *Pantoja*, 545 F. App'x at 49). As alternative explanations,

VNSNY suggests that (1) many patients were densely clustered, allowing for many visits in

rapid succession (particularly in institutional care facilities); (2) some visits, such as insulin

shots, are "routine and quickly completed," and (3) the data more likely suggest sloppy record

keeping, such as completing documentation "after all visits were completed." Memo. in Support

of Mot. to Dismiss at 14.

　　　VNSNY's first two suggested explanations are not themselves plausible explanations of

the evidence Lacey has presented, and therefore fall far short of explanations so obvious that

Lacey's proposed inferences are therefore unreasonable. *See, e.g.*, *In re Commodity Exch., Inc.*,

213 F. Supp. 3d 631, 649-50 (S.D.N.Y. 2016) ("*Iqbal* does not require the complaint to allege

'facts which can have no conceivable other explanation, no matter how improbable that

explanation may be.'" (quoting *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 360 (2d Cir.

2013))). The First Amended Complaint includes records for twelve nurses who each visited

between 3000 and 4000 patients in 2013. FAC ¶ 68. To meet such numbers, the nurses would

have been required to visit approximately 20 patients every single day on which they worked for

the entire year. *See id.* It can thus plausibly be inferred that these twelve nurses did not visit

numerous patients in a single facility every single workday of 2013 or that many of their patients

required only insulin injections (or other quick treatments) on every single visit. Moreover,

VNSNY's arguments do not account for the First Amended Complaint's specific allegations

about how far nurses had to travel and the time between those visits, such as Employee ID

97535, who claimed to have done 20 visits at 19 different addresses in Manhattan on January 20,

2014 (all without patient signatures as verification); Employee ID 99700, who claimed to visit 3

23

patients at 3 different addresses (2 miles apart in total) in just 35 minutes on January 24, 2014 (a day on which he or she claimed to visit 18 patients at 16 different addresses in total); or Employee ID 31877, who allegedly visited sixteen patients in a congregate care facility on March 17, 2014, including three patients in a seven-minute window.  FAC ¶ 70.

Regarding VNSNY's third explanation, it is plausible that some of the impossibly short nurse visits contained in the First Amended Complaint could be accounted for by sloppy recordkeeping by individual nurses, such as recording all of a day's visits at the end of the day.[7] Yet even if the Court accepts this explanation as plausible, it does not provide a basis for dismissing the First Amended Complaint.  To survive a motion to dismiss under Rule 12(b)(6), Lacey only must demonstrate that his allegations are plausible.  As the Second Circuit has directed, "[t]he question at the pleading stage is not whether there is a plausible alternative to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 189 (2d Cir. 2012).  Indeed, when considering a motion to dismiss, "it is not the province of the court to dismiss the complaint on the basis of the court's choice among plausible alternatives. Assuming that [the plaintiff] can adduce sufficient evidence to support its factual allegations, the choice between or among plausible interpretations of the evidence will be a task for the factfinder." *Id.* at 190.  Because Lacey has provided sufficient allegations for the Court to draw the plausible inference that VNSNY's nurses regularly falsified visits about which VNSNY knew or should have known, his claim survives the motion to dismiss regardless of whether there may be a plausible innocent explanation for some of the alleged fabrications.

---

[7] This explanation does not account, however, for nurses who claim to have visited 19 or 20 patients every single work day to total over 3000 visits for the year.  This is not a question of when patient visits were recorded, but rather of the number of visits that are possible over the course of an entire work year.

Finally, VNSNY argues that Lacey's false visits claim should be dismissed because he has not alleged that the false visits "had any impact on the acuity-based reimbursement tier payable for that episode." Memo. in Support of Mot. to Dismiss at 15. However, as explained in connection with Lacey's first claim, the question is not whether the false nursing visits caused CMS to pay extra but whether, had CMS known that VNSNY was not making the number of visits it reported (and that were called for in the Plan of Care), it would have naturally tended to not pay those claims (or continued to allow VNSNY to participate in Medicare and Medicaid at all). *See Escobar*, 136 S. Ct. at 1996, 2001. Because the Court finds that these alleged misrepresentations could be material to CMS's payment decision, Lacey has alleged sufficient facts to survive VNSNY's motion to dismiss.

### D.   Relator Has Alleged a Prima Facie Claim Based on VNSNY'S Home Health Aide Billing

Lacey has also sufficiently pleaded three claims relating to VNSNY's provision of home health aide services: first, that VNSNY re-codes services that are not eligible for repayment under Medicare as services that are eligible, thus knowingly submitting fraudulent claims for payment to CMS; second, that VNSNY improperly bills visits to Medicaid that should be submitted to Medicare, effectively double-billing CMS; and third, that VNSNY does not comply with home health aide supervision requirements despite representing to the State of New York that it has done so.

### 1.   Recoding

Lacey alleges that VNSNY recodes services that were "custodial care" services, which are not eligible for CMS reimbursement, as "personal care" services that are covered by Medicare. *See* FAC ¶¶ 75-81; *see also* 42 C.F.R. § 409.49(d). Lacey further alleges that VNSNY encourages its personnel to record hours as covered personal care services by using a

25

specially designed phone system that requires home health aide workers to record personal care services in order to record custodial care services. *See* FAC ¶¶ 80-81. Lacey has thus sufficiently pleaded that VNSNY has submitted factually false claims to CMS for repayment.

VNSNY responds that it is allowed to bill for custodial care services "incidental to a visit for the provision of [covered] care." Memo. in Support of Mot. to Dismiss at 17 (alteration in original) (quoting 42 C.F.R. § 409.45(b)(4)). In effect, VNSNY argues that all of the miscoded time was actually custodial care provided incidental to personal care. However, at the motion to dismiss stage, the Court must accept all of Lacey's allegations as true, including that the service hours described in the First Amended Complaint were not incident to personal care services and thus "none of these services were eligible for reimbursement."[8] FAC ¶ 78; *accord id.* ¶ 77.

VNSNY also suggests that, even accepting Lacey's allegations, no false claims were made to CMS because additional services would not have resulted in greater payment. However, for the same reasons explained above, the First Amended Complaint sufficiently alleges that it would have been material to CMS's payment decisions whether VNSNY had complied with the number of home health aide visits specified in the patients' Plans of Care, and thus absent the fraudulent recodings, CMS would have tended not to pay VNSNY. *See* FAC ¶¶ 81, 101, 108. That is sufficient at the Rule 12(b)(6) stage.

### 2.    Dual Billing

Lacey has also sufficiently alleged that, despite CMS's express directive that Medicaid be the "payor of last resort," FAC ¶ 82 (quoting The State Medicaid Manual, Pub. No. 45, § 3900.1), VNSNY bills only two hours to Medicare for dual-eligible patients and bills the rest to

---

[8] Lacey has provided evidentiary support for these allegations. For example, he cites to service hours that were improperly recoded as being listed in a VNSNY document titled "PIC_SchedsWithoutPersonalTasks.xls." FAC ¶ 77. The import of that title is that the hours were custodial tasks *not* associated with personal care tasks rather than, as VNSNY suggests, custodial tasks that occurred alongside personal care tasks.

Medicaid, thereby receiving full episodic rates from both services, *see id.* ¶¶ 82-88. Lacey has alleged that senior management personnel were specifically aware of the practice and knew that it was wrong, *see id.* ¶¶ 87-88, and that VNSNY management was warned by a healthcare consultant "you may want to make sure you don't have a whistleblower on this stuff," *id.* ¶ 88.

VNSNY's assertion that these allegations do not support the conclusion that VNSNY submitted false claims because "reimbursement is made on a flat, episodic basis and not premised on a fee-for-service or per-hour methodology," Memo. in Support of Mot. to Dismiss at 17, is misguided. First, the First Amended Complaint makes clear that prior to 2012, Medicaid *was* billed on an hourly fee-for-service basis, and that VNSNY therefore billed primarily to Medicaid to receive greater reimbursement. FAC ¶ 83. Second, the First Amended Complaint acknowledges that payment after 2012 is episodic for both Medicare and Medicaid, but alleges that by billing to both Medicare and Medicaid for all dual eligible payors, VNSNY still receives double payment for the patient that it would not receive if it only billed to Medicare. *Id.* ¶¶ 84, 86. That this system was fraudulent (and that VNSNY recognized it as such) is confirmed by the numerous alleged statements by VNSNY executives and those they consulted about the double-billing practice. *See id.* ¶¶ 87-88.

### 3. Supervision

Finally, Lacey has sufficiently alleged, under an implied false certification theory, that VNSNY submitted false claims to CMS and the State of New York when it submitted claims for payment that included home health aide services without disclosing that those services were provided without mandated supervision by a nurse or therapist. *See id.* ¶¶ 89-91. As discussed above, the payment codes on RAPs and final claims constituted "specific representations" under *Escobar* that were misleading half-truths in light of VNSNY's omissions, *see* 136 S. Ct. at 2001.

Lacey has succeeded in alleging materiality with regard to claims for reimbursement to the State of New York.  However, he has not pleaded sufficient facts to prove materiality for the analogous federal FCA claim.  Lacey has alleged – and VNSNY does not dispute – that New York previously found VNSNY had violated this requirement for 2003-2004 and required VNSNY to return approximately $66 million in overpayments from state Medicaid.  *See* FAC ¶ 91; *see also* 18 N.Y.C.R.R. § 505.23(a)(1)-(a)(2)(iii) (conditioning payment on providing home health aide services under supervision of a registered nurse or therapist).  That the defendant has previously been forced to return money for violating the same requirement they are alleged to have violated is clear evidence that following the requirement is material to New York's payment decisions.  *See Escobar*, 136 S. Ct. at 2003.

In contrast, with respect to the materiality of supervision for CMS's payment, Lacey asserts that "Medicaid treats [the supervision requirement] as a strict condition of payment." FAC ¶ 90.  This statement is no more than a "mere conclusory statement[]," which is insufficient on its own to plausibly allege a claim.  *Iqbal*, 556 U.S. at 678.  While the First Amended Complaint need not provide proof of its claims, it must do more than offer "'naked assertion[s]' devoid of 'further factual enhancement.'"  *Id.* (alteration in original) (quoting *Twombly*, 550 U.S. at 557).  Lacey offers no "further factual enhancement" here, however: he makes no allegations that, for example, CMS has passed a regulation labeling supervision as an express condition of payment; nor has he alleged that in other instances, CMS has denied payment or required reimbursement for an agency's violation of the supervision requirement.  By failing to allege any specific ways in which CMS has treated the supervision requirement as a condition of payment, Lacey has provided the Court with only a bare conclusory assertion, and as a result, he has "not nudged [his] claim[] across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.

In sum, Lacey has sufficiently pleaded all of his claims as required by Rule 12(b)(6) with the exception of his federal FCA claim regarding VNSNY's failure to require home health aides to be regularly supervised by a nurse or therapist. The Court therefore moves on to consider whether the remaining claims also survive the additional pleading requirements of Rule 9(b).

## III. RELATOR HAS ALLEGED VIOLATIONS OF THE FALSE CLAIMS ACT WITH PARTICULARITY AS REQUIRED BY RULE 9(B).

### A. Standard of Review

In addition to satisfying Rule 12(b)(6), False Claims Act claims must also satisfy the requirements of Federal Rule of Civil Procedure 9(b). *United States ex rel. Scharff v. Camelot Counseling*, No. 13-cv-3791 (PKC), 2016 WL 5416494, at *2 (S.D.N.Y. Sept. 28, 2016). Rule 9(b) requires that when alleging fraud, a party "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. Proc. 9(b). To satisfy Rule 9(b), pleadings "must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Bishop*, 823 F.3d at 43 (citation omitted). The purposes of Rule 9(b)'s particularity requirement are (1) "to provide a defendant with fair notice of a plaintiff's claim," (2) "to safeguard a defendant's reputation from improvident charges of wrongdoing," (3) "to protect a defendant against the institution of a strike suit," and (4) "to discourage the filing of complaints as a pretext for discovery of unknown wrongs." *Wood ex rel. United States v. Applied Research Assocs., Inc.*, 328 F. App'x 744, 747 (2d Cir. 2009) (citations omitted).

To plead submission of a false claim with particularity, "[i]n cases with extensive schemes, plaintiffs can satisfy this requirement in two ways: (1) providing sufficient identifying information about all the false claims, or (2) providing example false claims." *United States ex rel. Kester v. Novartis Pharm. Corp.*, 23 F. Supp. 3d 242, 258 (S.D.N.Y. 2014). Some kinds of

identifying information district courts have found satisfy the requirement are "dates of claims, contents of claims, identification numbers, reimbursement amounts, goods or services provided, and individuals involved in the billing." *Khurana*, 2016 WL 6652735, at \*16. However, "the adequacy of particularized allegations under Rule 9(b) is . . . case- and context-specific." *United States ex rel. Chorches v. Am. Medical Response*, 865 F.3d 71, 81 (2d Cir. 2017) (alteration in original) (quoting *Espinoza ex rel. JPMorgan Chase & Co. v. Dimon*, 797 F.3d 229, 236 (2d Cir. 2015)). "[T]here is no 'checklist of mandatory requirements' for every complaint." *Wood*, 2017 WL 1233991, at \*30 (citation omitted).

While Rule 9(b) requires particularity, "[i]t is not the purpose of Rule 9(b), as applied to FCA *qui tam* actions, to render the FCA toothless as to particularly clever fraudulent schemes." *Chorches*, 865 F.3d at 86; *see also Wood*, 2017 WL 1233991, at \*33 ("The purpose of Rule 9(b)'s heightened standard is to ensure that defendants have sufficient notice – not to immunize them from suit at the outset."). The rule "demands specificity, but . . . it does not elevate the standard of certainty that a pleading must attain beyond the ordinary level of plausibility." *Chorches*, 865 F.3d at 88. Moreover, as the Second Circuit recently instructed, if a relator alleges facts supporting a strong inference that the defendant violated the FCA but there is a dispute regarding whether Rule 9(b) has been entirely satisfied, the proper resolution may be a targeted discovery process rather than outright dismissal:

> Where a *qui tam* relator . . . makes allegations leading to a strong inference that specific false claims were submitted, defendants could initially be required to provide discovery only with respect to the cases identified in the complaint. If no genuine dispute of material fact is found to exist as to whether false claims were in fact submitted in that limited set of cases, the lawsuit would be at or near its end. If the initial inquiry produces evidence that seems to bear out the complaint's assertions, however, the door could be open to broader discovery without fear of subjecting an innocent defendant to burdensome and unjustified inquiries. We do not undertake to direct any particular approach to regulating discovery; that is left

to the discretion of the district court.  We note only that limitations on discovery to prevent open-ended, expensive fishing expeditions are plainly available.

*Id.* at 88 n.13 (citations omitted).

### B.       Relator's Claims Satisfy Rule 9(b)

As outlined below, Lacey has pleaded the various fraudulent actions of VNSNY with particularity to satisfy Rule 9(b) as to all but one of his claims.  He has sufficiently alleged that VNSNY's actions were fraudulent regarding its failure to follow patient Plans of Care, its submission of claims in which nurses falsified patient visits, its miscoding of custodial care services as personal care services, and its submission of claims including home health aide services which were not provided in compliance with supervision requirements.  However, as explained below, Lacey has failed to allege with particularity that VNSNY improperly billed Medicaid for dually eligible patients.

### 1.       Plan of Care Fraud

Lacey has pleaded with sufficient particularity that VNSNY committed fraud by submitting claims to CMS in which it had not provided services in accord with patients' Plans of Care.

Although the First Amended Complaint does not provide identifying information for individual false claims, it provides adequate information to satisfy the context-specific requirements of Rule 9(b).  It identifies numerous patients by unique numbers used by VNSNY in which claims were falsified.  *See* FAC ¶ 33 (identifying Patient Case Nos. xxx-0714, xxx-1454, xxx-4280, xxx-2446, and xxx-6863 as not receiving therapies required under their Plans of Care); *id.* ¶ 45 (identifying four additional patients by case number).  Lacey further identifies particular patients who did not receive all of the services required in their Plans of Care whose claims were submitted to CMS without altering those Plans, as well as the specific amount of

payment received from CMS. *See id.* ¶¶ 44, 47 (identifying ten patients for whom this was true). This is sufficient to satisfy Rule 9(b) and put defendant on notice about what claims are alleged to be fraudulent. *See Kester*, 23 F. Supp. 3d at 258 (suggesting as types of sufficient identifying information patient identity, date(s) of service, reimbursement amounts, services provided, and the government entity that reimbursed the claim); *see also Wood*, 2017 WL 1233991, at *31 ("By providing the names, locations, and relevant time periods [during which false claims were made], Allergan can 'connect the dots' to determine the pharmacies (and subsequent claims) that were produced by the underlying [fraudulent] scheme.").

Lacey also has alleged that specific internal corporate documents identified patients for whom VNSNY had not satisfied the Plans of Care. *See* FAC ¶¶ 33-35 (identifying "Rehab Delays 4-22-14.xls," "Therapy services not provided as of May 9," "UNDER_OVER UTILIZATION REPORT [#2024374].pdf," and "Late Starts of Care as of May 29, 2014" as lists and reports identifying patients). These documents provide VNSNY with clear notice of particular patients and the attendant claims Lacey is identifying as fraudulent, and allows VNSNY to disprove the alleged fraud through documentation concerning the patients within those reports, satisfying Rule 9(b). *See, e.g.*, *Wood*, 2017 WL 1233991, at *31 (finding Rule 9(b) satisfied where no particular false claim for payment was specifically identified because the claims were part of a sufficiently "defined pool").

Lacey has further alleged that these specific examples were part of a larger pattern of fraud. This includes statements from specific managers at VNSNY that VNSNY "never" followed the rule that HHAs only accept patients for whom it expects to be able to fulfill the Plan of Care requirements and that "roughly half" of VNSNY's patients did not receive services in accordance with the Plans of Care. FAC ¶¶ 31-32. Similarly, in a meeting with VNSNY Vice

Presidents, individuals overseeing management of VNSNY in different geographical zones explained that large numbers of patients were not receiving the services ordered in patient Plans of Care. *Id.* ¶¶ 38-39.  As a result, Lacey has identified specific claims and alleged a broader fraud scheme. *See Kester*, 23 F. Supp. 3d at 258.

### 2.    False Personnel Visit Records

Lacey has provided similarly sufficient information regarding VNSNY's use of falsified records of nurse and other personnel visits to patients.  The First Amended Complaint identifies twelve nurses who, in 2013, claimed to have conducted over 3000 visits, which would require visiting nearly 20 patients each working day of the year.  FAC ¶ 68.  These nurses are identified by unique Employee ID numbers.  By identifying the employees conducting fraud, along with the time period in which the fraud was committed, the First Amended Complaint satisfies the requirements of Rule 9(b).  *See Wood*, 2017 WL 1233991, at *31.  Lacey similarly identifies specific nurses by Employee ID number who, on particular dates, claimed to have visited an improbable (if not impossible) number of patients.  *See* FAC ¶ 70.  The First Amended Complaint bolsters this claim with a series of nurses – identified by Employee ID numbers – who failed to obtain patient signatures in more than half of their visits (including three nurses who did not obtain a single patient signature during the entire three-month period).  *See id.* ¶ 72.

Together, these allegations satisfy the purpose of Rule 9(b): VNSNY is on notice about the nurses whose practices form the basis of the false claims allegations, it has at its disposal the ability to combat these allegations and defend its reputation by providing an Answer explaining these nurses' practices, and the allegations are sufficiently specific to assure that this is not merely a strike suit or a fishing expedition for discovery into unknown wrongdoing.  *See Wood*, 328 F. App'x at 747.

VNSNY argues that Lacey has failed to allege that VNSNY billed and received payment from CMS for any of these claims. However, Lacey has alleged that specifically for the claims described in paragraph 70 of the First Amended Complaint, "VNSNY has billed and received payment from Medicare and Medicaid." FAC ¶ 71. While Lacey does not provide a claim number or billing date for these claims, the employee information, dates, locations, and patient numbers contained therein is sufficient to plead with particularity under Rule 9(b). Requiring Lacey to also provide claim numbers, billing amounts, or the actual bills themselves, *see* Memo. in Support of Mot. to Dismiss at 21, would turn Rule 9(b)'s requirements into a certainty requirement in contravention of the Second Circuit's directive in *Chorches*. 865 F.3d at 88.

VNSNY also argues, once again, that the evidence of nurses' practices is consistent with negligence rather than fraud. *See* Memo. in Support of Mot. to Dismiss at 21-22 (citing *Scharff*, 2016 WL 5416949). However, nothing in Rule 9(b) requires Lacey to provide further information tending to prove that the defendant's actions were fraudulent rather than some other explanation. *See Bishop*, 823 F.3d at 43 (Rule 9(b) requires a plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent" (citation omitted)). The First Amended Complaint satisfies Rule 9(b)'s requirement regardless of whether VNSNY may be able to establish a plausible alternative explanation for some of its nurses' recordkeeping.

### 3. Home Health Aide Fraud

Lacey has particularly alleged two of his three allegations regarding VNSNY's fraud in connection with its provision of home health aide services. First, with respect to fraudulently miscoding custodial care services as personal care services, Lacey has provided the unique client

identification numbers for patients whose care was miscoded, the number of hours that were

miscoded, the range of dates on which the services were provided, and in one case, the title of

the VNSNY internal report on which that information can be found. *See* FAC ¶¶ 77-78. He has

also alleged that these miscoded hours were submitted to CMS. *See id.* This identifying

information is sufficiently specific, *see Kester*, 23 F. Supp. 3d at 258, and satisfies the purposes

of Rule 9(b) such as allowing VNSNY to identify the allegedly fraudulent claims and to ensure

that Lacey does not merely seek discovery for unknown wrongs.

Second, Lacey has alleged with particularity that VNSNY has submitted claims to the

State of New York without disclosing its failure to supervise home health aide workers under the

requirements of New York law. *See* FAC ¶¶ 89-91. The First Amended Complaint identifies

specific patient identification numbers for cases in which supervision requirements of Medicaid

and state law were not followed, how many supervision visits were missed in the year 2013, and

the title of the VNSNY internal report detailing this information. *See id.* ¶ 90. Lacey also gives

the precise number of instances in which VNSNY failed to meet the supervision requirements in

both 2013 and the first half of 2014 as detailed in VNSNY's internal report. *See id.* This

information is sufficient to satisfy Rule 9(b).

Lacey has failed, however, to allege with the required particularity that VNSNY has

improperly billed Medicaid for dually eligible patients. In connection with this claim, Lacey

relies on six years of aggregate data, which reflect that a higher portion of home health aide

hours were billed to Medicaid than to Medicare, *see id.* ¶ 85, and asserts that if VNSNY had

been properly billing CMS, "a much higher percentage of these hours would have been

apportioned to Medicare and VNSNY would have received substantially less reimbursement,"

*id.* ¶ 86. However, Lacey has not provided the types of identifying information courts look to

when assessing particularity: he does not provide a single patient's identification information, dates of service, types of service, amount billed, dates of claims, contents of claims, or individuals who were involved in providing the services or filing claims. *See Khurana*, 2016 WL 6652735, at *16; *Kester*, 23 F. Supp. 3d at 258. Lacey's argument amounts to an allegation that if he is allowed to receive discovery on six years' worth of claims for dually eligible patients, he believes that he can establish that in some (or even many or most) of those instances, Medicaid was improperly billed based on a data trend and the comments of several management personnel. This information is simply too nonspecific to burden VNSNY with defending that all of its claims for dually eligible patients over six years were accurately billed.

In sum, Lacey's claims survive Rule 9(b) with the single exception of his allegations that VNSNY fraudulently billed Medicaid for dually eligible patients.

## IV.   Lacey's Claims Are Limited by the Relevant Statutes of Limitations

VNSNY argues that the First Amended Complain "must be dismissed insofar as it alleges conduct outside the statutes of limitations." Memo. in Support of Mot. to Dismiss at 24 (formatting omitted). FCA claims must be brought within six years, 31 U.S.C. § 3731(b)(1), and claims brought under the New York False Claims Act must be brought within ten years, N.Y. State Fin. Law § 192. Lacey does not dispute that these statutes of limitations apply to his claims and that, as a result, his claims are limited to false claims made after July 28, 2008 for FCA claims and after July 28, 2004 for New York False Claims Act claims.

The Court concludes that the statutes of limitation do not require dismissal of any of Lacey's claims, however, because he has specifically alleged that false claims were made to CMS and the State of New York by VNSNY within the relevant time periods. It is only in fleeting statements like the one quoted by VNSNY, *see* Memo. in Support of Mot. to Dismiss at

24 ("Lacey alleges that VNSNY's relevant conduct 'has occurred since at least 2004.'" (quoting

FAC ¶ 92)), that Lacey makes any reference to VNSNY's actions occurring prior to 2008.  Thus

while the Court agrees that these statutes of limitation are applicable to Lacey's claims, it finds

that Lacey has sufficiently alleged that VNSNY submitted false claims within the statutes to

survive this motion to dismiss.

## V.   Conclusion

The motion to dismiss is GRANTED with respect to the first cause of action (alleging

violations of the federal False Claims Act) to the extent it claims that VNSNY failed to properly

supervise home health aide services or improperly billed Medicaid for dually eligible patients.

The motion to dismiss is DENIED as to all other allegations under the first cause of action.

The motion to dismiss is GRANTED with respect to the second cause of action (alleging

violations of New York's False Claims Act) to the extent that it claims that VNSNY improperly

billed the State for dually eligible patients.  The motion to dismiss is DENIED as to all other

allegations under the second cause of action.

This resolves docket number 26.

The Court will schedule an initial pretrial conference in this matter by separate order.

SO ORDERED.


Dated: Sept. 26 , 2017
    New York, New York


_____
          ALISON J. NATHAN

       United States District Judge